BETSY C. MANIFOLD (182450)
RACHELE R. BYRD (190634)
**WOLF HALDENSTEIN ADLER FREEMAN & HERZ LLP**
750 B Street, Suite 1820
San Diego, CA 92101
Telephone: (619) 239-4599
Facsimile: (619) 234-4599
manifold@whafh.com
byrd@whafh.com

*Attorneys for Plaintiff*

[Additional Counsel on Signature Page]

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| IN RE EXTREME NETWORKS, INC. STOCKHOLDER DERIVATIVE LITIGATION | Master File No. 3:25-cv-02101-TLT<br><br>**SECOND AMENDED VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**<br><br>**JURY TRIAL DEMANDED**<br><br>Judge Trina L Thompson |

Plaintiffs Nathan Turner ("Turner") and Abbas Hemani ("Hemani," and together, "Plaintiffs"), by their undersigned attorneys, derivatively on behalf of Nominal Defendant Extreme Networks, Inc. ("Extreme" or the "Company"), file this Second Amended Verified Shareholder Derivative Complaint against Edward B. Meyercord III, Rémi Thomas, Cristina Tate, Kevin Rhodes, John C. Shoemaker, Charles Carinalli, Edward H. Kennedy, Kathleen M. Holmgren, Raj Khanna, Ingrid Burton, Norman Rice, Jonas Brown, and Joseph A. Vitalone (collectively, the "Individual Defendants" and together with Extreme, the "Defendants") for breaches of their fiduciary duties as directors and/or officers of Extreme.

Plaintiffs allege the following against the Individual Defendants based upon personal knowledge as to themselves and their acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through their attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Extreme, news reports, securities analysts' reports and advisories about the Company, information readily obtainable on the Internet, and public filings in the related federal securities class action lawsuit filed in the U.S. District Court for the Northern District of California captioned *Steamfitters Local 449 Pension & Retirement Security Funds v. Extreme Networks, Inc., et al.*, No. 3:24-cv-05102 (the "Securities Class Action").[1] Plaintiffs believe that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1. This is a shareholder derivative action brought in the right, and for the benefit, of Extreme against certain of its officers and directors seeking to remedy Defendants' violations of law that have occurred from March 2022 to January 30, 2024 (the "Relevant Period"), and have caused, and continue to cause, substantial harm to Extreme Networks and its shareholders, including

[1] On April 8, 2026, Plaintiffs served a books and records demand on the Company, attached hereto as Exhibit A (exhibits omitted). In response, the Company refused to produce documents. *See* Exhibit B.

monetary losses and damages to Extreme Networks' reputation and goodwill, while enriching Defendants.

2. Extreme is a leading global provider of cloud-based computer networking equipment, along with related services and support. The Company specializes in designing, developing, and manufacturing wired, wireless, and software-defined wide area network (SD-WAN) infrastructure solutions. Around August 2019, Extreme shifted its strategic focus to cloud-based networking. This transition showed early signs of success, with analyst firm Omdia recognizing Extreme as the fastest-growing vendor in its 2020 Cloud-Managed Networking Market Report.

3. During the Relevant Period, unknown to investors, Extreme faced declining client demand as customers had over-ordered products during the COVID-19 pandemic to avoid supply shortages with limited alternative sourcing options. This over-ordering cannibalized future purchasing needs. Instead of fully disclosing these adverse demand trends, Extreme manipulated and accelerated the fulfillment of back orders sooner and in larger quantities than previously indicated, creating the illusion of sustained organic growth and strong client demand. By relying on back-order fulfillment to offset declining organic demand, the Company masked its challenges. Defendants further concealed the faster-than-expected backlog normalization and its impact on organic demand and revenue growth by making materially false and misleading statements about demand trends. They compounded the deception by, *inter alia*, ceasing the quarterly reporting of key metrics, such as backlog and Book to Bill Ratios, thereby obscuring the true source of the Company's revenues during the Relevant Period.

4. Instead of fully disclosing the situation, Defendants repeatedly revised the timeline for reducing Extreme's backlog through a series of piecemeal updates while continuing to portray the Company's organic demand as strong and on track. When analysts sought clarity about the size of the backlog and its impact on demand and revenues, Defendants consistently misdirected them, avoiding detailed discussions of the backlog with statements emphasizing that they did not want to "dissect" the issue and urging investors to focus solely on reported revenues, regardless of whether those revenues stemmed from old orders or new ones.

5. During the Relevant Period, Defendants' statements, when considered in context and

collectively, created the false and misleading impression that Extreme was experiencing robust organic customer demand, a sustained backlog, and market share gains poised to drive record revenues for years to come. These misrepresentations inflated Extreme's stock price to a Relevant Period high of over $32 per share. However, as the true facts gradually emerged through a series of partial corrective disclosures, Extreme's stock price plummeted to less than $13 per share.

6. When evaluating materially the same allegations of false and misleading statements in the related Securities Class Action, this Court held that the allegations stated a claim for securities fraud, adequately alleged a fraudulent channel stuffing scheme, and that scienter could be inferred because the fraud involved the Company's core operations. Securities Class Action, Dkt. No. 132 (Mar. 23, 2026).

7. A majority of the Company's seven-member Board of Directors ("Board") participated in the dissemination of the false statements. The entire Board signed Forms 10-K that made false statements at issue in the Securities Class Action. Defendant Meyercord, the CEO, personally issued many of the other statements at issue in the Securities Class Action and oversaw the channel stuffing scheme as CEO. Another three directors reviewed and approved earnings releases in their capacities as Audit Committee members.

8. The Board did not merely participate in the dissemination of false and misleading statements, a majority of its members affirmatively took three separate actions during the fraud that collectively protected the wrongdoers, harmed the Company, concealed the fraud, and enriched the wrongdoers and directors themselves.

9. First, while the Company's stock price was artificially inflated due to the false and misleading statements alleged herein, the Board caused the Company to repurchase its own stock at the artificially inflated prices. The Board affirmatively authorized the Company to repurchase 7,740,611 shares of Extreme's common stock between July 2022 and January 2024 for over $150 million while the truth was concealed. In November 2022, in the middle of the fraud, the Board met and increased the authorized amount of repurchases that the Company could make in any given quarter. Every director participated in the repurchase authorization and increase.

10. Second, while the fraud was concealed from the market, and while the stock

repurchases they themselves had caused were propping up the already artificially inflated stock price, seven of the Defendants, including four directors, Meyercord, Thomas, Tate, Kennedy, Khanna, Burton, and Vitalone (collectively "Insider Trading Defendants"), sold over 880,000 shares of Extreme stock for nearly $17 million while in possession of non-public information related to, among other things, (a) that Extreme faced declining client demand as customers over-ordered during COVID-19, leading to reduced future purchases; (b) that Extreme compensated by fulfilling backlog orders at a higher rate than previously disclosed; (c) that this led to a faster depletion of the backlog than reported to investors; (d) that consequently, the backlog was shrinking faster than stated, contrary to claims it would only start to shrink in 4Q23 and normalize by FY26; (e) that the backlog was not on track to grow to $600 million; and (f) that Extreme's demand, revenue growth, and market share were misrepresented because the backlog fulfillment masked a decline in organic demand and revenue. The director Insider Trading Defendants, Meyercord, Kennedy, Khanna, and Burton directly benefitted from the concealed fraud and from their self-interested decision to sell during the stock repurchases by reaping proceeds between two and three times per share what they would have received had they sold after the truth was revealed.

11. Third, in September 2023, after two corrective disclosures had already caused significant share-price declines, but before the market knew of the fraud, the entire Board issued the 2023 Proxy Statement (the "2023 Proxy") soliciting shareholder approval of a Certificate of Incorporation amendment to provide officer exculpation under 8 *Del. C.* § 102(b)(7). That is, while the fraud was concealed, but long after they knew or should have known of the wrongdoing, the Board solicited and obtained a shareholder vote giving up valuable claims against the very same officers who were engaged at that very time in the fraudulent scheme.

12. As a result of the foregoing, Extreme has been severely harmed and the Defendants substantially and unfairly enriched.

13. Due to the breaches of fiduciary duty by the Individual Defendants, most of whom are current directors of Extreme, the collective engagement in fraud and misconduct, and the substantial likelihood of their liability in this derivative action and the Securities Action, a majority of Extreme's Board of Directors cannot consider a demand to commence litigation against themselves on behalf of

the Company with the requisite level of disinterestedness and independence.

**JURISDICTION AND VENUE**

14. This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 in that this Complaint states a federal question: violations of Sections 14(a) and 10(b) of the Exchange Act. This Court has supplemental jurisdiction over the state law claims asserted herein pursuant to 28 U.S.C. § 1367(a). This action is not a collusive one to confer jurisdiction on a court of the United States which it would not otherwise have.

15. This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

16. In connection with the acts, conduct, and other wrongs complained of herein, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, the United States mail, and the facilities of a national securities market.

17. This action is not a collusive action designed to confer jurisdiction on a court of the United States that it would not otherwise have.

18. This Court has personal jurisdiction over each Defendant named herein because each Defendant is either a corporation that conducts business in and is headquartered in this District or is an individual who has sufficient minimum contacts with this District to render the exercise of jurisdiction by the courts of this District permissible under traditional notions of fair play and substantial justice.

19. Venue is proper in this District pursuant to Section 27(a) of the Exchange Act and 28 U.S.C. § 1391 because Defendants have conducted business in this District, and a substantial portion of the transaction and wrongs complained of herein occurred in this District.

**PARTIES**

**Plaintiff**

20. Plaintiff Turner is, and has been at all relevant times, a shareholder of Extreme.

21. Plaintiff Hemani is, and has been at all relevant times, a shareholder of Extreme.

**Nominal Defendant**

22. Nominal Defendant Extreme is incorporated under the laws of Delaware, with its principal executive office located at 2121 RDU Center Drive, Morrisville, NC 27560. Extreme common stock trades on the Nasdaq Global Select Market ("Nasdaq") under the ticker symbol "EXTR."

**Individual Defendants**

23. Defendant Edward B. Meyercord III ("Meyercord") has been serving as the President and Chief Executive Officer of Extreme since April 2015. He joined the Company's Board of Directors in October 2009 as an independent director and held the position of Chairman from March 2011 to August 2015. Additionally, Meyercord is named as a defendant in the Securities Class Action.

24. The Company's 2024 Proxy Statement stated the following about Defendant Meyercord:

> Mr. Meyercord has served as our President and Chief Executive Officer since April 2015. Mr. Meyercord joined our Board of Directors as an independent director in October 2009 and served as Chair from March 2011 until August 2015. Prior to assuming his operating role at Extreme Networks in April 2015, Mr. Meyercord was Chief Executive Officer and Director at Critical Alert Systems, LLC, a privately held software-driven, healthcare information technology company from 2011 to 2015. Prior to that, Mr. Meyercord served as Chief Executive Officer, President and Director of Cavalier Telephone, LLC, a privately held voice, video and data services company, from 2006 to 2009. After the acquisition of Talk America Holdings, Inc. he served as Chief Executive Officer, President and Director of Talk America Holdings, Inc., a publicly traded company that provided phone and internet services to consumers and small businesses throughout the United States, from 1996 to 2006.
>
> Earlier in his career, Mr. Meyercord served as Vice President in the investment banking division of Salomon Brothers Inc. (now part of Citigroup, Inc.), a Wall Street investment bank, from 1993 to 1996. He also served on the board of Tollgrade Communications, Inc., a then-publicly traded telecommunications company, from August 2009 to May 2011. Mr. Meyercord holds a B.A. degree in economics from Trinity College in Hartford, Connecticut and a M.B.A. degree from the Stern School of Business at New York University.
>
> Mr. Meyercord brings to the Board of his extensive executive experience in leadership, management, operations, sales and marketing, strategy, execution, mergers and acquisitions, and finance. His background in the healthcare and

> telecommunications industries provides our Board with valuable industry expertise in several of our key markets. Also, the Board believes it is valuable to have the Company's Chief Executive Officer serve on the board to bring in-depth perspective on the Company's current operations, strategy, financial condition and competitive position.

25. Between his base salary of $800,000 and supplemental stock awards, non-equity incentive plan compensation, and all other compensation, Defendant Meyercord received $16,132,678 in compensation from Extreme in fiscal year 2023 in his role as CEO. 2023 Proxy at 55. This amount is almost double what he received in compensation as CEO for fiscal year 2022, and almost three times what he received as CEO for fiscal year 2021. *Id.*

26. Defendant Meyercord's compensation during the Relevant Period was directly dependent on "the creation of stockholder value," and "achieving the Company's strategic objectives and financial goals." *Id.* at 45. 55% of his compensation in FY 2023 was tied directly to Company and stock price performance:




*Id.*

27. In fact, for fiscal year 2023, Meyercord was eligible to receive bonuses targeted at 130% of his annual base salary, as long as he met the Board's expectations regarding Company value

and stock performance.[2] *See id.* at 49. The lack of independence and the financial motivation and benefits received by Meyercord render him incapable of impartially considering a demand to commence and vigorously prosecute this action. Meyercord had clear monetary incentive to commit and continue the wrongdoing as alleged herein. During the relevant period, Meyercord sold 635,329 shares of Extreme stock for total proceeds of $12,190,950.00.

28. Defendant Rémi Thomas ("Thomas") served as the Company's Chief Executive Officer from November 2018 to February 2023. Defendant Thomas is named as a defendant in the Securities Action. During the relevant period, Thomas sold 60,000 shares of Extreme stock for total proceeds of $1,024,516.00.

29. Defendant Cristina Tate ("Tate") served as the interim Chief Financial Officer from February 2023 to May 2023. She is currently the Senior Vice President of Financial Planning and Analysis at Extreme. Additionally, Defendant Tate is named as a defendant in the Securities Action. During the relevant period, Tate sold 1,410 shares of Extreme stock for total proceeds of $24,961.00.

30. Extreme's website currently states the following about Defendant Tate:

> Cristina Tate serves as Interim CFO and Senior Vice President, Financial Planning and Analysis at Extreme. She leads Extreme's Finance organization and is responsible for accounting, reporting, tax, treasury, internal auditing procedures, and supports investor relations. She is also responsible for worldwide financial planning and analysis, including budgeting, forecasting, and all finance business partnerships across the company's various corporate functions.
>
> Tate joined Extreme in March of 2019. Prior, she served as Vice President of Product Group Finance, and Vice President of FP&A and Central Functions Finance at Micro Focus and held several executive leadership roles at HP and Hewlett Packard Enterprise.
>
> Cristina holds a B.A. in Economics & Mathematics from the University of California, Santa Barbara. She is passionate about empowering women and supporting diversity, inclusion, and equity in the corporate environment and serves as Chair of Extreme's Women in Networking (WIN) Alliance.

---

[2] The Compensation Committee's and the full Board's approval of Meyercord's revenue-linked compensation demonstrates that the Director Defendants were focused on and specifically monitoring the Company's revenue metrics during the Relevant Period.

31. Defendant Kevin Rhodes ("Rhodes") serves as Executive Vice President and Chief Financial Officer at Extreme since May 2023. Additionally, Defendant Rhodes is named as a defendant in the Securities Action.

32. Extreme's website currently states the following about Defendant Rhodes:

> Kevin Rhodes, CPA, serves as Executive Vice President and Chief Financial Officer at Extreme. He is responsible for financial planning and reporting with a focus on developing and implementing key strategies and initiatives that support Extreme's continued growth and expansion.
>
> Rhodes joined Extreme in May 2023. Prior, Rhodes was EVP and CFO at Duck Creek Technologies, a global vertical SaaS provider, where he played a significant role in leading the company to a successful acquisition by Vista Equity Partners for $19 a share or $2.6B, a 64% premium over the 30-day volume weighted average price (VWAP). Previously, he held CFO roles at Finvi, Markforged and Brightcove. Rhodes holds an MBA from Babson College's FW Olin Graduate School of Business and a B.S., Accounting/Finance from Merrimack College.

33. Defendant John C. Shoemaker ("Shoemaker") has served as a member of the Board since October 2007 and has been the Chair of the Board since February 2017.

34. The Company's 2024 Proxy Statement stated the following about Defendant Shoemaker:

> Mr. Shoemaker has served as one of our directors since October 2007 and has been the Chair of Board since February 2017. He currently serves as a consultant to the high technology industry and also serves as a mentor to corporate executives. Since April 2023, Mr. Shoemaker has served as an advisor/investor of TalentSky, Inc., a private startup in the career development space. He served on the board of directors of Altera Corporation, a publicly-traded provider of programmable logic solutions, from 2007 until it was acquired by Intel Corporation in December 2015. Mr. Shoemaker was a member of the board of directors of SonicWall, a then publicly-traded firewall and cybersecurity solutions company, from 2004-2010, serving as its chair from 2007-2010. Mr. Shoemaker is a member of the Board of Trustees at Hanover College and a member of the Indiana University School of Business Dean's Advisory Council for the school of informatics, Computing, and Engineering, and the Johnson Center for Entrepreneurship Board.]
>
> Mr. Shoemaker's executive management experience includes various positions from 1990 to 2004 at Sun Microsystems, Inc., where he held roles that included

> Executive Vice President, World Wide Marketing, Mr. Shoemaker earned a B.A. in political science and business administration from Hanover College and a M.B.A. from Indiana University's Kelley School of Business. Mr. Shoemaker was named Entrepreneur of the Year by the Kelley School of Business in 2019 and was awarded an honorary Doctor of Humane Letters degree that same year.
>
> Mr. Shoemaker brings to the Board his extensive executive experience in senior level management positions in the technology industry, particularly in hardware systems, and provides strong operational, management and financial expertise to our Board.

35. Defendant Charles Carinalli ("Carinalli") has served as a member of the Board since October 1996.

36. The Company's 2024 Proxy Statement stated the following about Defendant Carinalli:

> Mr. Carinalli has served as one of our directors since October 1996. Mr. Carinalli has been a Principal of Carinalli Ventures since January 2002. From November 2000 to November 2001, Mr. Carinalli served as Chairman of Clearwater Communications, Inc., a privately held telecommunications company. Mr. Carinalli served on the board of directors of Fairchild Semiconductor company, from February 2008 until its acquisition by Microchip Technology in April 2016.
>
> From 1999 to May 2002, Mr. Carinalli was Chief Executive Officer and a director of Adaptive Silicon, Inc., a privately held developer of semiconductor products. From December 1996 to July 1999, Mr. Carinalli served as President, Chief Executive Officer, and a director of WaveSpan Corporation, a developer of wireless broadband access systems until the company was acquired by Proxim, Inc., a broadband wireless networking systems company. From 1970 to 1996, Mr. Carinalli served in various positions at National Semiconductor Corporation, a publicly-traded semiconductor company that developed and sold analog-based semiconductor and integrated communication products, most recently serving as Senior Vice President and Chief Technical Officer. Mr. Carinalli holds a B.S. in electrical engineering from the University of California, Berkeley and a M.S. in electrical engineering from Santa Clara University.
>
> Mr. Carinalli brings to the Board extensive engineering and engineering management expertise, as well as general management expertise and technology expertise, which aids our Board in understanding product development, engineering management and strategic planning, as well as risk assessment and planning.

37. Defendant Edward H. Kennedy ("Kennedy") has served as a member of the Board since April 2011 and was a member of the Audit Committee during the Relevant Period. During the relevant period, Kennedy sold 20,000 shares of Extreme stock for total proceeds of $378,100.00.

38. The Company's 2024 Proxy Statement stated the following about Defendant Kennedy:

> Mr. Kennedy has served as one of our directors since April 2011. In May 2023 Mr. Kennedy was appointed to the Board of Directors of Motionworks, a predictive population intelligence platform. He has previous public company board experience, having served as a director of Visual Networks, Inc., a network and performance management solutions provider, from 2002 until it was acquired by Fluke Electronic Corporation, an electronic test tools and software company, in 2006. He also served on several private boards: Avizia from 2014 until its merger with American Well in July 2018; Hatteras Networks from 2005 to 2011, when Hatteras Networks merged with overture; and Imagine Communications from 2007 until its acquisition by Harris Broadcast in 2010. He also served as a Board Director of the Grid Wise Alliance, a leading industry coalition driving the modernization of the U.S. electric system from 2013 to 2017. He currently serves on the Executive Parent Board of Villanova University and The Virginia Tech Dean of Engineering Advisory Committee, and was a Trustee of Flint Hill School, a private JK-12 college preparatory school in Oakton, Virginia, from 2011 to 2020.
>
> Since September 2018, Mr. Kennedy has been a Principal at Kenko Partners, a consultant and investment firm focused on technology and real estate. From June 2017 until September 2018, Mr. Kennedy served as the president and Chief Executive Officer of Cenx, Inc., a leader in service orchestration solutions for software-defined and virtualized networks before the company was acquired by LM Ericsson in 2018. From June 2019 to April 2017, Mr. Kennedy served as the Chairman, Chief Executive Officer and President of Tollgrade Communications, Inc., a telecommunication and smart grid company which he took private to Golden Gate Capital and then later sold the Smart Grid business to Hubbell (Aclara) Corporations and sold the Telco business to Enghouse Systems, a Canadian based, publicly-traded software and services company, in April 2017. Mr. Kennedy previously served as the Chief Executive Officer and President of Rivulet Communications, Inc., a medical video networking company, from 2007 until it was acquired by NDS Surgical Imaging, LLC, a medical imaging and informatics systems company, in 2010. He also previously served as President of Tellabs North American Operations, an optical network technology company, and as Executive Vice President of Tellabs, Inc. from 2002 to 2004. Mr. Kennedy co-founded Ocular Networks, Inc., a telecommunications equipment company, and Newbridge Networks Corporation, a then publicly-traded Canadian digital networking equipment company. Mr. Kennedy was a Venture Partner at Columbia

> Capital, a private equity investment firm, from 2005 to 2007, where he advised regarding investments into new and existing portfolio companies. Mr. Kennedy holds a B.S. in electrical engineering from the Virginia Polytechnic Institute and State University.
>
> Mr. Kennedy brings to the Board his extensive financial and executive leadership experience in technology companies, including networking companies, and provides management and financial expertise to our Board. He has been a member of NACD since 2017.

39. Defendant Kathleen M. Holmgren ("Holmgren") has served as a member of the Board since November 2015 and was a member of the Audit Committee during the Relevant Period.

40. The Company's 2024 Proxy Statement stated the following about Defendant Holmgren:

> Ms. Holmgren has served as one of our directors since November 2015. Ms. Holmgren is currently a member of the Board of Directors of Automation Anywhere, Inc., a privately held American global software company that develops robotic process automation software, where she serves on their Audit Committee. Ms. Holmgren was also the Chief Operating Officer for Automation Anywhere, Inc. from March 2013 through August 2015 and then served as Chief Officer-Future Workforce through March 2018. Ms. Holmgren is the first vice-chair of the board and chair of the Compensation Committee of Calavo Growers, Inc., a publicly-traded food and distribution company, which she joined in January 2017. From May 2017 through January 2021, Ms. Holmgren was a member of the Board of Directors of Fresh Realm, LLC, a privately-held delivery and business platform for the perishable food industry, representing Calavo Growers' interests. In June 2021, Ms. Holmgren became an advisory to Circle Security, a company that came out of stealth-mode in 2023. Circle Security is a cybersecurity platform powered by a patented decentralized cryptographic architecture purpose-built to deliver true prevention. She served on the Board of Group Delphi, a private design and media production company, from July 2014 through December 2019, and from October 2009 to December 2016, she served as a director at the Alliance of Chief Executives, LLC, an organization for chief executives.
>
> Since 2008, Ms. Holmgren has served as a Principal at Sage Advice Partners, a management consulting firm specializing in the high-tech and green-tech markets. She held the position of President and Chief Executive Officer of Mendocino Software, a privately held enterprise-class application data developer, from November 2007 to March 2008. Prior to November 2007, Holmgren spent over 20 years at Sun Microsystems, Inc., a publicly-held enterprise software company acquired by Oracle Corporation in 2010, where she held increasingly senior roles, culminating in Senior Vice President, Storage Systems. Ms. Holmgren holds a

> B.S. in industrial Engineering form California Polytechnic State University and a M.B.A. from the Standford Graduate School of Business.

41. Defendant Raj Khanna ("Khanna") has served as a member of the Board since December 2014 and was a member of the Audit Committee during the Relevant Period. During the relevant period, Khanna sold 40,000 shares of Extreme stock for total proceeds of $803,996.00.

42. The Company's 2024 Proxy Statement stated the following about Defendant Khanna:

> Mr. Khanna has served as one of our directors since December 2014. Since 2012, Mr. Khanna has served as an independent consultant, assisting companies with finance and internal audit issues. From 2004 to 2011, Mr. Khanna served as Vice President of Corporate Audit at Qualcomm, Inc., a publicly-traded semiconductor company. Prior to Qualcomm, Mr. Khanna held various finance roles at Sun Microsystems, Inc., from 1991 to 2004, including International Controller, Vice President Finance for Global Services Business and Senior Director of Finance for Strategic Business Units, and at Xerox Corporation, a provider of document management technology and services, from 1974 to 1991. Mr. Khanna holds a B. Tech in mechanical engineering from the Indian Institute of Technology and a M.B.A. from the University of Rochester, New York.
>
> Mr. Khanna brings to the Board his extensive experience leading finance and internal audit teams, including the establishment of financial controls and processes, delivering financial investment and M&A guidance, and providing strategic advice and direction regarding business model changes.

43. Defendant Ingrid Burton ("Burton") has served as a member of the Board since August 2019. During the relevant period, Burton sold 9,000 shares of Extreme stock for total proceeds of $183,150.00

44. The Company's 2024 Proxy Statement stated the following about Defendant Burton:

> Ms. Burton has served as one of our directors since August 2019 and is NACD-certified. Since May 2024, she is an advisor and formerly served as the marketing leader at Groq, an AI inference technology company. She also serves as an advisor to Luminous Law, a unique law firm focused on AI risk and audits, a position she has held since October 2022. She was an advisor to Dataiku, a leader in enterprise AI, from June 2021 to March 2024. From May 2022 to October 2023, she was a member of the board of directors of Fogo de Chão.
>
> Ms. Burton previously served as Chief Marketing Officer for Quantcast, a global advertising technology company, which position she held from November 2020 to March 2022. She served as Chief Marketing Officer at H2O.ai, an open source

AI and machine learning technology company from February 2018 to August 2020. Previously, from July 2015 to March 2017, Ms. Burton was Chief Marketing Officer of Hortonworks, a data software company. From January 2013 to June 2015, Ms. Burton was S.V.P. for Technology and Innovation Marketing, with SAP, a global enterprise software company. Ms. Burton previously held chief marketing officer positions with Silver Spring Networks and Plantronics and held various executive and senior management positions in marketing for over 20 years with Sun Microsystems. Ms. Burton holds a B.A. in Mathematics with a focus in Computer Science from San Jose State University.

45. Defendant Joseph A. Vitalone was the Company's Chief Revenue Officer until January 8, 2024. During the relevant period, Vitalone sold 167,224 shares of Extreme stock for total proceeds of $2,903,339.00.

46. Defendant Norman J. Rice, III ("Rice") served as Chief Operating Officer ("COO") of the Company from 2019 to February 2024. He has been the Chief Commercial Officer ("CCO") since February 2024.

47. The Company's website says the following about Rice:

> Norman serves as Chief Commercial Officer, leading the company's sales, services and supply chain organizations with a focus on driving revenue growth. In addition, Norman is the Executive Sponsor for the Sports and Entertainment industry and the company's National Football League (NFL) partnership.
>
> Rice joined Extreme in 2015 and most recently served as Chief Operating Officer. During his tenure, he architected successful go-to-market sales motions including building the company's stadium and venue business, orchestrating large opportunities with Verizon and Kroger, and managing the company through a complex macro supply chain environment.
>
> Prior to Extreme, Norman worked in private equity as an operating partner with Marlin Equity, as managing director for New Castle Capital group and had management roles in technology firms CA (NASDAQ: CA), Concord communications (Acquired by Concord), HoustonStreet Exchange and MicroStrategy (NASDAQ: MSTR). Previously, Norman was a Director on the Boards of DSP Group (NASDAQ: DSPG) and NitroSecurity (Acquired by McAfee) as well as on the Advisory Board of vKernal (Acquired by Quest Software).
>
> Norman holds a master's degree in management and an MS in Engineering, both from Dartmouth College, where he was a Scolville Fellow and Woodhouse Scholar award winner, as well as a BS from the University of Michigan.

48. Defendant Jonas Brown ("Brown") has been the Senior Director of Worldwide Distribution Sales and Strategy at Extreme Network since June 2018.

49. During the Relevant Period, the Individual Defendants were actively engaged in managing the Company's operations at the highest levels and had access to confidential and proprietary information related to the Company's business, operations, services, markets, competition, sales, demand, backlog, and future business prospects. They also participated in drafting, producing, reviewing, and disseminating the allegedly false and misleading statements detailed herein. Furthermore, they were either aware of or recklessly disregarded the inaccuracies and misrepresentations made about the Company through public statements, representations, and filings and either approved or ratified these statements actively, or through inaction, thereby violating the federal securities laws.

50. As officers and controlling persons of a publicly traded company whose securities are registered with the SEC under the Exchange Act and listed on the Nasdaq, the Individual Defendants had a duty to promptly disclose truthful, accurate, and complete information regarding the Company's business, operations, services, markets, competition, sales, demand, backlog, and current and future business prospects. They were also obligated to correct any prior statements that were materially false or misleading to ensure that the market price of the Company's publicly traded shares reflected truthful, accurate and complete information. The Defendants' false and misleading representations and omissions during the Relevant Period constituted a violation of these specific duties and obligations under federal securities laws.

51. The Individual Defendants, by virtue of their positions of control and authority as officers and directors of the Company, exercised control over the content of the Company's SEC filings, press releases, and other public statements issued during the Relevant Period. Each Individual Defendant received copies of the documents alleged to be false and misleading before or shortly after their publication and had the ability and opportunity to prevent their issuance or ensure their correction. As a result, each Individual Defendant bears responsibility for the accuracy of the public statements described herein and is therefore primarily liable for the representations contained within them.

**<u>FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS</u>**

52. By reason of their positions as officers, directors, and/or fiduciaries of Extreme, and because of their ability to control the business and corporate affairs of the Company, the Individual Defendants owed Extreme and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care.

53. The Individual Defendants were and are required to use their utmost ability to control and manage Extreme in a fair, just, honest, and equitable manner.

54. The Individual Defendants were and are required to act in furtherance of the best interests of Extreme and its shareholders to benefit all shareholders equitably.

55. Each director and officer of the Company owes Extreme and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company.

56. As fiduciaries of Extreme, the Individual Defendants were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein because of their position and authority.

57. The officers and directors of Extreme were and are required to exercise reasonable and prudent supervision over the management, policies, controls, and operations of the Company to discharge their duties.

58. Each Individual Defendant under their position as officers and directors of Extreme owed to the Company and its shareholders the highest fiduciary duties of loyalty, good faith, care, and diligence in the management and administration of the affairs of the Company.

59. As Extreme's directors and officers, the Individual Defendants knowingly acted with reckless disregard for their obligations as fiduciaries because their conduct posed a significant risk of harm to the Company.

60. The Individual Defendants had a duty to prevent and correct the dissemination of erroneous, misleading, and deceitful information concerning, *inter alia*, the Company's financial condition, business operations, management, performance, growth, earnings, and business prospects. Moreover, as senior officers of a publicly traded company whose common stock was registered with the SEC, pursuant to the Exchange Act, the Individual Defendants had a duty to act in the best interest

of the Company.

61. As fiduciaries, the Individual Defendants had a duty to disclose in the Company's regulatory filings with the SEC all events described in this Complaint that it failed to disclose so that the Company's valuation and the common stock price would be based on accurate information and to preclude deceptive practices in the market.

62. The Individual Defendants were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company to discharge their duties. Among other things, the Individual Defendants were required to:

a) Ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of Delaware, North Carolina, the United States, and pursuant to Extreme's Code of Conduct and internal guidelines;

b) Conduct the affairs of the Company in an efficient, businesslike manner to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

c) Remain informed as to how Extreme conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make a reasonable inquiry in connection with that information, and additionally, to take steps to correct such conditions or practices;

d) Establish and maintain systematic, accurate records and reports of the business and internal affairs of Extreme and procedures for the reporting of the business and internal affairs to the Board and to periodically investigate, or cause an independent investigation to be made of, said reports and records;

e) Maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that Extreme's operations would comply with all laws, and ensuring Extreme's financial statements and regulatory filings filed with the SEC and disseminated to the public and the Company's shareholders would be accurate.

f) Exercise reasonable control and supervision over the Company's officers' and employees' public statements and any other reports or information that the Company was required

by law to disseminate.

g) Refrain from unduly benefiting themselves and other Company insiders at the expense of the Company; and

h) Examine and evaluate any reports of examinations, audits, or additional financial information concerning the financial affairs of the Company and to make full and accurate disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above.

63. Each of the Individual Defendants also bore a duty of loyalty to Extreme and its shareholders, mandating the prioritization of the Company's and its shareholders' interests above their own in the management of the Company's affairs and prohibiting the use of their position, influence, or insight into the Company's operations for personal gain.

64. During the pertinent times, the Individual Defendants served as agents for each other and for Extreme, always operating within the parameters of their agency.

65. The Individual Defendants, through their advisory, executive, managerial, and directorial roles within Extreme, were privy to detrimental, confidential information concerning the Company.

66. Due to their positions of influence and authority, the Individual Defendants had the capability to, and indeed did, directly or indirectly control the improper actions detailed in this complaint, as well as the content of the various public declarations made by Extreme.

**CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION**

67. In committing the wrongful acts alleged herein, the Individual Defendants have engaged in, or aligned themselves with, a common course of conduct, acting in concert and conspiring with one another to further their misconduct. They caused the Company to conceal the true facts as outlined in this complaint. Additionally, the Individual Defendants aided, abetted, and/or assisted each other in breaching their respective duties.

68. The purpose and effect of the conspiracy, common enterprise, and/or common course of conduct was, among other things, to enable and conceal the Individual Defendants' violations of law, including breaches of fiduciary duty and unjust enrichment.

69. The Individual Defendants carried out their conspiracy, common enterprise, and/or coordinated actions by causing the Company to deliberately, recklessly, or negligently conceal material facts, fail to correct those misrepresentations, and violate applicable laws.

70. To advance this plan, conspiracy, and course of conduct, the Individual Defendants, both collectively and individually, carried out the actions described herein. As these actions were executed under the Board's authority, the Individual Defendants, as directors of Extreme, were direct, essential, and significant participants, collectively and individually, in the conspiracy, joint enterprise, and/or coordinated conduct alleged in this complaint.

71. Each of the Individual Defendants aided, abetted, and provided substantial assistance in the wrongdoings described herein. In providing such assistance, each Individual Defendant acted with actual or constructive knowledge of the primary misconduct, either directly participated in or significantly contributed to the commission of that wrongdoing, and was, or should have been, aware of his or her overall role in furthering the misconduct.

72. At all relevant times, each of the Individual Defendants acted as an agent of the other Defendants and of Extreme, and at all times operated within the course and scope of that agency.

## EXTREME NETWORKS, INC.
## CODE OF BUSINESS CONDUCT AND ETHICS

73. The Individual Defendants, like all employees, directors, and officers of the Company, are required to comply with Extreme's Code of Business Conduct and Ethics (the ''Code of Conduct''). The Code of Conduct states, in pertinent part, the following:

> **Policy Statement**
>
> At Extreme Networks, Inc., we are committed to conducting our business affairs honestly and in an ethical manner That goal cannot be achieved unless each of us accepts responsibility to promote integrity and demonstrate the highest level of ethical conduct in all of our activities. Activities that may adversely impact our reputation for integrity should be avoided. The key to achieving our business goal and complying with this Code of Business Conduct and Ethics (the "Code") is exercising good judgment. This Code was adopted to encourage:
>
> - Honest and ethical conduct, including fair dealing and the ethical handling of actual or apparent conflicts of interest;

- Full, fair, accurate, timely and understandable disclosure;

- Compliance with applicable governmental laws, rules and regulations;

- Prompt internal reporting of any violations of law or the Code;

- Accountability for adherence to the Code, including fair process by which to determine violations;

- Consistent enforcement of the Code, including clear and objective standards for compliance;

- Protection for persons reporting any such questionable behavior;

- The protection of the Company's legitimate business interests, including its assets and corporate opportunities; and

- Confidentiality of information entrusted to directors, officers and employees by the Company and its customers.

This Code applies to all employees (including those employed by professional employment organizations), officers and members of the Board of Directors (collectively, the "Directors") of Extreme Networks, Inc. and its subsidiaries and branches in all locations (collectively the "Company" or "Extreme Networks"). The Code is based on the Company's core values, good business practices and compliance with applicable law.

Managers set an example for other employees and are often responsible for directing the actions of others. Each manager and supervisor is expected to take necessary actions to ensure compliance with this Code, to provide guidance and assist employees in resolving questions concerning the Code and to permit employees to express any concerns regarding compliance with this Code. No one has the authority to order another employee to act contrary to this Code.

A key prerequisite to conducting business in an ethical and legal manner is to hire the best employees who share this goal and practice it. To this end, the Company will exercise due diligence when hiring and promoting employees. Where legally permitted, the Company will make reasonable inquiries into the background of each individual who is a candidate for such a position. All such inquiries will be made in accordance with applicable law and good business practice.

**Compliance with the Code**

Each employee, officer and Director is expected to become familiar with and understand the requirements of the Code. Most importantly, you must comply with the Code, and support others in their efforts to comply with it as well.

The Company's Chief Executive Officer ("CEO") is responsible for ensuring that the Code is established and effectively communicated to all employees, officers and Directors. Although the day-to-day compliance issues will be the responsibility of the Company's managers, the CEO has ultimate accountability with respect to the overall implementation of and successful compliance with the Code.

The Company will ensure that employees, officers and Directors have access to the Code on the Company's website and will provide periodic training on the Code to employees and officers.

**Code Requirements**

**1. Compliance with Laws and Regulations**

Extreme Networks is committed to full compliance with the laws and regulations of all jurisdictions in which it operates. Numerous laws and regulations define and establish obligations with which the Company, our employees and agents must comply.

If you violate laws and regulations in performing your duties for the Company, you not only risk individual indictment, prosecution and penalties, in addition to civil actions and penalties from the local authorities, you may also subject the Company to risks and penalties. If you violate laws or regulations in performing your duties for the Company, you may also be subject to immediate disciplinary action, including possible termination of your employment with the Company, as permitted by applicable laws.

* * *

**6. Full, Fair, Accurate, Timely and Understandable Disclosure**

All Company disclosures in reports and documents that the Company submits to any government authority, and other public communications made by the Company, must be full, fair, accurate, timely and understandable. You must take all steps available to assist Extreme Networks in its disclosure responsibilities, consistent with your role within the Company. In particular, you are required to provide prompt and accurate answers to all inquiries made to you in connection with the Company's preparation of its public reports and disclosures. The Company's CEO and Chief Financial Officer ("CFO") are responsible for designing, establishing, maintaining, reviewing and evaluating the

effectiveness of the Company's disclosure controls and the procedures (as such term is defined by applicable SEC rules) on a quarterly basis.

The Company's CEO, CFO, and Corporate Controllers (and such other Company officers designated from time to time by the Audit Committee, collective, the "Senior Officers") will take all steps necessary or advisable to ensure that all Company disclosures in reports and documents filed with or submitted to the SEC, and all disclosures in other public communication made by the Company, are full, fair, accurate, timely and understandable.

Senior Officers are also responsible for establishing and maintaining adequate internal control over financial reporting to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes, in accordance with generally accepted accounting principles ("GAAP"). The Senior Officers will take all necessary steps to ensure compliance with our system of internal controls and GAAP. For example, Senior Officers will ensure that Extreme Networks makes and keeps books, records, and accounts which accurately and fairly reflect the transactions and dispositions of our assets in reasonable detail. Senior Officers will also ensure that we devise and maintain a system of internal accounting controls sufficient to provide reasonable assurance that:

- Transactions are executed in accordance with management's general or specific authorization;
- Transactions are recorded as necessary to: (i) permit preparation of financial statements in conformity with GAAP or any other criteria applicable to such statements, and (ii) maintain accountability for assets;
- Access to assets is permitted, and receipts and expenditures are made, only in accordance with management's general or specific authorization;
- The method that the Company uses to record its assets is consistent with existing assets at reasonable intervals, and appropriate action is taken with respect to any differences; and
- All to permit prevention or timely detection of unauthorized acquisition, use or disposition of assets that could have a material effect on our financial statements.

Any attempt to enter inaccurate or fraudulent information into the Company's accounting system will not be tolerated and may result in disciplinary action, up to and including termination of employment, as permitted by applicable laws.

* * *

**11. Protection and Proper Use of Company Assets**

You should protect the Company's assets and ensure their proper use. Company assets, both tangible and intangible, are to be used only for legitimate business purposes of the Company and only by authorized employees, officers, Directors, or consultants. Intangible assets include but are not limited to: intellectual property such as trade secrets; patents, trademarks and copyrights; business, marketing and service plans; engineering and manufacturing ideas; designs; databases; proprietary Company records; organizational data; and any unpublished financial data and reports. Unauthorized alteration, destruction, use, disclosure or distribution of Company assets violates Company policy and this Code. Theft, waste of, or carelessness in using any company assets or funds have an adverse impact on the Company's operations and profitability and will not be tolerated.

* * *

**14. Reporting Violations of the Code**

You should promptly report any violation or suspected violation of this Code to the appropriate Company personnel or via the Company's anonymous and confidential reporting procedures. However, nothing in this Code prevents you from communicating directly with relevant government authorities about potential violations of law.

The Company's efforts to ensure observance of, and adherence to, the goals and policies outlined in this Code mandate that you should promptly bring to the attention of the Company any material transaction, relationship, act, failure to act, occurrence or practice that you believe, in good faith, is inconsistent with, in violation of, or reasonably could be expected to give rise to a violation of, this Code. You should report any suspected violation of the Company's financial reporting obligations or any complaints or concerns about questionable accounting or auditing practices.

Here are some approaches to handling your reporting obligations:

- In the event you believe a violation of the Code or a violation of applicable laws and/or governmental regulations has occurred, or you have observed or become aware of conduct which appears to be contrary to the Code, you should immediately report the situation to your supervisor, the Legal Department, or the Chair of the Audit Committee

- If you have or receive notice of a complaint or concern regarding the Company's financial disclosure, accounting practices, internal accounting controls, auditing, or questionable accounting or auditing matters, you should

> immediately advise your supervisor, the CFO, the Chief Legal, Administrative & Sustainability Officer, or the Chair of the Audit Committee.

* * *

**EXTREME NETWORKS, INC.**
**CHARTER OF THE AUDIT COMMITTEE OF THE BOARD OF DIRECTORS**

74. In addition to these duties, under the Audit Committee Charter in effect during relevant times, Defendants Khanna (Chair), Holmgren, and Kennedy ("Audit Committee Defendants") owed specific additional duties to Extreme. Specifically, the Audit Committee Charter States:

> **I. Statement of Policy**
>
> This Charter specifies the scope of the responsibilities of the Audit Committee (the "Committee") of the Board of Directors (the "Board") of Extreme Networks, Inc. (the "Company") and the manner in which those responsibilities shall be performed, including the structure, processes and membership requirements.
>
> The primary functions of the Committee are to assist the Board in fulfilling its oversight responsibilities with respect to the Company. These functions include: (i) reviewing and reporting to the Board on financial reports and financial information to be disclosed by the Company and the Company's compliance with legal and regulatory requirements; (ii) reviewing the qualifications, independence and performance, and approving the terms of engagement, of the Company's independent auditors; (iii) reviewing the performance of the Company's internal audit function; and (iv) overseeing and reviewing the Company's policies and programs that govern risk assessment and risk management. Consistent with this role, the Committee should encourage continuous improvement of, and should foster adherence to, the Company's financial policies, procedures and practices at all levels within the Company. In performing these functions, the Committee shall:
>
> - Retain the independent auditors of the Company, evaluate their independence, qualifications and performance, and approve the terms of engagement of the independent auditors for audit services and non-audit services.
>
> - Regularly communicate with the independent auditors, financial and senior management of the Company and regularly report to the Board.

- Establish and observe complaint procedures regarding accounting or internal auditing controls.

* * *

## V. COMMITTEE AUTHORITY AND RESPONSIBILITIES

* * *

### B. Review of the Charter, Financial Reporting, Policies and Processes

To fulfill its responsibilities and duties the Committee shall, to the extent that it deems necessary or appropriate, and in addition to the items described above:

i. Review and reassess the adequacy of this Charter periodically and recommend any proposed changes to the Board for approval.

ii. Review and discuss with management and the independent auditors the Company's annual audited financial statements, any certification, report, opinion, or review rendered by the independent auditors, and recommend to the Board whether the audited financial statements should be included int eh Company's annual report on Form 10-K. Review and discuss with management and the independent auditors the Company's quarterly reports on Form 10-Q prior to filing with the Securities and Exchange Commission.

iii. Review and discuss earnings press releases and other information provided to analysts and rating agencies, including "pro forma" or adjusted financial information.

iv. Review annually with management its assessment of the Company's internal controls and procedures for financial reporting, and review annually with the independent auditors the attestation to and report on the assessment made by management of the effectiveness of the Company's internal control structure and procedures for financial reporting, each as required under the rules of the Securities and Exchange Commission, and consider whether any changes to the internal controls processes and procedures are appropriate based on management's assessment or the independent auditor's report.

v. Review with management and approve changes to the Company's global signature authority matrix.

vi. Review and discuss with management and the independent auditors any off-balance sheet transactions or structures and their effect on the Company's financial results and operations.

vii. Review with the independent auditor and management the extent to which changes or improvements in financial or accounting practices, as approved by the Committee, have been implemented.

viii. Report to the Board regarding any audit opinions that contain going concern qualifications.

ix. Provide oversight and review of the Company's investment policy, including a periodic review and approval of the Company's investment policies and performance.

x. Annually review its own performance.

C. **Risk Management, Related Party Transaction and Legal Compliance**

i. Review with the principal executive and financial officers of the Company any report on significant deficiencies in the design or operation of internal controls which could adversely affect the Company's ability to record, process, summarize, and report financial data, any material weaknesses in internal controls, and any fraud, whether or not material, that involves management or other employees who have a significant role in the Company's internal controls.

ii. Approve or ratify related-party transactions of the executive officers (as defined under Rule 3b-7 of the Securities Exchange Act of 1934, as amended) and members of the Board in accordance with the Company's Related Person Transaction Policy after reviewing each such transaction for potential conflicts of interests and other improprieties.

iii. Maintain and periodically review and approve any necessary updates to the Company's Related Person Transaction Policy.

iv. Maintain and periodically review and approve any necessary updates to the Company's Hedging and Risk Management Policy.

v. Establish procedures for the receipt, retention, and treatment of complaints received by the Company regarding accounting, internal accounting controls or auditing matters, and the confidential, anonymous submission by employees of the Company of concerns regarding questionable accounting or auditing matters. Adopt, as necessary, appropriate remedial measures or actions with respect to such complaints or concerns.

vi. Discuss with management and the independent auditor any correspondence with regulators or governmental agencies that raise material issues regarding the Company's financial statements or accounting policies.

vii. Review management's monitoring of compliance with the Foreign Corrupt Practices Act and other applicable anti-corruption laws.

viii. Review, with the Company's legal counsel and accounting advisors, and report to the Board on legal compliance matters, including corporate securities trading policies and disclosure of insider and related-party transactions. Meet and discuss with the Company's legal counsel any report provided by such counsel concerning evidence of material violation of securities laws or breach of fiduciary duty or similar violation by the Company or any agent, and adopt, as necessary, appropriate remedial measures.

ix. Prepare the Committee's report required by the rules of the Securities Exchange Commissions to be included in the Company's annual proxy statement.

x. Receive reports on and discuss any significant issues reviewed by in-house and outside counsel concerning litigation, contingencies, claims, or assessments.

xi. Assist the Board in fulfilling its responsibilities to oversee management's conduct as it relates to the Company's capital structure, financing transactions, share repurchases, and dividend programs.

xii. Provide oversight and engage management with respect to risk assessment and risk management, including cybersecurity, privacy, enterprise, financial and other risks.

xiii. Review and approve the Company's D&O insurance and other risk management policies and programs.

75. During the Relevant Period, committee assignments for the current Board were as follows: Meyercord, none (CEO, not independent); Shoemaker, Chair of the Nominating, Governance and Environmental & Social Responsibility Committee ("NGES Committee") and member of the Compensation Committee (also Independent Board Chair since February 2017); Carinalli, Chair of the Compensation Committee and member of the NGES Committee; Holmgren, member of the Audit, Compensation, and NGES Committees; Kennedy, member of the Audit and

Compensation Committees; Khanna, Chair of the Audit Committee; Burton, member of the NGES Committee.

76. The 2023 Proxy represented to shareholders that "Our Board also reviews and discusses with management on a quarterly basis its financial results and forecasts." 2023 Proxy at 11. Thus, each director, not just the Audit Committee members, reviewed quarterly financial results and forecasts for the Company, at a minimum, seven times during the Relevant Period, if not more at other Board meetings. 2023 Proxy at 12 ("Our Board held seven meetings during the fiscal year ended June 30, 2023."); 2022 Proxy at 12 ("Our Board held ten meetings during the fiscal year ended June 30, 2022").

77. The 2023 Proxy further represented that "[t]he Audit Committee of our Board oversees management of the Company's financial risks, and oversees and reviews our risk management policies, including the Company's investment policies and anti-fraud program." 2023 Proxy at 11. It further represented that the Audit Committee "assists our Board in fulfilling its oversight responsibilities with respect to financial risks, including risk management in the areas of financial reporting, internal controls, investments and compliance with legal and regulatory requirements," and held nine meetings during fiscal 2023. 2023 Proxy at 13; 2022 Proxy at 13 (Audit Committee met ten times during fiscal 2022).

78. In the same filing, Defendants Khanna and Kennedy were each expressly designated "audit committee financial experts" as that term is defined in Item 407(d)(5) of Regulation S-K under the Exchange Act. 2023 Proxy at 12. The 2023 Proxy also represented that Khanna and Kennedy "have past employment experience in finance or accounting, requisite professional certification in accounting or other comparable experience or background that results in their financial sophistication, including being or having been a chief executive officer, chief financial officer or other senior officer with financial oversight responsibilities." *Id.*

79. The 2023 Proxy also described enumerated fiduciary duties of Defendant Shoemaker as Independent Chair of the Board, including: "chairing executive sessions of the independent directors;" "ensuring that independent directors have adequate opportunities to meet without management present;" "serving as designated contact for communication to independent directors,

including being available for consultation and direct communication with major stockholders;" "ensuring that the independent directors have an opportunity to provide input on the agenda for meetings of our Board;" "assuring that there is sufficient time for discussion of all agenda items;" and "being identified as the recipient of communications with stockholders in the annual meeting proxy statement." 2023 Proxy at 11.

80. Defendant Carinalli chaired the Compensation Committee during the entire Relevant Period. In that capacity, he approved and signed the Compensation Committee Report recommending Meyercord's fiscal 2023 compensation of $16,132,678 which was purportedly "directly dependent on 'the creation of stockholder value'" and on "'achieving the Company's strategic objectives and financial goals.'" The metrics on which Meyercord's fiscal 2023 compensation depended, including stockholder value, revenue, and stock-price performance, were the very metrics this Court found had been inflated by the channel-stuffing scheme when it denied the motion to dismiss the Securities Class Action.

## FACTUAL BACKGROUND

81. Extreme is a global provider of cloud-based computer networking equipment, as well as related services and support. Its product portfolio includes wired, wireless, and software-defined wide area network (SD-WAN) infrastructure equipment. In approximately August 2019, Extreme pivoted its focus to cloud-based networking solutions.

82. Extreme utilizes a diverse range of sales and distribution channels, including: (i) original equipment manufacturers (OEM) and strategic partnerships, (ii) distributors, (iii) resellers, and (iv) filed sales.

83. First, Extreme maintains OEM partnerships and strategic relationships with several large businesses. After testing and validation, the Company's enterprise solutions are integrated into the end products and services of these OEMs and strategic partners, who then market and sell them to their customers.

84. Second, Extreme has built strong partnerships with leading distributors in the electronics and computer networking industries. These distributors primarily sell Extreme's products to resellers, thereby expanding the Company's reach. They also enhance Extreme's ability to support

resellers by offering comprehensive service and product fulfillment capabilities. Additionally, distributors are typically granted the right to return a portion of their inventory to Extreme for stock replenishment purposes, claim rebates for competitive discounts, and participate in promotional programs.

85. Third, Extreme works with numerous resellers worldwide who sell directly to end-user customers. These relationships are established on a non-exclusive basis. Unlike distributors, resellers are not granted inventory return rights and do not automatically qualify for participation in cooperative marketing programs.

86. Fourth, Extreme leverages its own field sales organization to support its channel partners and directly sell to select end-user customers, including large enterprises and global accounts within the service provider sector.

**Revenue Recognition**

87. Extreme derives the majority of its revenue from the sale of networking equipment. Additional revenue is generated through software-as-a-service (SaaS) offerings and service fees associated with maintenance contracts, professional services, and training related to the Company's products. These products and services are available for purchase individually or as part of bundled packages.

88. Extreme recognizes revenue based on the type of offering. For products, revenue is recognized at a specific point in time, typically upon receipt of the product. For services and subscription contracts, revenue is recognized over time as the service is delivered. In cases involving multiple performance obligations, the transaction price is allocated to each obligation based on its relative standalone selling price.

89. Backlog is a key metric for Extreme, reflecting client demand and anticipated future revenue. It is defined as confirmed orders with purchase orders for products to be fulfilled and billed to customers with approved credit. Product shipments depend on manufacturing capacity and supply chain conditions.

**Effects of the COVID-19 Pandemic**

90. Extreme's products depend on key components such as merchant silicon, integrated

circuits, and power supplies. The COVID-19 pandemic, which began in early 2020, disrupted global supply chains, causing bottlenecks and a global semiconductor shortage. This shortage impacted the availability of networking equipment, leading to component shortages, increased costs for components and freight, and higher order of backlogs. As a result, Extreme's backlog increased significantly, rising from $3.17 million on June 30, 2020, to a peak of $555 million on September 30, 2022.

91. By the start of the Relevant Period, backlog had become increasingly significant to Extreme's business, leading the Company to report it quarterly to investors. Additionally, Extreme provided investors with the "Product Book to Bill Ratio" and "Service Book to Bill Ratio" (collectively, the "Book to Bill Ratios"). Unlike backlog, the Book to Bill Ratios measure order flow during a specific period, calculated as the dollar value of orders received divided by the dollar value of orders shipped and billed. A Book to Bill Ratio above 1.0 indicates stronger demand, with more orders received than fulfilled, while a ratio below 1.0 suggests weaker demand. At the outset of the Relevant Period, as of June 30, 2022, marking the end of the Company's fiscal year 2022 (FY22), both the Product and Service Book to Bill Ratios stood at 1.29x, reflecting robust demand.

92. On May 18, 2022, the Board authorized a share repurchase program with authorization to repurchase up to $200.0 million of Extreme common stock over a three-year period beginning in the fiscal year starting July 1, 2022. Under the authorization, a maximum of $25.0 million could be repurchased in any quarter.

**Defendants Engaged in Fraudulent Schemes**

93. When Extreme announced its FY22 results on July 27, 2022, the Company projected improvements in its supply chain environment during FY23. In light of the substantial backlog growth following the COVID-19 pandemic, investors and analysts sought clarity on how quickly Extreme could address its backlog and the potential effects on its revenue, growth trajectory, and underlying organic demand trends.

94. To reassure investors that fulfilling the Company's backlog would complement rather than detract from its organic revenue, profitability, and growth prospects, Defendants began the Relevant Period by emphasizing Extreme's "unprecedented" and "unabated market demand"

alongside its "record backlog," which they claimed to have "complete visibility into." They projected the backlog would continue growing to at least $600 million over the "next several quarters" and would only begin to decline in the fourth quarter of FY23(4Q23). Defendants asserted that these factors would drive "accelerated growth over the next several years," building on the anticipated double-digit revenue growth in FY23. Additionally, they assured investors that backlog levels would not normalize to a range of $50 million to $100 million until fiscal year 2026 (FY26).

95. However, unbeknownst to investors, during the Relevant Period, Extreme was experiencing adverse client demand trends. Clients had overordered products from Extreme in the wake of the COVID-19 pandemic due to limited alternative sourcing options and to mitigate supply shortages. This overordering effectively cannibalized Extreme's clients' purchasing needs during the Relevant Period.

96. Instead of fully and accurately disclosing these issues, Extreme, as supply chain constraints eased, began fulfilling back orders more quickly and in larger quantities than previously represented. This strategy created the false impression of sustained organic growth and strong client demand. In reality, Defendants used the fulfillment of back orders to compensate for the loss of organic client demand that occurred during the Relevant Period.

97. To conceal the fact that the Company's backlog was decreasing and "normalizing" faster than disclosed – thereby masking the decline in organic demand and revenue growth – Defendants made materially false and misleading statements about the Company's organic demand trends while engaging in a "channel stuffing" scheme to meet expected revenue numbers, as discussed further herein. They further obscured the truth by discontinuing the quarterly reporting of critical metrics, such as the Company's backlog and Book-to-Bill Ratios, thereby making it more difficult for investors and the public to discern the actual source of Extreme's revenues during the Relevant Period.

98. Rather than being transparent about the situation, Defendants repeatedly revised the timeline for drawing down Extreme's backlog in a series of piecemeal disclosures while simultaneously portraying the Company's organic demand as strong and on track. When analysts questioned Defendants in ways intended to ascertain the amount of the Company's backlog and the

interplay between its normalization and Company demand and revenues, Defendants repeatedly misdirected analysts and investors. For example, Defendants stated that they did not want to get into "dissecting backlog" and that investors should focus instead on the Company's reported revenues-regardless of whether those revenues were being generated by old orders or new ones.

99. Making matters worse, rather than be transparent, Defendants instead credited the Company's revenue growth to continued and organic customer demand, reassuring the investing public of "unabated" and "exceptionally strong" demand, "solid execution" and "strong funnel opportunities." Moreover, Defendants repeatedly claimed "complete visibility" into its backlog, of which, the "vast majority" of which included "firm customer commitments and which orders were "not cancelable," and accurately reflected "end user demand." Defendants specifically reassured investors:

> "We have complete visibility into our product backlog and have received negligible cancellations to date of less than 1% of bookings. Our backlog primarily consists of our latest-generation universal products." (4Q2022 Earnings Call – July 27, 2022, Defendant Meyercord)
>
> "Once backlog begins to release, it will unlock an accelerated wave of product shipments and revenue growth over multiple quarters. We have complete visibility into our product backlog, the vast majority of which is comprised of orders with current delivery request dates." (1Q2023 Earnings Call – Oct. 27, 2022, Defendant Meyercord)
>
> "[The backlog] it's not cancelable. These are real projects that we see. . . . the vast majority of our backlog is related to this kind of end user demand project-based business and we don't see double ordering." (Needham Technology & Media Conference – May 17, 2023, Defendant Tate)
>
> "We have the benefit of a healthy backlog of customer orders with request dates that spread fairly evenly through the end of our fiscal year. End customer orders remain firm and distributor orders have normalized, giving us confidence in our outlook for this fiscal year." (FY2023 Earnings Call – August 2, 2023, Defendant Meyercord)

In reality, orders placed were typically cancellable and returnable, and it was industry standard to be able to do so.

100. Throughout the Relevant Period, analysts accepted Defendants' explanations of

backlog insight and organic growth revenue. For example, Lake Street Capital Markets issued a report on July, 2022 stating that the "tale of FY22 was that market demand remains strong for Extreme networking products . . . and services . . . We thought Q4 (Jun) might hint at signs of a slowdown, especially in Europe, but that was not the case." The report continued: "Extreme maintained its FY23 revenue target of 10%-15% growth, driven by strong demand amongst all major verticals and the unlocking of the backlog," and Lake Street Capital Markets kept its Buy rating and raised its price target for Extreme stock to $15. Three months later, in response to the Company's 1Q 2023 earnings report, the same analyst reported "Extreme maintained its FY23 revenue target of 10%-15% growth, driven by strong demand amongst all major verticals," and reiterated its "Buy" rating.

101. Former employees have provided detailed accounts as to how Defendants initiated a scheme to leverage the Company's backlog by "stuff[ing]" its channel and therefore close revenue gaps and be able to report "strong" and "unabated" demand. First, rather than fulfill orders in a "first in, first out" ("FIFO") order as it historically had, Extreme "decommitted" all existing FIFO priority and instead began prioritizing orders based on size. Those distributors who placed the largest orders would receive prioritized backlog shipments, inflating the numbers, and ensuring that the Company would be able to meet and exceed its revenue targets.

102. This scheme was unsustainable, however. Distributers who had placed the largest orders, and whose orders were therefore prioritized under the new scheme, were allowed to return product, negatively affecting revenue. Moreover, the Company's change in policy burned bridges and destroyed the backlog – which caught up to the Company during the second and third quarters of fiscal year 2024.

103. According to a former employee of Extreme, who had served as the Senior Distribution Manager responsible for the TD Synnex distributer account, Defendants Meyercord, Thomas, and Rice directed Defendant Brown to manufacture demand for Extreme product rather than disclose the truth of the situation. According to this former employee, it was in the beginning of March 2022 "when it got ugly," and Extreme was vastly short on its Q3 2022 revenue targets.

104. The former employee attended a meeting called by Brown on March 16, 2022. During the meeting, Brown posed the question: "how do we get into the company # that the street expects…?" The plan was to "decommit all" the backlog orders based on when they placed, meaning that orders would no longer be prioritized based on a first come, first serve basis. Contemporaneous notes taken by the employee reflect the same:




105. On the same call, Defendant Brown explained that Defendant Meyercord "chose this path-lesser of the 2 evils" to "blow up" the Company's "first-in, first-out" ("FIFO") backlog allocation system because the Company was "running out of tricks in our bag" to meet its quarterly numbers. The former employee took this to mean that when forced to choose between drastically changing the Company's FIFO backlog allocation system or disclosing the reality of Extreme's situation to the public, Meyercord chose the former. Again, contemporaneous notes taken by the former employee show the same:






106. Multiple other former employees corroborated the events above. For example, another former employee who worked directly with a leading distributor, Westcon, gave the example of a deal he made with Westcon in the spring of 2022 based on the above policy changes at Extreme: Westcon would be prioritized and receive $50 million in backlog product in exchange for Westcon agreeing to purchase unneeded and "end of sale" stock for $52 million, resulting in a recorded $102 million order. Westcon would then be allowed to return most of the $52 million in unneeded stock the following quarter. That same former employee was aware of other similar deals with other distributors.

107. As the channel stuffing scheme took hold, Defendants realized that while quarterly revenue numbers might be up as a result, distributors' return of unwanted product would negatively affect future numbers. They therefore began shifting policy with distributors in an attempt to slow product return, even after deals were made. Former employees described how these actions understandably developed "continued distrust" with the Company's distributors, further threatening already tenuous relationships and future sales. A former employee described a Company-wide policy proposed at the time, explained in an email from Defendant Brown: "If a Distributor stock rotates a specific product, they are no longer eligible to re-order 'said' product for the next 12 months." Brown was "not concerned about policing this new policy. Having it in there will be a deterrent and drive the behavior we want."

108. That same former employee forwarded that email to Defendant Thomas explaining to Thomas that Brown "works with distributors to by bad product that is not sellable to make the corporate number and then artificially suppresses them from rotation [of] bad product to order good

product. He basically wants to punish or threaten them that if they return anything, he will not allow them to buy it again for 12 months… He basically admits having it there will get the behavior he wants and deter them… from managing their own finances and inventory.” (Ellipses in the original). The former employee also forwarded numerous other documents and emails to Thomas evidencing the channel stuffing scheme as part of the same email.

109. That same former employee left Extreme in July of 2022 as a result of the Defendants’ unethical behavior and practices. In an exit interview with then CFO Defendant Thomas, as well as Executive Vice President of Global Human Resources Kimberly Basnight, and his Human Resources Manager, the former employee again detailed to Thomas specific examples of channel stuffing and distributor manipulation as described herein.

110. To make matters worse, the Company was engaging in channel stuffing tactics not only with Distributors, but with partners and resellers as well during the Relevant Period. As the Company counted revenue at the time of shipment, early shipments to partners also artificially inflated revenue numbers. Moreover, because Extreme monitored end user sales, Defendants were aware that product was being shipped to partners without an end user order in place. Former employees corroborate these tactics, explaining how, at the end of each quarter, the Company would ship inventory to partners knowing that those partners did not yet have any end-user customer commitment to purchase the same. Partners were monetarily incentivized to take early shipments, leading to not only the shipment of unneeded product and an immediate overall loss of revenue for Extreme, but also an “exhaust[ion] of demand from the future.”

111. On top of channel stuffing schemes described above, Extreme also employed other tactics during the Relevant Period to artificially inflate revenue. For example, the Company would double count orders into the revenue and pipeline forecast, even when Defendants knew that those orders had been cancelled or were non-existent. Former employees explained that lost bids and cancelled orders would purposefully not be removed from revenue forecasts until the end of a quarter in order to maintain artificially inflated forecasts. A former employee recalled one specific incident in which Extreme ordered the wrong hardware for a customer. When the Company called back the wrong order and sent the correct one, it did not cancel out the first order, but instead put the new order

"on top of the old one," counting it as two orders and two sets of revenue, and including both in the 2Q 2024 revenue forecast.

112. As indicated above, by the second half of 2023, supply chain constraints began to loosen on Extreme and its competitors. With more options and flexibility, Extreme's customers stopped caving to the Company's pressure regarding channel stuffing. Instead, they started cancelling backlogged orders at a higher rate and not placing new orders with the Company. According to a former employee with connections to Extreme's customers, distributors were no longer in a position in which they had to place unneeded orders and have the liabilities placed on their books. When distributors no longer had anything to gain from Extreme's scheme, the scheme, along with the Company's quarterly revenue numbers, collapsed. As a result, the Company was forced, through a series of partial disclosures from January 25, 2023 through January 31, 2024, to reveal the truth behind its channel stuffing and manipulative sales and inventory practices. Notable, over the course of those disclosures, Defendants continued to make false and misleading statements, as described further herein, that kept stock prices at an artificially high level until the Company's final disclosure on January 31, 2024.

113. In sum, during the Relevant Period, Defendants' statements, when considered in context and collectively, created a false and misleading impression that Extreme was experiencing robust organic customer demand, a sustained backlog, and market share gains expected to drive record revenues for years to come. These representations caused Extreme's stock price to reach a Relevant Period high of over $32 per share. However, the truth was gradually revealed through a series of partial corrective disclosures, leading to a significant decline in Extreme's stock price to less than $13 per share.

## MATERIALLY FALSE AND MISLEADING STATEMENTS

114. On July 27, 2022, Extreme announced its financial results for the fourth quarter and fiscal year ended June 30, 2022 ("4Q22" and "FY22," respectively). The Company reported these year-end results in three key components: (i) Extreme issued a press release (the "FY22PR"); (ii) Extreme held a conference call with investors and analysts to discuss the Company's financial results

(the "FY22 Call"); and (iii) Extreme made a PowerPoint presentation available for the FY22 Call that provided certain additional financial information (the "FY22 PPT").

115. The FY22 PR, subtitled "*Record Bookings and Double-Digit Revenue Growth in FY22 Reiterates FY23 Revenue Growth of 10-15%,*" reported that Extreme's revenues for the quarter were "$278.2 million, flat year-over-year, and down 3% quarter-over quarter," and Extreme's revenues for FY22 were "$1.1 billion, up 10% from $1.0 billion in fiscal 2021." The FY22 PR quoted Defendants Meyercord and Thomas who highlighted Extreme's purported "unabated market demand" and "record backlog," stating in relevant part:[3]

> "***For FY22 we achieved double-digit growth in both bookings and revenue due to strong demand*** for our differentiated enterprise networking and 5G infrastructure solutions. Bookings grew 24%, revenue exceeded $1.1 billion for the first time, and we exited the year with a record product backlog of $513 million . . ." stated Ed Meyercord, President and CEO of Extreme.
>
> ***"Our teams continue to see <u>unabated market demand</u>, as networking projects remain a priority for our global customers. This is evidenced by our FY23 funnel of new projects, which is up double-digits from last year.*** Our differentiated Cloud and Fabric solutions are driving more competitive wins today than ever before. Our new ExtremeCloud SD-WAN and AIOps solutions provide us new ways to drive long-term subscription growth," concluded Meyercord.
>
> Extreme's Chief Financial Officer Remi Thomas, added, "***After another quarter of solid execution, we achieved double-digit growth for the year and improved operating margins, even in the current supply chain environment***. We crossed the $100 million mark in SaaS ARR driven by the strength of our Cloud offerings. Finally, our strong cash flow performance during the quarter allowed us to return another $20 million to shareholders in the form of share buybacks.
>
> ***"As we enter FY23, our <u>record backlog</u>, combined with the expected improvement in the supply chain environment through the course of the year gives us further confidence that we can grow the topline between 10-15%,*** improve our gross margin to exit the year above 60%, and deliver an operating margin between 10-15%," concluded Thomas."

116. During the FY22 Call, Defendant Meyercord, in his prepared remarks, asserted that Extreme was facing "unprecedented demand." He further projected that the Company's backlog

[3] Emphases are added unless otherwise noted.

would continue to grow over "the next several quarters" and would only "begin to shrink" in 4Q23, stating the following in relevant part:

> ***Our results for fiscal '22 highlight <u>unprecedented demand</u> for Extreme's solutions and a very vibrant and healthy market for networking.***
>
> ***We reported record bookings growth of 24% which is a clear indication that we're taking share and winning in the market. And our forward-looking funnel for fiscal '23 is up double digits year over year. This is a leading indicator of future bookings growth. The differentiation of our fabric and cloud solutions for enterprise customers, combined with the high performance of our global sales and channel teams gives us the confidence in our outlook for continued growth and demand.*** Our technology solutions are critical to infrastructure initiatives underpinning digital transformation for all of our customers around the world. We believe these important projects will continue to remain a priority, irrespective of a changing macroeconomic environment.
>
> ***For the year, our double-digit revenue growth led to an all-time high revenue of $1.1 billion, <u>yet it was understated by the $400 million of incremental backlog we built during the year</u>. Our total Q4 ending backlog was $513 million, thanks to the current supply chain environment.***
>
> * * *
>
> ***As we noted during our Investor Day in May, <u>we expect to continue to build backlog for the next several quarters,</u> given our outlook for continued bookings growth and the gradual recovery in supply chain. For the guidance we provided, we expect sequential improvements in our ability to deliver product to customers throughout fiscal '23. Based on the lead times and commitments<u>, we expect backlog will begin to shrink by Q4 of fiscal '23. We have complete visibility into our product backlog</u> and have received negligible cancellations to date of less than 1% of bookings.*** Our backlog primarily consists of our latest-generation universal products. So when we begin to ship product, we will also see an improvement in subscription and services bookings that are attached to our wired and wireless products.

117. Later in the call, when an analyst inquired about the Company's bookings and pipeline, Defendant Meyercord responded by emphasizing that Extreme continued to experience exceptional demand trends, stating in relevant part:

> ***And so Alex, you're rightfully pointing out kind of this – how we're looking at bookings, which is really our measure of true demand, and then versus revenue,***

> ***and our revenue outlook is really a function of supply chain and product that we are able to release, given the massive backlog that we've built up and the continued strength of bookings.*** So I'll just start off with supply chain. You've asked about that.
>
> ***What we see is a gradual improvement throughout the year. So think of a step function where we will be stepping our revenue, quarter by quarter, throughout the year, based on our outlook of supply chain. . . .***
>
> ***So our teams, as I mentioned in my comments, are more confident today than they have been in our ability to step function our supply of product to our customers' partners. So what does that mean? That is how we built the revenue forecast for fiscal '23, which is that step function, with sharper improvement in the second half of the fiscal.***
>
> ***As it relates to demand, our demand has been strong, as we talked about it for the year, 24% for us. That's record-breaking performance. . . .***
>
> In terms of our internal plans, we hit our internal target, which is why we continue to grow bookings. But relative to where we were in the March quarter with the pricing action, it was different. ***As we look out at the first half of fiscal '23, we see bookings growth continue, and that is a function of several factors.*** First of all, we rely on our teams and our bottoms-up roll-up from direct sellers in the field rolling up geographically. ***There's a lot of confidence from our field teams in the numbers that they're actually calling, I'd say stronger than in years past. The second thing, we look at that funnel, and we run our own metrics and look at the commit levels and the confidence levels with our algorithms and our formulas there. And they're up***. As we mentioned, if you look at our funnel year over year, we are up over double digits in terms of the opportunities. And over the course of last year, with competitiveness at Extreme, our conversion rates on that funnel have improved, so we're more confident about the quality of the funnel and our ability to win, and we still see growth there.
>
> Finally, we have an AI tool, [recall] the number based on all the CRM activity and looking at the opportunities. That's up, and now our partners, channel partners and our distributors, they have an outlook and view, and they're calling a number. ***So when we look at all those different data points, it points to increase in demand.*** What I would tell you is that for the first quarter, we definitely expect to be over a book-to-bill of 1 and that the normal seasonal trends in bookings and comparisons will likely be different because of the pricing actions.

118. Later in the call, when an analyst pressed for details about the Company's backlog, Defendant Meyercord confirmed that Extreme anticipated its backlog would reach at least $600 million before beginning to normalize in 4Q23, stating in relevant part:

> ***Oh, the backlog, yes. So, we would expect to see backlog decline. We would – what we mentioned is that it would level out and start chipping away at that in our Q4. We're not expecting a meaningful impact, but it's really in the second half of the calendar '23 that you'll start to see us take more meaningful chunks out of that backlog.*** And again, it will all be based on supply of components and the increased volume. ***So I think through our fiscal year, the second half of our fiscal year, you'll see a step up, and then throughout fiscal '24 and probably into fiscal '25, you'll see us right-size our backlog.***
>
> * * *
>
> ***I'm not sure we provided guidance on that, but I think that [$600] would be a – I think that's a fairly – I think that's a fairly conservative number. I would say that's a safe number, <u>based on the strength of bookings that we've got relative to supply</u>, especially if you look at the trend over the last several quarters.***

119. On August 2, 2022, Defendant Meyercord gave an interview to computer publication trade newspaper CRN Magazine, titled "Extreme Networks CEO: Beating Cisco an 'Exclamation Mark' on Fiscal Year 2022." In response to the question "[h]ow does Extreme's most recent fiscal quarter highlight how you're winning against the competition?" Meyercord answered:

> I can tell you that ***growth is spread across all of our geos*** when we look at the strength and performance in the Americans [sic], in EMEA, in Asia-Pacific. When we look at overall industry vertical growth, our solutions have been very successful across the board, across our verticals, ***so, it's just this very evenly spread, organic growth that we're experiencing at Extreme. It means that we're taking share.***

120. On August 29, 2022, Extreme submitted its 2022 annual report on Form 10-K ("FY22 10-K") to the SEC. It was signed by Defendants Meyercord, Burton, Carinalli, Holmgren, Kennedy, Khanna, and Shoemaker. This report, included certifications attesting to its accuracy and completeness signed by Defendants Meyercord and Thomas. The FY22 10-K also incorporated the FY22 financial results outlined in the FY22 press release referenced earlier, stating:

> ***Product revenues increased $62.3 million or 8.9% for the year ended June 30, 2022, compared to fiscal 2021. The product revenues increase for the year ended June 30, 2022 as compared to fiscal 2021 was primarily due to strong demand for our products*** partially offset by supply chain constraints which impacted our ability to fulfill the demand for our products during fiscal 2022.

121. Around the time Extreme filed its FY22 10-K, the Company published a letter on its website for shareholders, in which Defendant Meyercord emphasized Extreme's substantial backlog and strong demand. He asserted that these factors positioned the Company for "accelerated growth over the next several years," stating in relevant part:

> ***We are pleased to report record results, unprecedented economic growth and continued business momentum at Extreme as we closed fiscal 2022. . . .***
>
> Revenue exceeded $1.1 billion for the first time in Extreme's history despite unprecedented supply chain constraints. ***And we exited the year with a record $513 million in product backlog, up 5x from last year, setting the stage for <u>accelerated growth over the next several years</u>. The continued strength of bookings demand, the re-leveling of our book-to-bill ratio and the high quality of our order backlog gives us greater visibility into the next several years and increased confidence of the returns from our investments in new products, people, and innovations.***

122. On September 28, 2022, the Board, comprised of Meyercord, Burton, Carinalli, Holmgren, Kennedy, Khanna, and Shoemaker, caused the Company to issue a definitive proxy statement soliciting stockholder votes in advance of the special meeting to be held November 17, 2022 (the "2022 Proxy"). These seven Individual Defendants solicited stockholder votes in favor of four management proposals, including the election of all seven directors to new terms as directors through the 2023 annual meeting and a proposal to "[a]pprove an amendment and restatement of our Equity Incentive Plan to, among other things, add 6,500,000 shares of our common stock to those reserved for issuance under the plan," and to restate the Company's certificate of incorporation to adopt simple majority voting provisions. The 2022 Proxy repeatedly directed shareholders to the FY22 10-K and claimed that the Company's incentive compensation practices reward executives for performance.

123. According to the 2022 Proxy:

> Our Board has an active role in overseeing management of the risks we face. This role is one of informed oversight rather than direct management of risk. Our Board regularly reviews and consults with management on the Company's strategic direction and the challenges and risks we face. Our Board also reviews and discusses with management on a quarterly basis its financial results and forecasts. The Audit Committee of our Board oversees management of the Company's financial risks, and oversees and reviews our risk management policies, including the Company's

> investment policies and anti-fraud program. The Compensation Committee of our Board oversees our management of risks relating to and arising from our compensation plans and arrangements. These committees periodically report on these matters to the full Board.
>
> Management is tasked with the direct management and oversight of legal, financial and commercial compliance matters, which includes identification and mitigation of associated areas of risk. Our Chief Administrative and Sustainability Officer provides regular reports of legal risks and developments to the Audit Committee and to our full Board. Our Chief Financial Officer, Corporate Controller, Senior Vice President of Financial Planning & Analysis, and Senior Director of Internal Audit provide regular reports to the Audit Committee concerning financial, tax and audit related risks. In addition, the Audit Committee receives periodic reports from management on our compliance programs and efforts, our investment policies and practices, and the results of various internal audit projects. The Compensation Committee's compensation consultant, together with our Senior Vice President of HR and Chief Diversity & Inclusion Officer and other members of management, provides analysis of risks related to our compensation programs and practices to the Compensation Committee.

124. Also included in the 2022 Proxy was a Report of the Audit Committee, which specified that the Committee "meets with the Company's independent auditors, with and without the Company's management present, to discuss the results of their audit of the Company's financial statements and its internal control over financial reporting as of the end of the fiscal year, the Company's internal audits, and the overall quality of the Company's financial reporting." 2022 Proxy at 67. The 2022 Proxy continues: "Additionally, the Audit Committee has discussed and reviewed with the Company's management the audited financial statements and management's report on internal control over financial reporting as of the end of the fiscal year." *Id.*

125. The Audit Committee's responsibilities included assisting the Board "in fulfilling its oversight responsibilities with respect to financial risks, including risk management in the areas of financial reporting, internal controls, investments and compliance with legal and regulatory requirements." 2022 Proxy at 13.

126. In the 2022 Proxy, the Board specifically admitted to having "an active role in overseeing management of the risks" that Extreme faces, and that the Audit Committee oversees "management of the Company's financial risks." *Id.* at 11. In the Company's August 29, 2022 Form 10-K ("2022 10-K"), Extreme details at length the risks and uncertainties that it considers substantive enough to possibly have a "material and adverse effect on [its] business, operations, industry, financial condition, results of operations or future financial performance." 2022 10-K at 14.

127. The risks detailed in the 2022 10-K include, *inter alia*, the impacts of the COVID-19 pandemic on the business, including, specifically, "demand for Extreme's products and services, including Extreme's enterprise-scale products, have been and may continue to be reduced due to, among other things, uncertainties in the global economy and financial markets, cancellation or postponement of large gatherings, reduction in office sizes, as well as reduced customer spending." 2022 10-K at 15.

128. Another specific risk identified as overseen by the Board is the need to "develop and increase the productivity of [the Company's] distribution channels to increase net revenues and improve [] operating results." *Id*. at 18. The 2022 10-K goes on the explain: "A substantial reduction or delay in sales of our products to a significant reseller, distributor or other customer could harm our business, operating results and financial condition because our expense levels are based on our expectations as to future revenues and, to a large extent, are fixed in the short term." *Id*.

129. Five pages of the 2022 10-K are dedicated to "Risks Related to Financial Matters," including, *inter alia*, profitability, acquisition and strategic investments, restructuring, stock price, competition, investment, credit facility restrictions, debt or equity financing, the Company's ability to borrow, the credit risk of Extreme's channel partners and end customers, adequate management of financial reporting, internal controls, and the public funding of educational institutions. *See* 2022 10-K at 20-25.

130. These substantive risks identified in the 2022 10-K, which was signed by the entire Board, demonstrate that the Board, and specifically the Audit Committee Defendants, who admitted to playing an "active role" in overseeing management of these risks in the 2022 Proxy, were specifically tasked with monitoring and managing the very risks at the heart of the wrongdoings alleged herein.

131. The 2022 Proxy was therefore materially misleading in that it: (i) touted Audit Committee responsibilities but omitted to disclose that the Audit Committee was not discharging its duties under the Audit Committee Charter, while soliciting shareholder votes to reelect the entire Board and to approve a new equity incentive plan and add 6.5 million shares of stock for compensation of wrongdoers; and (ii) touted the Board's oversight of enterprise risk but omitted to

disclose that the Board was not adequately overseeing risks related to the Company's internal controls related to critical audit matters.

132. On October 27, 2022, Extreme announced its financial results for the first quarter of FY23, which ended on September 30, 2022 ("1Q23"). The Company disclosed its 1Q23 results through three channels: (i) a press release (the "1Q23 PR"), which was also filed with the SEC as an exhibit to a Form 8-K signed by Defendant Thomas; (ii) a conference call with investors and analysts to discuss the financial results (the "1Q23 Call"); and (iii) a PowerPoint presentation accompanying the 1Q23 Call, providing additional financial details (the "1Q23 PPT").

133. The 1Q23 PR, subtitled "*Double-Digit Growth Fueled by Cloud Subscription Results in Record Revenue*," disclosed that Extreme's quarterly revenues were $297.7 million, up 11% year-over-year, and up 7% quarter-over-quarter." The press release included a statement from Defendant Thomas, affirming that Extreme was on track to achieve FY23 revenue growth of 10%-15%. Additionally, the 1Q23 PR projected quarterly revenue for the second fiscal quarter of 2023 ("2Q23") in the range of $299 to $309 million.

134. In the prepared remarks delivered by Defendant Meyercord during the 1Q23 Call, he emphasized the Company's "record" levels of demand, revenues, and backlog. He further indicated that the backlog was expected to continue growing through the end of FY23, stating in relevant part:

> ***We had a record quarter as demand for cloud-driven networking and for Extreme Solutions has never been stronger. Again, our share gains are evident by double-digit revenue growth, record revenue and continued growth of backlog, which now sits at $555 million.***
>
> * * *
>
> ***With a strong outlook for bookings growth and the gradual improvement in supply, <u>we expect to build backlog through the end of the fiscal year</u>. We anticipate neutral book-to-bill or release of backlog in our fiscal Q1 of '24. Once backlog begins to release, it will unlock an accelerated wave of product shipments and revenue growth over multiple quarters. We have complete visibility into our product backlog, the vast majority of which is comprised of orders with current delivery request dates.***

135. In response to a question from an analyst, Defendant Meyercord reaffirmed that the Company's backlog was expected to grow throughout FY23, stating in relevant part:

> [W]e're expecting to grow backlog during the year. So in terms of how we get to our fiscal year growth, the expectation is that we are not reducing backlog, but we're growing backlog. I just want to clarify that.

136. Later in the call, Defendant Thomas stated that the backlog would not normalize to a range between $50 million and $100 million until FY26, stating in relevant part:

> ***Christian, I'll let Ed chime in as well because we're both very close to the topic, but we believe it's going to be fiscal '26 when it really goes back to normal. And we'd expect our backlog to be anywhere between $5- million to $100 million at that point in time.***

137. On October 28, 2022, Extreme submitted its 1Q23 quarterly report on Form 10-Q ("1Q23 10-Q") to the SEC. This report, signed by Defendant Thomas and certified by both Defendants Meyercord and Thomas, attested to its accuracy and completeness. The 1Q23 10-Q incorporated the financial results detailed in the 1Q23 PR.

138. On November 15, 2022, Defendant Meyercord attended the Needham Virtual Security, Networking & Communications Conference. In response to an analyst's question regarding how the Company got to where it is "from being a $75 million a quarter company 10 years ago that hadn't had any growth for a decade to a company with the kind of robust results" the Company has been "prowessed in," Meyercord responded:

> ***And as you and I've discussed, we built up quite a bit of backlog because of the supply chain scenario, but it's all very high quality and we are very confident in the backlog. And so in a way, it just gives us a lot of confidence in the revenue growth forecast that we've got into the future and for the next couple of years. So, we are in a different place and we're going to continue to build on this. We've got a great team and yeah, we're hitting on all cylinders right now.***

139. The analyst followed up saying that it was "surprising" that Meyercord "made some pretty positive comments about the backlog staying pretty much where it is through the June fiscal year end quarter." Meyercord responded: "***We're not seeing [decommits], we're not seeing de-books.***

***The number that we've thrown out as a fraction of 1% and we would attribute that more than normal course of business kind of thing. So, yeah to your point, we're feeling a lot of confidence in the backlog number we have.***"

140. Later, at the same conference, Defendant Meyercord explained that the Company's revenues were actually underreported, as they'd been accounted for in the Company's backlog. An analyst asked: "You're looking at a pretty good growth rate in the fiscal year. But if I were to look out and say, okay, if I were to get modestly more availability instead of the growth rate of, say, 12% in revenues in that timeframe. Could it be 15% to 20% and dig into that backlog a little sooner and we have a lot of leverage?" And Meyercord responded:

> Absolutely. We haven't made the call yet for – a revised call yet in terms of supply chain and the implication for that in terms of unlocking backlog. But the answer is, yes. It absolutely could be. And as you know, as we see that, we also have some interesting investment opportunities that we're looking at to drive bookings growth. There's operating leverage in the model, Alex, what as you know, gets us excited as we look at this, because I say it kind of tongue in cheek, ***but we've been underreporting our earnings, because we haven't been showing our revenue, because we've been putting in backlog.*** Meanwhile, we've been paying for it.

141. The statements referenced above were materially false and misleading when made because they omitted the disclosure of the following adverse facts related to Extreme's business, operations, and financial condition, which were either known to the Defendants or recklessly disregarded by them, including:

(a) that Extreme was experiencing adverse client demand trends, as its clients had over-ordered products during the COVID-19 pandemic to mitigate supply shortages and due to limited alternative sourcing options, thereby cannibalizing their purchasing needs during the Relevant Period;

(b) that Extreme was increasingly compensating for these adverse organic demand trends by fulfilling backlog orders at a rate that materially exceeded the proportion previously represented to investors;

(c) that as a result of (a) and (b), Extreme was depleting its backlog at a significantly faster rate than had been represented to investors;

(d) that, as a result of (a) through(c), Extreme's backlog was already declining and at a much faster pace than indicated by Defendants' statements to investors, which asserted that the backlog would only "begin to shrink" in 4Q23 and would not "really go back to normal" until FY26;

(e) that, as a result of (a) through(d), Extreme's backlog was not on course to continue growing to $600 million; and

(f) that, as a result of (a) through(e) above, Defendants had materially misrepresented Extreme's organic demand, revenue growth, and market share gains, as the fulfillment of Extreme's backlog concealed a decline in organic demand and the associated revenues.

142. On November 17, 2022, the Board met and increased the authorization to repurchase stock in any quarter from $25.0 million per quarter to $50.0 million per quarter.

143. On November 18, 2022, the Company filed a Form 8-K with the SEC, disclosing the results from the votes on the proposals contained the 2022 Proxy. In particular, all seven directors were reelected to new terms and the proposed equity incentive plan amendment was approved, as was the amendment to the Company's certificate of incorporation. The misleading disclosures in the 2022 Proxy were fundamental to the shareholder approval of the 2022 Proxy's proposals. As a result of the misleading statements and omissions, the Company was harmed.

144. Signaling a significant shift, on January 25, 2023, Extreme issued a press release announcing the resignation of Defendant Thomas, the Company's CFO, effective February 16, 2023. The accompanying Form 8-K further disclosed that Defendant Tate would be appointed as the Company's Principal Financial and Accounting Officer. Defendant Tate was set to take on these roles temporarily while the Company initiated a search for a new CFO.

145. Also on January 25, 2023, Extreme announced its financial results for 2Q23, which ended on December 31, 2022. As part of this disclosure, Extreme revealed that its backlog had decreased to $532 million compared to 1Q23. Additionally, the Company's Product Book-to-Bill Ratio had dropped from 1.3x to 0.9x, and its Service Book-to-Bill Ratio had declined from 1.4x to 1.2x. During a related earnings call, Extreme executives further revised the timeline for backlog normalization, shortening it from their previous projections.

146. Following this news, the price of Extreme stock fell from $19.31 per share at market close on January 24, 2023, to $16.50 per share on January 25, 2023, representing a nearly 15% decline on unusually high trading volume exceeding 9 million shares.

147. This, however, was not the end of the story: while being forced to admit certain adverse numbers, the Defendants still failed to fully disclose the truth and continued to make materially false and misleading statements and omissions as outlined herein, and the price of Extreme stock remained artificially inflated as a result.

148. On January 25, 2023, Extreme disclosed its 2Q23 results through three channels: (i) a press release (the "2Q23 PR"); (ii) a conference call with investors and analysts to discuss the financial results (the "2Q23 Call"); and (iii) a PowerPoint presentation accompanying the 2Q23 Call, which included additional financial details (the "2Q23 PPT").

149. The 2Q23 PR, subtitled "*Delivers Consistent Double-Digit Growth and Raises FY23 Revenue Outlook*," announced that Extreme's quarterly revenues were $318.3 million, up 13% year-over-year, and up 7% quarter-over-quarter." The press release included a statement from Defendant Meyercord, who emphasized "end customer demand" and attributed the Company's improved supply chain environment to its ability to raise the FY23 revenue growth outlook, stating in relevant part:

> President and CEO Ed Meyercord stated: "Extreme delivered another quarter of great results. ***The continued strength of subscription and accelerated product deliveries drove another quarter of double-digit year-over-year revenue growth. We are raising our FY23 revenue growth outlook to the high-end of our 10-15% range and expect this momentum to continue into FY24, as the supply chain environment continues to improve."***
>
> ***"We feel confident in end customer demand.*** The majority of our bookings are with government, education, and healthcare sectors, where spending is more resilient. Our enhanced fabric and cloud subscription offerings are gaining traction in the marketplace. ***Finally, we have good visibility for the second half of the year based on the strength of our sales funnel," continued Meyercord.***

150. The 2023 PPT featured a slide titled "FQ2'23 HIGHLIGHTS" which identified "Backlog" of "$542M" as one of the items "DRIVING GROWTH." This figure represented a decline from the $555 million reported in the previous quarter. The same slide also highlighted that the

Company's Product Book-to-Bill Ratio had dropped from 1.3x in the prior quarter to 0.9x, while the Service Book-to-Bill Ratio had decreased from 1.4x to 1.2x.

151. In Defendant Meyercord's prepared remarks during the 2Q23 Call, he emphasized "***exceptionally strong***" customer demand, highlighted the Company's market share gains, and referenced the size of its backlog as key factors in raising Extreme's FY23 revenue guidance, stating in relevant part:

> ***We had another record quarter, as demand for cloud-driven networking and for Extreme Solutions remains exceptionally strong with good visibility through fiscal year end '23, leading us to raise our full year revenue outlook to the high end of our range.***
>
> ***Our share gains are evident by a second consecutive quarter of double-digit revenue growth, 17% growth in product revenue,*** record free cash flow ***and a sizable backlog.***

152. Later in the call, Defendant Meyercord stated that Extreme's backlog would "remain relatively stable for the next several quarters" due to the Company's "strong outlook for bookings growth" and the "gradual improvement of supply," stating in relevant part:

> ***On the supply chain side, our ability to pull in components enabled us to achieve revenue upside, which we believe is sustainable into the second half of the year. As a result, we are raising our revenue outlook to the high-end of our prior 10% to 15% guidance range. We continue to be laser-focused on tactical execution to meet our customers' needs.***
>
> This quarter alone, we qualified an additional 37 component suppliers and significantly reduced our parts shortages. ***Based on all the actions we've taken with our supply chain over the past year, we now have visibility and confidence that the ramp of our product deliveries will continue to improve and reduce lead times.***
>
> ***With a strong outlook for bookings growth and the gradual improvement of supply, we expect backlogs to remain relatively stable for the next several quarters. We're in the beginning stages of an accelerated wave of product shipments and revenue growth over multiple quarters.***

153. He continued:

> ***As we enter the second half [of FY2023], our confidence in the revenue outlook is supported by our product backlog of $542 million,*** our services and subscription deferred revenue balance of $446 million, as well as a product pipeline that is up double-digits year-over-year. . . . ***Against this backdrop, we expected for Q3 revenue to be in the range of $315 million to $325 million***, gross margin to be in the range of 58% to 60%, operating expenses to be in the range of $140 million to $145 million, and earnings to be in the range of $31.1 million to $38.4 million, or $0.23 to $0.29 per diluted share. We expect to cross the 60% gross margin threshold in Q4. For full fiscal year '23, we expect revenue growth towards the high end of our 10% to 15% outlook, with an operating margin in the mid-teens.

154. Also during the call, Defendant Meyercord asserted that customer demand was expected to keep the Company's backlog "very, very stable" throughout the second half of FY23, stating in pertinent part:

> But our supply chain teams have done a great job. We talked about all the work that's going on behind the scenes. So we are seeing it loosen. So we've seen an acceleration in the release of products. And at the end of the day, we want to take care of our customers with some of that older aged backlog that's out there. . . .
>
> ***The second half for us, as you know, we see a lot of demand, and we're really confident our teams are very confident of that demand. So we have booking strength we see in the second half of the year, and that should hold that backlog – that should hold the backlog very, very stable through the second half of the year.***

155. During the call, Defendant Meyercord updated the Company's timeline for backlog normalization, extending it to the last quarter of FY25 ("4Q25"), i.e., the quarter ended June 30, 2025, citing the "strength of demand" and the anticipated release of backlog, in relevant part:

> ***We still have the same outlook and the way we've guided that is, that we see backlog returning to normal by the last quarter of fiscal '25. And then sort of being normal as we enter '26. And so, that's how we model it. And that's how we've seen it. And it's a combination of strength of demand, because we continue to see strong bookings. And then also just this – the release of backlog in terms of how we forecast supply chain.***

156. On January 27, 2023, Extreme submitted its 2Q23 quarterly report on Form 10-Q ("2Q23 10-Q") to the SEC. The report, signed by Defendant Thomas and certified by both Defendants

Meyercord and Thomas, attested to its accuracy and completeness. The 2Q23 10-Q also incorporated the financial results outlined in the 2Q23 PR detailed above.

157. On April 24, 2023, Extreme announced that Defendant Rhodes would assume the role of the Company's new CFO, effective May 30, 2023.

158. On April 26, 2023, Extreme reported its financial results for its third fiscal quarter of FY23, ended March 31, 2023 ("3Q23"). Extreme reported its 3Q23 results in three parts: (i) Extreme issued a press release (the "3Q23 PR"), a copy of which the Company also filed with the SEC on a Form 8-K signed by Defendant Tate; (ii) Extreme held a conference call with investors and analysts to discuss the Company's financial results (the "3Q23 Call"); and (iii) Extreme made a PowerPoint presentation available for the 3Q23 Call that provided certain additional financial information (the "3Q23 PPT").

159. The 3Q23 PR, subtitled "Delivers Record Revenue, Operating Margin, and EPS and Raises FY23 Outlook," announced that Extreme's revenues for the quarter were "$332.5 million, up 16% year-over-year, and up 4% quarter-over-quarter." In the 3Q23 PR, Defendant Meyercord was quoted, describing the time as a "quarter of record results," attributing the success to the Company's improving supply chain, market share gains, and strong customer demand. The PR stated in relevant part:

> President and CEO Ed Meyercord stated: "***Extreme delivered another quarter of record results punctuated by improving supply chain conditions, the strengthening of our competitive position, and solid execution. Market share gains were highlighted by 20% growth in bookings from new customers during the quarter, which drove sequential product bookings growth of 6%.*** The combination of our enterprise cloud and fabric networking solutions delivers a simplified experience for customers and provides our team a competitive advantage in the field. ***Our funnel of opportunities is up double-digits and we expect higher sequential bookings growth as we head into Q4.***"

160. Similar to previous presentations, the 3Q23 PPT featured a slide titled "FQ'23 HIGHLIGHTS," which included a column of items "DRIVING GROWTH." However, unlike prior presentations, this slide omitted disclosure of the Company's backlog amount, the Product Book-to-Bill Ratio, and the Service Book-to-Bill Ratio.

161. In Defendant Meyercord's prepared remarks during the 3Q23 Call, he emphasized the quarter's record results, attributing them to "improvements in our supply chain" and "demand trends." Additionally, Defendant Meyercord further revised Extreme's timeline for the normalization of the Company's backlog, now projecting it to occur in the first quarter of FY25 ("1Q25") with a revised range of $75 million to $100 million, stating in relevant part:

> ***Extreme delivered another quarter of record results, driven by solid execution of our teams. Our top line performance was highlighted by improvements in our supply chain that drove 16% total revenue growth and 22% product revenue growth on a year-over-year basis.*** We achieved double-digit growth in 8 of the past 9 quarters. Our operating margin and EBITDA also achieved quarterly records in Q3.
>
> ***Product orders grew 6% sequentially and orders from new customers grew 20% during this timeframe.*** This is the second consecutive quarter where new logos are playing a substantial role in our growth. ***We believe demand trends will continue as customers recognize the simplicity of our one network, one cloud solutions relative to the complexity and total cost of ownership of our largest competitors.***
>
> ***Although our Q3 bookings typically decline sequentially in the March quarter, we in fact grew from December, reflecting strong demand.***
>
> * * *
>
> This quarter, we were able to bring our lead times down faster than expected in Q3, putting us in a healthier position. The actions we have taken with our supply chain over the past year give us greater visibility and confidence that the consistently quarter ramp-up of our product deliveries and revenue will continue.
>
> <u>***We expect our backlog will normalize to a range of $75 million to $100 million in our Q1 fiscal '25.***</u>

162. When an analyst pressed for additional details about changes to the Company's backlog, Defendants Meyercord and Tate acknowledged the revised normalization parameters, shifted the emphasis to the Company's revenues, and reaffirmed the expectation of a mid-teens growth rate through FY25, stating in relevant part:

> [Meyercord:] Yes, Mike, let me jump in and then Cristina, feel free to follow. Yes, we – ***there's a distributor component of backlog and then there's the customer***

> ***order component. And as we said, the customer order component of backlog did not change during the quarter. But the distributor ordering is driven by lead times and lead times came in faster than we expected this quarter, which that occurrence is good news because it means that the market is getting healthier, and we're able to deliver products to customers sooner.***
>
> ***At the same time, it means that our distributors will adjust their orders accordingly. And the early ordering that we had experienced earlier would effectively go away and older orders would be adjusted effectively and modified to the shorter lead time. What we are doing is we're trying to focus people, Mike, on our revenue outlook, and we're confirming the mid-teens revenue growth through our fiscal '25.***
>
> And with a new target point of $75 million to $100 million in ending backlog, we think that distributors going forward are going to have – they'll keep more orders on us and they'll have more inventory on hand so they don't get caught the way they got caught this last cycle. ***What we want people to do is focus on that $75 million to $100 million, and then that would be a landing point for backlog and then focus on what we're calling is going to be this mid-teens, a mid-teens revenue growth rate through fiscal '25.*** Cristina, I don't know if you want to add anything to that?
>
> [Tate:] Thanks, Ed. I would just add that the distributor – as we went through this constrained supply chain environment, the days that distributors were on order with us was elevated. ***And as lead times come down, as Ed mentioned, the whole environment is getting normalized, and so the distributor orders and the backlog is coming to that normalized level of $75 million to $100 million. And we expect to get to that level at around Q1 '25. And as Ed said, our scenario-based planning gives us commitment and confidence in the guidance that we gave.***

163. Later in the call, Defendant Meyercord announced that Extreme would discontinue providing backlog and Book-to-Bill Ratios in its quarterly presentations, as it had previously done. He stated: "[y]es, I think what we'll do is just – we'll let you know how we're trending towards that end goal."

164. When an analyst pressed again for clarification regarding the Company's backlog during the call, Defendant Meyercord stated that the backlog was "about 5x" normal. He also emphasized the Company's revenue growth outlook and reiterated the timeline for backlog normalization through 1Q25, stating in relevant part:

> Yes. Thanks, Christian, for the question. ***<u>What we've said is that overall backlog is about 5x.</u>*** Obviously, distributor behavior is a little more tied to lead times and

> lead times came down faster. We're expecting them to come down, so ***we really don't want to get into sort of dissecting backlog. Really what we want to do is reinforce our outlook of revenue growth. And we're doing that out through our fiscal '25, which is out there. We baked that into our revenue guide, and that's where we're trying to focus everyone.***

165. On April 27, 2023, Extreme filed its 3Q23 quarterly report on Form 10-Q ("3Q23 10-Q") with the SEC. The report, signed by Defendant Tate and certified by Defendants Meyercord and Tate, attested to its accuracy and completeness. The 3Q23 10-Q also incorporated the financial results outlined in the 3Q23 PR detailed above and reported total revenues of $332.5 million and product revenues of $241.1 million for the quarter.

166. On May 17, 2023, Defendant Tate had the following exchange with an analyst at the Needham Technology & Media Conference:

> Analyst: …you guys have pretty good visibility four, five, six quarters at least, and a pretty strong pipeline. So can you talk a little bit about…the pipeline and visibility that you're seeing in terms of new customer wins, in terms of the aging and weighting of that pipeline?"
>
> Tate: So we're always—obviously, we're very keen on demand and where demand is going. And so, we do a lot of analytics around that…***And we're seeing good demand. We're seeing double-digit growth in our weighted funnel year over year. And so that gives us confidence that demand is going to continue***. We saw, like you said, new logo growth, 20% bookings growth from new logos. And so we're expanding into different markets, going beyond our installed base. We're seeing larger deals in our funnel than we have in the past. And so we're competing at a higher level. So all of those things contribute.
>
> ***As far as visibility, we have our backlog. We talk a lot about our product backlog, but we also have services and subscription backlog that goes along with that.*** We've been growing our subscription business, which gives us visibility as far as our deferred revenue balance, our ARR, what we can expect quarter-after-quarter. ***So between the backlog and the deferred revenue that we will recognize over time, we have really good, probably better than ever visibility into what we're going to achieve through the next fiscal year.***

167. Also at the Conference, Defendant Tate was asked to "talk a little bit more about where the backlog was, what it did last quarter, why it did what it did last quarter and, to some extent, the

difference between the end customer demand and the disties that support the end customers, that stock inventory?" Tate misleadingly responded:

> ***The backlog is – consists of both the end user demand, and so orders for specific deals, specific projects; stadiums, hospitals, schools, et cetera. And then we have orders that are from our distributors for get – having product on hand and on order to be able to deliver customers when the demand hits.***
>
> ***
>
> ***Now, we expect to see that continue over the next several quarters. We expect to see both releasing product, being able to ship to customers, enjoying that product revenue growth,*** and we also expect to see the distributor orders adjusting as the lead times come down. It may not be linear, we may not see the same level of reduction in backlog in Q4 that we saw in Q3. We think it'll still be kind of gradual over the next several quarters but – four to five quarters until we get to that normalized level, which we said would be around $75 million to $100 million.

168. An analyst again pressed Defendant Tate for information about the Company's backlog and associated visibility into the same, asking: "So going back to the backlog issue, one of the questions we get most frequently is how visible is the backlog or is it double ordering or triple ordering? Can you address that issue…and maybe split between what you would you would see at the distie level and what you would see at the customer level?" Tate responded:

> So ***we have excellent visibility into our backlog***. If I think about the question of double ordering or triple ordering, to me that means somebody needs some access points for a school, let's call it, and they're going to order access points from us and they're going to order access points from another vendor, or they may order it twice from us just to get the product. ***That is not happening, that's not a phenomenon we see at all.***
>
> Our customers have to go through a deal registration process, it goes through – ***it's not cancelable. These are real projects that we see. And so I would say the vast majority of our backlog is related to this kind of end user demand project-based business and we don't see double ordering.***

169. On August 2, 2023, Extreme announced its financial results for 4Q23 and FY23. The year-end results were disclosed through three channels: (i) a press release (the "FY23 PR"); (ii) a conference call with investors and analysts to discuss the financial results (the "FY23 Call"); and (iii)

a PowerPoint presentation accompanying the FY23 Call, which provided additional financial details (the "FY23 PPT").

170. The FY23 PR quoted Defendants Meyercord and Rhodes:

> "***Extreme delivered a year of exceptional performance, with revenue growth accelerating to 31% in the fourth quarter and 18% overall for the year***," said Ed Meyercord, President and Chief Executive Officer. "This marks our second consecutive year of double-digit growth. We're outgrowing our competitors, gaining share, and winning new logos, which helped drive more than 30% growth in the value of deals over $1 million. . . . I remain confident in our growth prospects and am excited about the new innovations and opportunities we have in store for FY24 and beyond," concluded Meyercord.
>
> Kevin Rhodes, Executive Vice President and Chief Financial Officer stated, "the strong topline growth we achieved in Q4 and FY23 resulted in significant operating leverage that drove over 76% growth in GAAP EPS. We doubled our cash generation to $235 million in free cash flow this year, and even after repurchasing another $100 million worth of shares, and paying down $80 million in debt, we improved our yearend balance sheet to achieve a net cash position. ***Extreme has never been in a more robust financial position***, and I am encouraged about our future prospects."

171. In Defendant Meyercord's prepared remarks during the FY23 Call, he stated that "[e]nd customer orders remain firm" and confirmed that the normalization of the Company's backlog in 1Q25 was still on track, stating in relevant part:

> ***This quarter, we were able to bring our product lead times down again as our supply chain environment continues to improve. We have the benefit of a healthy backlog of customer orders with request dates that spread fairly evenly through the end of our fiscal year. End customer orders remain firm and distributor orders have normalized, giving us confidence in our outlook for this fiscal year.***
>
> ***We continue to expect our backlog to settle in a range of $75 million to $100 million in Q1 '25.***

172. In Defendant Rhodes' prepared remarks during the call, he emphasized Extreme's revenue outlook for fiscal year 2024 ("FY24"), projecting "continued strong product revenue growth," stating in relevant part:

> To that end, fourth quarter earnings per share were $0.33 at the high end of our guidance entering the quarter. For the full year, fiscal '23, revenue of $1.3 billion grew 18% grom the prior year on product revenue growth 22**%. *During fiscal year '24, we expect continued strong product revenue growth, given the growing interest in our solution by customers and the ongoing normalization of our backlog.***

173. When an analyst requested an update on Extreme's backlog, Defendant Meyercord declined to provide a specific backlog figure. Instead, he stated that the Company's backlog would begin to normalize throughout FY24 and into 1Q25, stating in relevant part:

> ***So Mike, we said last quarter that we were not going to give – we were going to move away from giving a specific backlog number each and every quarter. I think what Ed said in his prepared remarks is that our backlog is now – we feel like it will <u>start</u> to normalize throughout 2024 and into Q1 of 2025. We feel good about the level of backlog we have. For instance, it's primarily, I'd say, 90-plus percent is all end customer orders at this point. And so the distribution orders that we had in the past have basically worked themselves through the system, especially with supply chain getting better. And so we feel good about those end customer orders and the timing of when those orders need to be shipped to those customers based on their own, I'll call it, like upgrade cycle and whatnot, we feel like it will come down fairly evenly throughout the year and into Q1 of '25. So feeling good about the level of backlog that we have and the timing of that coming out.***

174. During the same call, Defendant Meyercord also emphasized that: "***in EMEA and the rest of the markets, they remain very strong, and the demand in the U.S. market remains very strong***."

175. At the Rosenblatt Securities Technology Summit on August 22, 2023, Defendant Rhodes expressed confidence in the revenue growth guidance provided by the Company:

> Analyst: The company gave guidance and not timid guidance, which is mid- to high teens revenue growth guidance with margin improvement every year, I think, and pretty aggressively right now. So, you came in basically a year into that where you did nothing, but exceed it, or three quarters of a year into that… [ ] this fiscal year, we saw some order weakness year-over-year in the beginning of the year. I think it started to come back. But, are you nervous about having not just 2024, but 2025 guidance out there?...how are you feeling about the guide?

> Rhodes: ***So, this year, we've got strong visibility into 2024, in particular Q1 and beyond Q2 and et cetera. And I can see it in the pipeline. I can see in our win rates, et cetera. And that gives me confidence in our ability to kind of say what we think is going to happen in 2024***. In 2025, I'm not changing yet the long-term guidance that the company had. I have no reason to. The reality is I went and looked at what we had as inherent assumptions within that model. We're already hitting some of those numbers that we have in long-term model from a – hey, we think that operating income is going to be closer to the 20% range. Well, geez, we just landed in Q4 at 17%. And then, OpEx, we're going to be in the 43% range. We're hitting that as well. And so, there's a number of different areas within the long-term model, growth rates, et cetera, as well in the 13% to 17% range. ***We're already calling mid-teens growth this year and think in 2025 with the momentum we are building today, we don't see a lot of change for that at this moment***. We will update it again in November at our Analyst Day, and we're excited for that.

176. The statements referenced above were materially false and misleading when made because they omitted the disclosure of the following adverse facts related to Extreme's business, operations, and financial condition, which were either known to the Defendants or recklessly disregarded by them, including:

(a) that Extreme was experiencing adverse client demand trends, as its clients had over-ordered products during the COVID-19 pandemic to mitigate supply shortages and due to limited alternative sourcing options, thereby cannibalizing their purchasing needs;

(b) that Extreme was increasingly compensating for these adverse organic demand trends by fulfilling backlog orders at a rate that materially exceeded the proportion previously represented to investors;

(c) that as a result of (a) and (b), Extreme was depleting its backlog at a significantly faster rate than had been represented to investors;

(d) that, as a result of (a) through(c), Extreme's backlog was already declining and at a much faster pace than indicated by Defendants' statements to investors, which asserted that the backlog would only "begin to shrink" in 4Q23 and would not "really go back to normal" until FY26;

(e) that, as a result of (a) through (d), Extreme's backlog was not on course to continue growing to $600 million;

(f) that, as a result of (a) through(e) above, Defendants had materially misrepresented Extreme's organic demand, revenue growth, and market share gains, as the fulfillment of Extreme's backlog concealed a decline in organic demand and the associated revenues;

(g) that, as a result of (a) through(f), Extreme was not in a position to reasonably achieve "mid-teens revenue growth through [its] fiscal '25," and such representations lacked a reasonable and objective factual basis; and

(h) that, as a result of (a) through(g) above, Defendants had materially misrepresented Extreme's organic demand, revenue growth, and market share gains, as the fulfillment of Extreme's backlog concealed a decline in organic demand and the associated revenues.

177. Soon thereafter, on August 24, 2023, Extreme filed its Form 10-K annual report for FY23 ("FY23 10-K") with the SEC. It was signed by Defendants Meyercord, Thomas, Burton, Carinalli, Holmgren, Kennedy, Khanna, and Shoemaker. This report, included certifications attesting to its accuracy and completeness signed by Defendants Meyercord and Thomas. The FY23 10-K disclosed that the Company's backlog had decreased to $267.3 million, reflecting an approximate $245 million decline year-over-year and a $275.7 million decrease over the prior six months. The FY23 10-K stated in relevant part:

> ***Our product backlog at June 30, 2023, net of anticipated back-end rebates for distributor sales, was $267.3 million, compared to $513.0 million at June 30, 2022. The decrease in backlog year over year is primarily due to a combination of a resumption in shipment of orders during fiscal 2023, after experiencing significant delays due to supply chain constraints in prior years, and a reduction in distributor orders due to shorter lead times.***

178. The 2023 10-K also disclosed:

> On May 18, 2022, our Board of Directors authorized a share repurchase program with authorization to repurchase up to $200.0 million of our common stock over a three-year period beginning in our fiscal year commencing July 1, 2022. A maximum of $25.0 million may be repurchased in any quarter. On November 17, 2022, the Board increased the authorization to repurchase in any quarter from $25.0 million per quarter to $50.0 million per quarter. The current repurchase authorization supersedes and replaces any previously authorized repurchase programs. Purchases may be made from time to time in the open market or pursuant to a 10b5-1 plan. The manner, timing and amount of any future purchases will be determined by our management based on their evaluation of market

> conditions, stock price, Extreme's ongoing determination that it is the best use of available cash and other factors. The repurchase program does not obligate Extreme to acquire any shares of its common stock, may be suspended or terminated at any time without prior notice and will be subject to regulatory considerations. During the year ended June 30, 2023 we repurchased a total of 5,375,391 shares of common stock on the open market at a total cost of $99.9 million with an average price of $18.58 per share. As of June 30, 2023, we have $100.1 million available under our share repurchase program.

179. Following this news, the price of Extreme stock dropped from $27.68 per share at market close on August 24, 2023, to $25.16 per share on August 25, 2023, representing a 9% decline on unusually heavy trading volume exceeding 10 million shares. However, as happened previously, because the Defendants again failed to fully disclose the truth and continued to make materially false and misleading statements and omissions, as detailed herein, the price of Extreme stock remained artificially inflated.

180. On September 26, 2023, the Board, comprised of Meyercord, Burton, Carinalli, Holmgren, Kennedy, Khanna, and Shoemaker, caused the Company to issue a definitive proxy statement soliciting stockholder votes in advance of the special meeting to be held November 8, 2023 (the "2023 Proxy"). These seven Individual Defendants solicited stockholder votes in favor of six management proposals, including the election of all seven directors to new terms as directors through the 2024 annual meeting and a proposal to "[a]pprove an amendment and restatement of our Equity Incentive Plan to, among other things, add 5,000,000 shares of our common stock to those reserved for issuance under the plan," and, critically, to "[a]pprove the Restated Certificate of Incorporation to provide for officer exculpation." The 2023 Proxy repeatedly directed shareholders to the FY22 10-K and claimed that the Company's incentive compensation practices reward executives for performance.

181. According to the 2023 Proxy:

> Our Board has an active role in overseeing management of the risks we face. This role is one of informed oversight rather than direct management of risk. Our Board regularly reviews and consults with management on the Company's strategic direction and the challenges and risks we face. Our Board also reviews and discusses with management on a quarterly basis its financial results and forecasts and regularly reviews cyber risk issues. The Audit Committee of our Board oversees management of the Company's financial risks, and oversees and reviews our risk management policies, including the Company's investment policies and anti-fraud program. The Compensation Committee of our Board oversees our management of risks relating to

and arising from our compensation plans and arrangements. These committees periodically report on these matters to the full Board.

Management is tasked with the direct management and oversight of legal, financial and commercial compliance matters, which includes identification and mitigation of associated areas of risk. Our Chief Legal, Administrative and Sustainability Officer provides regular reports of legal risks and developments to the Audit Committee and to our full Board. Our Chief Financial Officer, Corporate Controller, Senior Vice President of Financial Planning & Analysis, and Senior Director of Internal Audit provide regular reports to the Audit Committee concerning financial, tax and audit related risks. In addition, the Audit Committee receives periodic reports from management on our compliance programs and efforts, our investment policies and practices, and the results of various internal audit projects. The Compensation Committee's compensation consultant, together with our Senior Vice President of Human Resources and Chief Diversity & Inclusion Officer and other members of management, provides analysis of risks related to our compensation programs and practices to the Compensation Committee.

182. In connection with the proposal to amend the certificate of incorporation to exculpate fiduciary breaches by officers, the 2023 Proxy stated:

The proposed Officer Exculpation Amendment would allow for the exculpation of our officers to the fullest extent permitted by the DGCL, and will provide that such exculpation of both our officers and directors will be provided to the fullest extent permitted by DGCL except to the extent such exemption from liability or limitation is not permitted under the DGCL, as it current exists or as it may hereafter may be amended. As described above, this means that the proposed Officer Exculpation Amendment would allow for the exculpation of Covered Officers only in connection with direct claims brought by stockholders, including class actions, but would not eliminate officers' monetary liability for breach of fiduciary duty claims brought by the corporation itself or for derivative claims brought by stockholders in the name of the corporation. Further, the Officer Exculpation Amendment would not limit the liability of officers for any breach of the duty of loyalty to the corporation or its stockholders, any acts or omissions not in good faith or which involve intentional misconduct or a knowing violation of the law, or any transaction from which the officer derived an improper personal benefit.

**Rational for Adoption of the Officer Exculpation Amendment**

In approving the Officer Exculpation Amendment and recommending it for approval by our stockholders, the Board considered the narrow class and type of claims to which Amended 102(b)(7) applies, the limited number of officers that are covered by Amended 102(b)(7) and the benefits the Board believes would accrue to the Company from providing officer exculpation. Our Board believes that adopting the Officer Exculpation Amendment would better position the Company to attract top officer candidates and retain our current officers, and would also more closely align the protections available to our officers with those already available to our directors. In addition, adopting the Officer Exculpation Amendment would enable officers to exercise their business judgment in furtherance of the interests of the stockholders without the potential for distraction posed by the risk of personal liability. The nature

> of the role of officers often requires them to make decisions on crucial matters. Frequently, officers must make decisions in response to time-sensitive opportunities and challenges, which can create substantial risk of investigations, claims, actions, suits, or proceedings seeking to impose liability based on hindsight, regardless of merit. Limiting our current and prospective officers' concern about personal risk would empower officers to best exercise their business judgment in furtherance of stockholder interests and better position the Company to retain our current officers and attract top officer candidates. Enhancing our ability to retain and attract experienced officers is in the best interests of the Company and its stockholders and we should seek to assure such persons that exculpation under certain circumstances is available. For these reasons, the Board determined that it is advisable and in the best interests of the Company and our stockholders to amend Article EIGHTH of our Current Certificate to add the liability protection afforded by Amended 102(b)(7) for Covered Officers.
>
> * * *
>
> **OUR BOARD UNANIMOUSLY RECOMMENDS A VOTE "FOR" APPROVAL OF THE OFFICER EXCULPATION AMENDMENT.**

183. Also included in 2023 Proxy was a Report of the Audit Committee, which specified that the Committee "meets with the Company's independent auditors, with and without the Company's management present, to discuss the results of their audit of the Company's financial statements and its internal control over financial reporting as of the end of the fiscal year, the Company's internal audits, and the overall quality of the Company's financial reporting." 2023 Proxy at 77. The 2023 Proxy continues: "Additionally, the Audit Committee has discussed and reviewed with the Company's management the audited financial statements and management's report on internal control over financial reporting as of the end of the fiscal year." *Id.*

184. The Audit Committee's responsibilities included assisting the Board "in fulfilling its oversight responsibilities with respect to financial risks, including risk management in the areas of financial reporting, internal controls, investments and compliance with legal and regulatory requirements." 2023 Proxy at 13.

185. As set forth in the 2023 Proxy and quoted above, the Board specifically had "an active role in overseeing management of the risks" that Extreme faces, and the Audit Committee oversaw "management of the Company's financial risks." *Id.* at 11. In the Company's August 24, 2023 10-K ("2023 10-K"), Extreme also again details at length the risks and uncertainties that it considers substantive enough to maybe have a "material and adverse effect on [its] business, operations,

industry, financial condition, results of operations or future financial performance." 2023 10-K at 15. The risks detailed in the 2023 10-K include, *inter alia*, supply chain logistics, and market needs and opportunities. 2023 10-K at 17-18.

186. Five pages of the 2023 10-K are dedicated to "Risks Related to Financial Matters," including, *inter alia*, profitability, acquisition and strategic investments, restructuring, stock price, competition, investment, credit facility restrictions, debt or equity financing, the Company's ability to borrow, the credit risk of Extreme's channel partners and end customers, adequate management of financial reporting, internal controls, and the public funding of educational institutions. *See* 2023 10-K at 20-25.

187. Again, these substantive risks enumerated in the 2023 10-K demonstrate that the Director Defendants, and specifically the Audit Committee Defendants, who admitted to playing an "active role" in overseeing management of these risks in the 2023 Proxy, were specifically tasked with monitoring and managing the very risks at the heart of the wrongdoings alleged herein.

188. The 2023 Proxy was materially misleading in that it asked shareholders to approve exculpation of fiduciary breaches by the Company's officers while concealing that many of those same officers were, unknown to stockholders, at that very moment actively engaged in breaching their fiduciary duties. A reasonable shareholder would have found the truth of the officers' wrongdoing material to their vote on the proposal. Additionally, the 2023 Proxy was materially misleading because it: (i) touted Audit Committee responsibilities but omitted to disclose that the Audit Committee was not discharging its duties under the Audit Committee Charter, while soliciting shareholder votes to reelect the entire Board and to approve a new equity incentive plan and add 5 million shares of stock for compensation of wrongdoers; and (ii) touted the Board's oversight of enterprise risk but omitted to disclose that the Board was not adequately overseeing risks related to the Company's internal controls related to critical audit matters.

189. Additionally, the FY23 10-K incorporated the FY23 financial results outlined in the FY23 PR detailed above. On November 1, 2023, Extreme announced its financial results for the first quarter of FY24, which ended on September 30, 2023 ("1Q24"). As part of this disclosure, Extreme revealed that working through its backlog was creating an "air pocket of demand" among end

customers, leading to a "more tempered" revenue growth outlook of "mid-to-high single digits" for FY24. Additionally, Extreme stated that it now expected its backlog to normalize between $75 million and $100 million "by the end of Q4 fiscal '24."

190. Following this news, the price of Extreme stock fell from $20.62 per share at market close on October 31, 2023, to $17.86 per share on November 1, 2023, representing a 13% decline on unusually heavy trading volume of nearly 10 million shares. However, because the Defendants yet again failed to fully disclose the truth and continued to make materially false and misleading statements and omissions, as detailed herein, the price of Extreme stock remained artificially inflated.

191. On November 1, 2023, Extreme announced its 1Q24 results through three channels: (i) a press release (the "1Q24 PR"); (ii) a conference call with investors and analysts to discuss the financial results (the "1Q24 Call"); and (iii) a PowerPoint presentation accompanying the 1Q24 Call, which included additional financial details (the "1Q24 PPT").

192. The 1Q24 PR included a quote from Defendant Meyercord, who emphasized the Company's increased market share, stating in relevant part:

> **"Extreme delivered another quarter of double-digit growth as we continued to increase both market and mindshare with new customers, while expanding our presence within our existing base," said Ed Meyercord, President and Chief Executive Officer.**

193. The 1Q24 PR also provided financial guidance for Extreme's second quarter of FY24, ending December 31, 2023 ("2Q24"), stating that the Company was on track to achieve revenues in the range of $312 million to $327 million during the quarter.

194. In his prepared remarks during the 1Q24 Call, Defendant Meyercord reaffirmed a "mid-teens top line growth outlook" for the Company "[o]ver the long term" and reiterated that Extreme's backlog was expected to normalize by the fourth fiscal quarter of FY24 (4Q24"), stating in relevant part:

> In light of what we would call an air pocket of demand and decision-making, leading to our revised growth outlook for the year, we took immediate action to realign resources to drive higher productivity and profitability. As a result, we continue to expect high teens operating margin in fiscal '24. That will allow us to

> group our EPS by over 25% during the year. Our funnel of opportunities continues to grow up double digits on a year-over-year basis as our underlying business and competitive position remains strong.
>
> ***Over the long term, we expect to return to a mid-teens top line growth outlook*** and a mid-20s operating margin. And here's why.
>
> * * *
>
> Our increasing pool of large, high-profile customers and our technology differentiation is why we continue to see the value of deals over $1 million grow each quarter. In Q1, we have more than 30 deals over $1 million. ***We continue to have a healthy customer order backlog with clear visibility to order with specific customer request dates through the balance of our fiscal year.***
>
> This quarter, our product lead times normalize, allowing us to continue working down backlog from product and strengths. ***We continue to expect our backlog to [settle] in a range of $75 million to $100 million by the end of Q4 fiscal '24.***

195. In the prepared portion of his remarks during the 1Q24 Call, CFO Rhodes revised FY24 revenue growth expectations downward to mid-high single digits and provided 2Q24 revenue guidance in the range of $312 million to $327 million, stating in relevant part:

> Now turning to guidance. ***We remain optimistic about the enterprise networking spending environment and our ability to take share.*** However, looking ahead at the balance of fiscal 2024, we are taking a more cautious tone and the current spending environment.
>
> Based on changing customer buying patterns and macroeconomic conditions, we are tempering our revenue outlook for this quarter and the balance of the year. ***We do believe that this is an air pocket as opposed to a more systemic issue within our target markets.***
>
> ***For the second quarter, we expect revenue to be in a range of $312 million to $327 million***; gross margin to be in a range of 60.2% to 62.2%, operating margin to be in a range of 15.4% to 17.3% and earning to be in a range of $0.26 to $0.31 per diluted share on a share count of 134 million shares.
>
> **Despite expected near-term market conditions and lower revenue expectations for the full year fiscal '24, *we expect mid – to high single digits of revenue growth,*** which we believe is above industry growth estimates and implies our share gains will continue.

196. During the call, Defendant Meyercord reiterated that the backlog would not fully normalize until the end of 4Q24, despite acknowledging that distributor backlog had already normalized, stating in pertinent part:

> ***I think it's fair to say that the – our backlog as it relates to distribution has normalized, but we still have a fair amount of customer backlog that's out there*** – and I can give an example of like Kroger. We had a very large win with Kroger. They're deploying all their stores. They don't necessarily want all the equipment upfront at once. They want to time that with their deployment.
>
> So we have customer request dates, very specific customer request dates. That is one of – one example of many. ***And what we've said and what continues to be the case is that we see the normalization of our backlog at the end of fiscal – Q4 of this fiscal year.***

197. Defendant Meyercord was again interview by CRN Magazine on November 22, 2023 in an article entitled "Extreme Networks CEO: 'These are Boon Times for Our Channel Partners," in which he stated:

> ***As you know, we put up 19 percent growth [in 1Q2024]. And I think the channel is very healthy because the channel is digesting all this backlog that is being released***. From a project perspective, our channel partners are busy at work implementing our technology and networking solutions. So from that standpoint, these are boon times for our channel partners.

198. The statements referenced above were materially false and misleading when made because they omitted the disclosure of the following adverse facts related to Extreme's business, operations, and financial condition, which were either known to the Defendants or recklessly disregarded by them, including:

(a) that Extreme was experiencing adverse client demand trends, as its clients had over-ordered products during the COVID-19 pandemic to mitigate supply shortages and due to limited alternative sourcing options, thereby cannibalizing their purchasing needs;

(b) that Extreme was increasingly compensating for these adverse organic demand trends by fulfilling backlog orders at a rate that materially exceeded the proportion previously represented to investors;

(c) that as a result of (a) and (b), Extreme was depleting its backlog at a significantly faster rate than had been represented to investors;

(d) that, as a result of (a) through (c), Extreme's backlog was already declining and at a much faster pace than indicated by Defendants' statements to investors, which asserted that the backlog would only "begin to shrink" in 4Q23 and would not "really go back to normal" until FY26;

(e) that, as a result of (a) through (d), Extreme's backlog was not on course to continue growing to $600 million; and

(f) that, as a result of (a) through (e) above, Defendants had materially misrepresented Extreme's organic demand, revenue growth, and market share gains, as the fulfillment of Extreme's backlog concealed a decline in organic demand and the associated revenues.

199. Also in November of 2023, Extreme filed both a Form 10-Q and a Form 8-K with the SEC. First, on November 2, 2023, the Company filed its 1Q24 quarterly report on Form 10-Q ("1Q24 10-Q") with the SEC. The report, signed by Defendant Rhodes and certified by both Defendants Meyercord and Rhodes, attested to its accuracy and completeness. The 1Q24 10-Q also incorporated the financial results outlined in the 1Q24 PR detailed above. Finally, the 1Q24 10-Q disclosed: "During the three months ended September 30, 2023, the Company repurchased a total of 880,215 shares of its common stock on the open market at a total cost of $24.9 million with an average price of $28.28 per share."

200. Then, on November 17, 2023, the Company filed a Form 8-K with the SEC, disclosing the results from the votes on the proposals contained the 2023 Proxy. In particular, all seven directors were reelected to new terms and the proposed equity incentive plan amendment was approved, as was the amendment to the Company's certificate of incorporation, and the amendment to the certificate of incorporation to exculpate fiduciary breaches by officers. The misleading disclosures in the 2023 Proxy were fundamental to the shareholder approval of the 2023 Proxy's proposals. As a result of the misleading statements and omissions, the Company was harmed.

201. On January 8, 2024, Extreme issued a press release providing a business update that reduced the Company's 2Q24 and long-term revenue outlooks, stating in relevant part:

> ***Second quarter revenues are now expected to be approximately $294 to $297 million, compared to the prior outlook of $312 to $327 million. . . .***
>
> ***Our revised second fiscal quarter outlook reflects industry headwinds of channel digestion and elongated sales cycles. In late Q2, we saw multiple large deals pushing out to future quarters,"*** stated Ed Meyercord, President and CEO at Extreme. ***"We remain confident in our long-term strategy and our ability to achieve double-digit long-term revenue and EPS growth supported by competitive customer wins and the growth in our opportunity funnel."***

202. Following this news, the price of Extreme stock fell from $17.52 per share at market close on January 8, 2024, to $16.23 per share on January 9, 2024, a 7% decline on unusually heavy trading volume exceeding 4 million shares. However, because the Defendants *yet again* failed to fully disclose the truth and continued to make materially false and misleading statements and omissions, as detailed herein, the price of Extreme stock remained artificially inflated.

## THE TRUTH FINALLY EMERGES

203. On January 31, 2024, Extreme announced disappointing financial results and operational trends for 2Q24. The Company reported revenues of $296.4 million for the quarter, reflecting a 7% decline year-over-year. Additionally, Extreme disclosed that its product backlog had already normalized during the quarter and that the Company had made the "conscious decision to put channel digestion behind [it] in the March quarter," which led to a "reduction in channel inventory in the third quarter" of between $40 million to $50 million." This would result in "[d]emand . . . being . . . masked by inventory flowing out of the channel." Contrary to the earlier expectation of increased revenues, Extreme revised its guidance, revealing that the Company was actually on track to face lower revenues in FY24. In a related earnings call, Defendant Meyercord confirmed that Extreme's baseline business" was projected to achieve only around $1.1 billion in annual revenues.

204. Following this announcement, Extreme's stock price fell from $16.64 per share at the market close on January 30, 2024, to $12.59 per share on February 2, 2024, marking a 24% drop over three trading days on unusually high volume. Overall, Extreme's stock price plummeted from a Relevant Period peak of $32.27 per share to a low of $12.59 per share after the truth was revealed, **representing a decline of more than *60%*.**

205. On February 1, 2024, the Company filed its Form 10-Q for the second quarter of fiscal 2024, which disclosed: "During the three months ended December 31, 2023, the Company repurchased 1,485,005 shares of its common stock on the open market at a total cost of $25.0 million with an average price of $16.81 per share."

206. Since its January 2024 revelations, Extreme has continued to report worsening business conditions. On May 1, 2024, the Company revealed that it had generated just $106.4 million in product revenue for its third fiscal quarter of FY24, which ended on March 31, 2024 ("3Q24"), less than half of the $241.1 million in product revenue from the same period the previous year. In a press release about the results, Defendant Meyercord stated that "channel inventory was significantly reduced during the quarter" and that the Company's customers were still "working through prior purchases." Similarly, on August 7, 2024, Extreme announced 4Q24 revenue of only $256.7 million, a 29% year-over-year decline, and annual revenue of $1.1 billion, down 15% year-over-year. The Company also disclosed it was taking an additional provision of $46.5 million for excess and obsolete inventory and losses on its supplier commitments in 4Q24, along with $64.5 million for FY24. These charges contributed to net losses exceeding $54 million for 4Q24.

**IN REPURCHASING STOCK, EXTREME RELIED ON THE INDIVIDUAL DEFENDANTS' FALSE OR MISLEADING STATEMENTS**

207. In purchasing common stock in connection with the stock repurchase program, Extreme relied on the Individual Defendants' false or misleading statements, either directly or through the "fraud on the market" doctrine articulated in *Basic Inc. v. Levinson*, 485 U.S. 224 (1988), and *Co. v. Erica P. John Fund, Inc.*, 134 S. Ct. 2398 (2014), or through the doctrine articulated in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972).

208. Throughout the Relevant Period, Extreme justifiably expected the Individual Defendants to disclose material information as required by law and SEC regulations in the Company's periodic filings with the SEC and in statements made to the investing public. Extreme would not have purchased its securities at artificially inflated prices had the Individual Defendants disclosed all material information known to them or that was so obvious it should have been known to them, as detailed herein. Thus, reliance by Extreme should be presumed with respect to the Individual

Defendants' omissions of material information as established by the *Affiliated Ute* presumption of reliance.

209. Additionally, the "fraud on the market" presumption applies to the Individual Defendants' misstatements of material facts or failures to disclose material facts.

210. At all relevant times, the market for Extreme stock was an efficient market for the following reasons, among others:

a. Extreme stock met the requirements for listing, and was listed and actively traded on the Nasdaq, a highly efficient market;

b. As a regulated issuer, Extreme filed periodic public reports with the SEC and the Nasdaq;

c. Extreme regularly and publicly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services;

d. Extreme was followed by several securities analysts employed by major brokerage firm(s) who wrote reports which were distributed to the sales force and certain customers of their respective brokerage firm(s). Each of these reports was publicly available and entered the public marketplace; and

e. The market price of Extreme's stock reacted rapidly to new information entering the market.

211. As a result of the foregoing, the market for Extreme stock promptly digested current information regarding the Company from all publicly available sources and reflected such information in the price of Extreme's common stock. The foregoing facts indicate the existence of an efficient market for trading of Extreme's stock and support application of the fraud-on-the-market doctrine.

212. Extreme relied on the integrity of the market price for the repurchase of its common stock and is entitled to a presumption of reliance with respect to the Individual Defendants'

misstatements and omissions alleged herein. Had Extreme known of the material adverse information not disclosed by the Individual Defendants or been aware of the truth behind the Individual Defendants' material misstatements, the Company would not have purchased Extreme stock at artificially inflated prices.

## NEITHER THE STATUTORY "SAFE HARBOR" NOR THE "BESPEAKS CAUTION" DOCTRINE APPLIES TO THE INDIVIDUAL DEFENDANTS' MISREPRESENTATIONS

213. Neither the safe-harbor provision of the Private Securities Litigation Reform Act of 1995 ("PSLRA") nor the judicially created "bespeaks caution" doctrine applicable to forward looking statements under certain circumstances applies to any of the false or misleading statements pleaded herein. None of the subject statements constituted a forward-looking statement; rather, they were historical statements or statements of purportedly current facts and conditions at the time the statements were made.

214. Alternatively, to the extent any of the false or misleading statements pleaded herein could be construed as forward-looking statements, they were not accompanied by any meaningful cautionary language identifying important fact that could cause actual results to differ materially from those in the purportedly forward-looking statements. Further, to the extent the PSLRA's safe harbor would otherwise apply to any forward-looking statements pleaded herein, the Individual Defendants are liable for those false or misleading forward-looking statements pleaded herein because, at the time each such statement was made, the speaker(s) knew the statement was false or misleading, or the statement was authorized and/or approved by an executive officer of Extreme or an Individual Defendant who knew that the statement was materially false or misleading when made. None of the historic or present tense statements made by the Individual Defendants were assumptions underlying or relating to any plan, projection, or statement of future economic performance, as they were not stated to be such assumptions underlying or relating to any projection or statement of future economic performance when made, nor were any of the projections or forecasts made by the Individual Defendants expressly related to, or stated to be dependent on, those historic or present tense statements when made.

## ADDITIONAL SCIENTER ALLEGATIONS

215. Defendants, as described herein, acted with scienter, meaning they knowingly or recklessly disregarded that the public documents and statements they issued and disseminated during the Relevant Period, either in the name of Extreme or in their own name, were materially false and misleading. Defendants knowingly and significantly contributed to or approved the issuance or dissemination of such statements and documents, constituting primary violations of federal securities laws. By receiving information reflecting the true facts about Extreme, including its backlog, organic demand, revenues, and market share, and by controlling, receiving, and/or modifying Extreme's materially false and misleading statements, defendants were active and culpable participants in the alleged fraudulent scheme.

216. Defendants knowingly and recklessly disregarded the false and misleading nature of the information they caused to be disseminated to the investing public. The fraudulent scheme detailed herein could not have been carried out during the Relevant Period without the knowledge, complicity, or, at the minimum, the reckless disregard of personnel at the highest levels of Extreme, including the Individual Defendants.

217. Due to their positions within Extreme, the Individual Defendants controlled the content of Extreme's public statements during the Relevant Period and were deeply involved in the Company's operations. Each Individual Defendant either received or had access to the information alleged herein to be false and misleading, either prior to or shortly after its release, and had the ability and opportunity to prevent its dissemination or ensure it was corrected. By virtue of their positions and access to material, non-public information, the individual Defendants knew, or recklessly disregarded, that the adverse facts outlined herein were not disclosed and were actively concealed from the public, while the positive representations being made were false and misleading.

218. Several additional facts support the Plaintiff's allegations that the Defendants fraudulently concealed adverse information regarding Extreme's demand, backlog, revenue growth, and market share prior to the disclosure of the truth.

219. First, in their public statements, the Individual Defendants presented themselves as the most knowledgeable individuals regarding Extreme's customer demand trends, revenue growth rate,

supply chain, backlog, and Book to Bill Ratios. Defendants' frequent discussions of these topics underscore both their understanding of their importance to investors and their familiarity with the relevant facts. Moreover, Defendants explicitly admitted to having detailed knowledge of the Company's supply chain issues and backlog. For instance, during the 1Q23 Call, Defendant Thomas stated, "[w]e get weekly reads from my supply chain teams as to what they're able to ship this quarter." Similarly, during the same call, Defendant Meyercord stated, "[we] have complete visibility into our product backlog, the vast majority of which is comprised of orders with current delivery request dates." On other occasions, Defendants described their visibility into backlog as "clear" (on the 1Q24 Call) and "complete" (on the FY22 Call). Defendant Thomas also acknowledged that he and Defendant Meyercord were "both very close to the topic" of the Company's backlog. These admissions regarding their direct knowledge of the information alleged to have been concealed from investors during the Relevant Period provide strong evidence of scienter.

220. Second, during the 2Q24 Call, the Defendants acknowledged their substantial control over the backlog processed each quarter, highlighting their direct involvement in the misrepresented aspects of Extreme's business. For example, Defendant Meyercord mentioned, "***[w]e've made the <u>conscious decision</u> to put channel digestion behind us in the March quarter.***" He further elaborated:

> ***And we had to <u>make a decision</u> to whether or not we want to <u>manage this out over time or take it all in one fell swoop</u>. And our view and our perspective is to get it cleaned up and get normalized as we head into Q4 and turn the corner on '25. And that's how <u>we've made the decision</u> that we're making.***

The Defendants' claims that they controlled the pace at which Extreme's backlog would normalize as supply chain constraints eased, strongly suggest their scienter. This acknowledgement of control indicates that the Defendants had access to the necessary information to determine the backlog amount, the timeline for normalization, and whether fulfilling the backlog was concealing a decline in organic demand and growth.

221. Third, starting with the reporting of Extreme's 3Q23 results on April 26, 2023, the Defendants suspiciously ceased reporting the Company's backlog amount on a quarterly basis along with the Book to Bill Ratios. This action was an apparent attempt to obscure the true source of the

Company's reported revenues. Despite previously considering this information material enough to disclose to investors, the Defendants chose to withhold it, fully aware of investor concerns about how the normalization of the backlog would impact the Company's revenues and growth. This concern was evident from the frequence with which analysts questioned them on these topics. Notably, when pressed for information about the Company's backlog and organic growth trends, the Defendants repeatedly misdirected analysts and investors, urging them to focus on the overall revenue while obscuring its source. For instance, on the 3Q23 Call, Defendant Meyercord stated, "[w]e really don't want to get into sort of dissecting backlog. Really what we want to do is reinforce our outlook of revenue growth." Similarly, on the FY23 Call, when asked for an update on the backlog amount, Meyercord responded, "[s]o Mike, we said last quarter we were not going to give – we were going to move away from giving a specific backlog number each and every quarter. . . . We feel good about the level of backlog we have." The Defendants' failure to provide information they had previously deemed material, without adequately explaining why it was no longer relevant to investors, further indicates that they were acting in bad faith and with fraudulent intent.

222. Fourth, the Defendants stated that they tracked backlog and Book to Bill Ratios internally, confirming both the materiality of these metrics and their knowledge of this information. For instance, during the 3Q23 Call, even while announcing that they would no longer publicly disclose backlog and Book to Bill Ratios in their quarterly presentations, the Defendants mentioned they would continue to track these metrics internally to understand how the Company was "trending." In other instances, they provided a range for the current backlog, demonstrating their awareness. Furthermore, the Company's eventual disclosure of its backlog amount in its FY23 10-K, which led to a sharp decline in Extreme's stock price, underscores the critical importance of this information to investors and confirms that the Defendants were indeed tracking it.

223. Fifth, several executives left the Company during the Relevant Period. Defendant Thomas, the Company's CFO, unexpectedly resigned on January 25, 2023, allegedly to take a position at an unnamed privately held software company. Additionally, on January 8, 2024, the day the Company unexpectedly issued a negative business update for 2Q24, it was announced that Chief

Revenue Officer (CRO) Joe Vitalone had resigned. These executive departures further support an already compelling inference of scienter.

224. Sixth, the Defendants had both the motive and opportunity to commit fraud. For instance, during the Relevant Period, Defendant Meyercord sold over 585,000 shares of Extreme stock, generating total proceeds of $11.6 million. These sales were suspicious in both timing and amount, as they occurred before the disclosure of all adverse information regarding the Company's backlog, revenue growth, and market share detailed herein.

## INSIDER SELLING

225. Before the full disclosure by Extreme and understanding by the market of the declining post- COVID-19 client demand Defendants Meyercord, Thomas, Tate, Kennedy, Khanna, Burton, and Vitalone ("Insider Trading Defendants") sold over 880,000 shares for nearly $17 million while in possession of material non-public information regarding the Company's business growth.

226. Defendant Meyercord sold 635,329 Extreme shares, while the price of the Company's stock was artificially inflated for approximately $12,190,950 in proceeds while in possession of material, non-public information. As CEO, Defendant Meyercord knew the truth about (a) declining client demand as customers over-ordered during COVID-19, leading to reduced future purchases; (b) the fulfillment of backlog orders at a higher rate than previously disclosed; (c) the faster depletion of the backlog than reported to investors; (d) the falsity of claims the order backlog would only start to shrink in 4Q23 and normalize by FY26; (e) that the backlog was not on track to grow to $600 million; and (f) Extreme's overstated demand, revenue growth, and market share. The dates, times, and amounts of Meyercord's insider sales during the Relevant Period follow:

| Transaction Date | Insider and Title | Shares Sold | Average Price | Total Proceeds |
|---|---|---|---|---|
| March 1, 2022 | **Edward Meyercord**<br>*President and CEO* | 25,000 | $11.13 | $278,133.00 |
| April 1, 2022 | **Edward Meyercord**<br>*President and CEO* | 25,000 | $12.18 | $304,445.00 |
| October 27, 2022 | **Edward Meyercord**<br>*President and CEO* | 100,000 | $17.10 | $1,710,374.00 |
| November 11, 2022 | **Edward Meyercord**<br>*President and CEO* | 4,200 | $19.00 | $79,814.00 |

| Transaction Date | Insider and Title | Shares Sold | Average Price | Total Proceeds |
|---|---|---|---|---|
| November 17, 2022 | **Edward Meyercord** *President and CEO* | 95,800 | $19.08 | $1,827,717.00 |
| May 31, 2023 | **Edward Meyercord** *President and CEO* | 200,000 | $21.15 | $4,229,662.00 |
| June 7, 2023 | **Edward Meyercord** *President and CEO* | 100,000 | $23.05 | $2,304,910.00 |
| November 7, 2023 | **Edward Meyercord** *President and CEO* | 28,443 | $17.10 | $486,424.00 |
| December 1, 2023 | **Edward Meyercord** *President and CEO* | 28,443 | $16.32 | $464,164.00 |
| January 2, 2024 | **Edward Meyercord** *President and CEO* | 28,443 | $17.77 | $505,307.00 |
| | **TOTAL** | **635,329** | | **$12,190,950.00** |

227. Defendant Thomas sold 90,000 Extreme shares, while the price of the Company's stock was artificially inflated for approximately $1,314,216 in proceeds while in possession of material, non-public information. As former CEO, Defendant Thomas knew the truth about (a) declining client demand as customers over-ordered during COVID-19, leading to reduced future purchases; (b) the fulfillment of backlog orders at a higher rate than previously disclosed; (c) the faster depletion of the backlog than reported to investors; (d) the falsity of claims the order backlog would only start to shrink in 4Q23 and normalize by FY26; (e) that the backlog was not on track to grow to $600 million; and (f) Extreme's overstated demand, revenue growth, and market share. The dates, times, and amounts of Thomas's insider sales during the Relevant Period follow:

| Transaction Date | Insider and Title | Shares Sold | Average Price | Total Proceeds |
|---|---|---|---|---|
| March 1, 2022 | **Remi Thomas** *EVP, Chief Financial Officer* | 10,000 | $11.39 | $113,900.00 |
| June 23, 2022 | **Remi Thomas** *EVP, Chief Financial Officer* | 10,000 | $8.75 | $87,500.00 |
| July 1, 2022 | **Remi Thomas** *EVP, Chief Financial Officer* | 10,000 | $8.83 | $88,300.00 |
| August 1, 2022 | **Remi Thomas** *EVP, Chief Financial Officer* | 10,000 | $12.79 | $127,936.00 |
| September 1, 2022 | **Remi Thomas** *EVP, Chief Financial Officer* | 10,000 | $14.05 | $140,511.00 |

| Transaction Date | Insider and Title | Shares Sold | Average Price | Total Proceeds |
|---|---|---|---|---|
| November 1, 2022 | **Remi Thomas** *EVP, Chief Financial Officer* | 10,000 | $18.08 | $180,813.00 |
| December 1, 2022 | **Remi Thomas** *EVP, Chief Financial Officer* | 10,000 | $20.74 | $207,409.00 |
| January 3, 2023 | **Remi Thomas** *EVP, Chief Financial Officer* | 10,000 | $18.46 | $184,567.00 |
| February 2, 2023 | **Remi Thomas** *EVP, Chief Financial Officer* | 10,000 | $18.33 | $183,280.00 |
| | **TOTAL** | **90,000** | | **$1,314,216.00** |

228. Defendant Tate sold 1,410 Extreme shares, while the price of the Company's stock was artificially inflated for approximately $24,961 in proceeds while in possession of material, non-public information. As interim CFO, Defendant Tate knew the truth about (a) declining client demand as customers over-ordered during COVID-19, leading to reduced future purchases; (b) the fulfillment of backlog orders at a higher rate than previously disclosed; (c) the faster depletion of the backlog than reported to investors; (d) the falsity of claims the order backlog would only start to shrink in 4Q23 and normalize by FY26; (e) that the backlog was not on track to grow to $600 million; and (f) Extreme's overstated demand, revenue growth, and market share. The dates, times, and amounts of Tate's insider sales during the Relevant Period follow:

| Transaction Date | Insider and Title | Shares Sold | Average Price | Total Proceeds |
|---|---|---|---|---|
| February 16, 2023 | **Cristina Tate** *Interim CFO* | 669 | $18.78 | $12,564.00 |
| May 16, 2023 | **Cristina Tate** *Interim CFO* | 741 | $16.73 | $12,397.00 |
| | **TOTAL** | **1,410** | | **$24,961.00** |

229. Defendant Kennedy sold 20,000 Extreme shares, while the price of the Company's stock was artificially inflated for approximately $378,100 in proceeds while in possession of material, non-public information. As a Board member, Defendant Kennedy knew the truth about (a) declining client demand as customers over-ordered during COVID-19, leading to reduced future purchases; (b) the fulfillment of backlog orders at a higher rate than previously disclosed; (c) the faster depletion of the backlog than reported to investors; (d) the falsity of claims the order backlog would only start to

shrink in 4Q23 and normalize by FY26; (e) that the backlog was not on track to grow to $600 million; and (f) Extreme's overstated demand, revenue growth, and market share. The dates, times, and amounts of Kennedy's insider sales during the Relevant Period follow:

| Transaction Date | Insider and Title | Shares Sold | Average Price | Total Proceeds |
|---|---|---|---|---|
| May 23, 2023 | **Edward H. Kennedy**<br>*Director* | 20,000 | $18.91 | $378,100.00 |
| | **TOTAL** | **20,000** | | **$378,100.00** |

230. Defendant Khanna sold 40,000 Extreme shares, while the price of the Company's stock was artificially inflated for approximately $803,966 in proceeds while in possession of material, non-public information. As a Board member, Defendant Khanna knew the truth about (a) declining client demand as customers over-ordered during COVID-19, leading to reduced future purchases; (b) the fulfillment of backlog orders at a higher rate than previously disclosed; (c) the faster depletion of the backlog than reported to investors; (d) the falsity of claims the order backlog would only start to shrink in 4Q23 and normalize by FY26; (e) that the backlog was not on track to grow to $600 million; and (f) Extreme's overstated demand, revenue growth, and market share. The dates, times, and amounts of Khanna's insider sales during the Relevant Period follow:

| Transaction Date | Insider and Title | Shares Sold | Average Price | Total Proceeds |
|---|---|---|---|---|
| August 29, 2022 | **Raj Khanna**<br>*Director* | 20,000 | $15.00 | $300,000.00 |
| February 9, 2023 | **Raj Khanna**<br>*Director* | 10,000 | $19.53 | $195,318.00 |
| August 9, 2023 | **Raj Khanna**<br>*Director* | 10,000 | $30.87 | $308,678.00 |
| | **TOTAL** | **40,000** | | **$803,996.00** |

231. Defendant Burton sold 9,000 Extreme shares, while the price of the Company's stock was artificially inflated for approximately $183,150 in proceeds while in possession of material, non-public information. As Board member, Defendant Burton knew the truth about (a) declining client demand as customers over-ordered during COVID-19, leading to reduced future purchases; (b) the fulfillment of backlog orders at a higher rate than previously disclosed; (c) the faster depletion of the

backlog than reported to investors; (d) the falsity of claims the order backlog would only start to shrink in 4Q23 and normalize by FY26; (e) that the backlog was not on track to grow to $600 million; and (f) Extreme's overstated demand, revenue growth, and market share. The dates, times, and amounts of Burton's insider sales during the Relevant Period follow:

| Transaction Date | Insider and Title | Shares Sold | Average Price | Total Proceeds |
|---|---|---|---|---|
| December 14, 2022 | **Ingrid Burton**<br>*Director* | 9,000 | $20.35 | $183,150.00 |
| | **TOTAL** | **9,000** | | **$183,150.00** |

232. Defendant Vitalone sold 167,244 Extreme shares, while the price of the Company's stock was artificially inflated for approximately $2,903,339 in proceeds while in possession of material, non-public information. As Chief Revenue Officer, Defendant Vitalone knew the truth about (a) declining client demand as customers over-ordered during COVID-19, leading to reduced future purchases; (b) the fulfillment of backlog orders at a higher rate than previously disclosed; (c) the faster depletion of the backlog than reported to investors; (d) the falsity of claims the order backlog would only start to shrink in 4Q23 and normalize by FY26; (e) that the backlog was not on track to grow to $600 million; and (f) Extreme's overstated demand, revenue growth, and market share. The dates, times, and amounts of Vitalone's insider sales during the Relevant Period follow:

| Transaction Date | Insider and Title | Shares Sold | Average Price | Total Proceeds |
|---|---|---|---|---|
| August 1, 2022 | **Joseph A. Vitalone**<br>*Chief Revenue Officer* | 46,682 | $12.83 | $598,921.00 |
| August 29, 2022 | **Joseph A. Vitalone**<br>*Chief Revenue Officer* | 35,372 | $15.00 | $530,633.00 |
| October 26, 2022 | **Joseph A. Vitalone**<br>*Chief Revenue Officer* | 20,226 | $16.06 | $324,769.00 |
| January 24, 2023 | **Joseph A. Vitalone**<br>*Chief Revenue Officer* | 19,854 | $19.14 | $380,045.00 |
| September 15, 2023 | **Joseph A. Vitalone**<br>*Chief Revenue Officer* | 45,090 | $23.71 | $1,068,971.00 |
| | **TOTAL** | **167,224** | | **$2,903,339.00** |

## SUMMARY OF THE INDIVIDUAL DEFENDANTS WRONGFUL CONDUCT

233. The Individual Defendants breached their fiduciary duties because they allowed or permitted the Company to disseminate false and misleading statements. Additionally, the Company's SEC filings and omissions caused the above-discussed internal failures caused or allowed the illicit activity described in this Complaint.

234. The Individual Defendants breached their fiduciary duties because they failed to maintain an adequate system of oversight, disclosure controls, and procedures.

235. The Individual Defendants breached their fiduciary duties to Extreme because they willfully or recklessly made and/or caused the Company to make false and/or misleading statements and omissions of material fact regarding, at least, Forms 8-K, Proxy, press releases, soliciting materials described in this complaint. Defendants signed and authorized the SEC filings that were false and misleading because the Defendants falsely stated/or failed to disclose the following on their watch that: (1) Extreme was experiencing adverse client demand trends, as its clients had over-ordered products during the COVID-19 pandemic to mitigate supply shortages and due to limited alternative sourcing options, thereby cannibalizing their purchasing needs; (2) Extreme was increasingly compensating for these adverse organic demand trends by fulfilling backlog orders at a rate that materially exceeded the proportion previously represented to investors; (3) Extreme was depleting its backlog at a significantly faster rate than had been represented to investors; (4) Extreme's backlog was already declining and at a much faster pace than indicated by Defendants' statements to investors; (5) Extreme's backlog was not on course to continue growing to $600 million; (6) Extreme was not in a position to reasonably achieve "mid-teens revenue growth through [its] fiscal '25," and such representations lacked a reasonable and objective factual basis; and (7) Defendants had materially misrepresented Extreme's organic demand, revenue growth, and market share gains, as the fulfillment of Extreme's backlog concealed a decline in organic demand and the associated revenues.

## DAMAGES TO EXTREME

236. As a direct and proximate result of the Individual Defendants' misconduct, Extreme has incurred, and will continue to incur, losses and expenses amounting to millions of dollars.

237. Such expenditures include, but are not limited to:

a. Legal fees associated with the federal securities lawsuit filed against the Company, its CEO, former CFO, and interim CFO as well as any internal investigations, and amounts paid to outside lawyers, accountants, and investigators in connection thereto;

b. Any funds paid to settle the Securities Action;

c. Tens of millions of dollars paid to repurchase Company stock at artificially inflated prices;

d. Costs associated with implementing measures to remediate the material weaknesses in the Company's internal control over financial reporting; and

e. Substantial compensation and benefits paid to the Individual Defendants who breached their fiduciary duties to the Company, such as bonuses linked to the Company's achievement of specific objectives, as well as other benefits provided to those Individual Defendants.

238. As a direct and proximate result of the Individual Defendants' actions, Extreme has suffered and will continue to suffer damage to its reputation and goodwill, along with a "liar's discount" that will negatively impact the Company's stock in the future. This is due to the Company's misrepresentations and the Individual Defendants' breaches of fiduciary duties and unjust enrichment.

**<u>THE SECURITIES CLASS ACTION MOTION TO DISMISS IS DENIED</u>**

239. On March 23, 2026, in the Securities Action, the Honorable Trina L. Thompson denied defendants' motion to dismiss the Securities Class Action in its entirety. *Steamfitters Local 449 Pension & Ret. Sec. Funds v. Extreme Networks, Inc.*, No. 3:24-cv-05102-TLT, Dkt. No. 132 (N.D. Cal. Mar. 23, 2026) (the "Securities Class Action MTD Order"). The Securities Class Action MTD Order is a matter of public record and is incorporated by reference in its entirety herein.

240. In the Securities Class Action MTD Order, the Court found that plaintiffs had adequately pled falsity and scienter as to each of the individual defendants in the Securities Class Action: Meyercord, Thomas, Tate, Rhodes, Rice, and Brown. Securities Class Action MTD Order at

24–25. Meyercord, Thomas, Tate, Rhodes, Rice, and Brown are each named as Individual Defendants in this action.

241. In the Securities Class Action MTD Order, the Court held that the allegations adequately allege falsity because they "provide[] particularized details about the purported illicit channel stuffing scheme to render Defendants' growth and demand statements false to survive the motion at this stage." *Id*. at 15.

242. The Court's scienter findings rested on two independent grounds. First, under "holistic review," the Court found that senior executives "were motivated to inflate [the Company's] 'financial results and stock prices because their eligibility for stock options and executive bonuses were based principally on the company's financial performance.'" Securities Class Action MTD Order at 23–24. The Court credited the allegation that Meyercord alone earned over $1.1 million in cash in FY 2023 through the executive compensation program. *Id.* at 23–24.

243. Second, the Court independently found scienter under the core operations doctrine: "[T]he individual Defendants must have known about the backlog orders because of their devastating effect on the corporation's revenue." *Id.* at 24–25. The Court further held that Defendant Brown's contemporaneous statement that there were "[l]ots of eyes on this backlog process – it's updated all the way up to Ed [Meyercord]," combined with evidence that senior executives reviewed real-time sales and backlog databases including Clari and Salesforce, satisfied the core operations inference. *Id.* at 24.

244. The Court rejected defendants' argument that Meyercord's increased total shareholdings undercut scienter. The Court held that, because Meyercord's share acquisitions "resulted from derivative conversions rather than open-market purchases," the increase in holdings in fact *supports* an inference of scienter. *Id.* at 24.

245. The channel stuffing and backlog misrepresentations affected the Company's core operations. Revenues through the distributor channel, the channel through which the channel-stuffing scheme was executed, accounted for 80% of total product revenues in fiscal year 2022, 83% in fiscal year 2023, and 85% in fiscal year 2024. *Id.* at 3. The top three distributors alone accounted for more than 54% of total Company revenues in FY 2022, 53% in FY 2023, and 59% in FY 2024. *Id.* Backlog

was a metric that Extreme itself repeatedly identified as "a key driver" of reported growth and one into which it represented having "complete visibility."

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

246. Plaintiffs bring this action derivatively in the right and for the benefit of the Company to redress injuries suffered and to be suffered as a direct and proximate result of the breaches of fiduciary duties and gross mismanagement by the Individual Defendants.

247. Plaintiffs will adequately and fairly represent the interests of the Company in enforcing and prosecuting its rights and have retained counsel competent and experienced in derivative litigation.

248. Plaintiffs are current owners of the Company stock and have continuously owned Company stock during all times relevant to the Individual Defendants' wrongful course of conduct alleged herein.

249. Plaintiffs understand their obligation to hold stock throughout the duration of this action and are prepared to do so.

250. During the illegal and wrongful course of conduct at the Company and through the present, the Board consisted of the Individual Defendants.

251. Because of the facts set forth throughout this Complaint, demand on the Company Board to institute this action is not necessary because such a demand would have been a futile and useless act, and Plaintiffs have not made (and should be excused from making) a pre-filing demand on the Board to initiate this action.

252. The Company's Board is currently comprised of seven members: Defendant Meyercord, Shoemaker, Carinalli, Kennedy, Holmgren, Khanna, and Burton. Thus, Plaintiffs are only required to show that a majority of the Board, *i.e.*, 4, cannot exercise independent objective judgement about whether to bring this action or whether to vigorously prosecute this action.

253. Each of the Directors approved and/or permitted the wrongs alleged herein to have occurred and participated in efforts to conceal or disguise those wrongs from the Company's stockholders or recklessly and/or with gross negligence disregarded the wrongs complained of herein and are therefore not disinterested parties.

254. Each of the Directors authorized and/or permitted the false statements to be disseminated directly to the public and made available and distributed to shareholders, authorized and/or permitted the issuance of various false and misleading statements, and are principal beneficiaries of the wrongdoing alleged herein, and thus, could not fairly and fully prosecute such a suit even if they instituted it.

**Defendant Meyercord**

255. Defendant Meyercord is not disinterested or independent, and therefore, is incapable of considering demand because, Meyercord is, and was at all relevant times, an employee (CEO since April 2015) who derived substantially all of his wealth and livelihood from his relationship with the Company making him not disinterested or independent.

256. The lack of independence and financial benefits received by Meyercord renders him incapable of impartially considering a demand to commence and vigorously prosecute this action.

257. In addition, Meyercord, while in possession of material non-public information, sold 635,329 shares of the Company's stock at various prices per share for a windfall of $12,190,950.00, while in possession of material non-public information. As a result of his insider selling, Meyercord may be personally subject to disgorgement.

258. Meyercord is also a defendant in the Securities Class Action, which seeks to hold him liable for much of the same wrongdoing as is alleged herein.

259. Furthermore, the Company's 2024 Proxy concedes that Meyercord is not an independent director.

260. As such, Defendant Meyercord cannot independently consider any demand to sue himself for breaching his fiduciary duties to the Company, as that would expose him to substantial liability and threaten his livelihood.

**Audit Committee Defendants Khanna, Holmgren, and Kennedy**

261. Defendants Khanna, Holmgren, and Kennedy are not disinterested or independent and, therefore, are incapable of considering demand because they serve as members of the Audit Committee. Pursuant to the Audit Committee's Charter, the purpose of the Committee is to assist the Board in fulfilling its oversight responsibilities related to, *inter alia*, accounting, legal, regulatory,

and public disclosure requirements. Thus, these Defendants were responsible for knowingly or recklessly allowing the improper statements. Further, these Defendants reviewed and approved the improper press releases made to the public. Despite their knowledge, these Defendants caused these improper statements.

262. Defendants Khanna, Kennedy, and Holmgren served on the Audit Committee throughout the Relevant Period, with Khanna as Chair. 2023 Proxy at 12. The Audit Committee met nine times during fiscal 2023 alone. *Id.*

263. Pursuant to the Audit Committee Charter, Khanna, Kennedy, and Holmgren were required to: (a) "[r]eview and discuss earnings press releases and other information provided to analysts and rating agencies, including 'pro forma' or adjusted financial information;" (b) "[r]eview and discuss with management and the independent auditors the Company's annual audited financial statements" and recommend to the Board whether audited financial statements should be included in the Company's Form 10-K; (c) "[r]eview and discuss with management and the independent auditors the Company's quarterly reports on Form 10-Q prior to filing with the Securities and Exchange Commission;" (d) "[r]eview with the principal executive and financial officers of the Company any report on significant deficiencies in the design or operation of internal controls which could adversely affect the Company's ability to record, process, summarize, and report financial data, any material weaknesses in internal controls, and any fraud, whether or not material, that involves management or other employees who have a significant role in the Company's internal controls;" and (e) "[e]stablish procedures for the receipt, retention, and treatment of complaints received by the Company regarding accounting, internal accounting controls or auditing matters."

264. The 2023 Proxy represented to shareholders, as an affirmative statement on which shareholders were asked to rely in approving the exculpation amendment for the officers, that "[t]he Audit Committee of our Board oversees management of the Company's financial risks, and oversees and reviews our risk management policies, including the Company's investment policies and ***anti-fraud program***." 2023 Proxy at 11 (emphasis added).

265. Khanna, Kennedy, and Holmgren either: (a) actually reviewed the earnings press releases, analyst presentations, and Forms 10-K and 10-Q containing the materially false and

misleading statements identified herein, and failed to take the corrective action required by their charter duties; or (b) failed to perform the review duties their charter required and the 2023 Proxy represented they were performing, in violation of their duty of good faith to the Company and to shareholders. Either scenario establishes a substantial likelihood of liability.

266. The distribution channel and backlog, comprising 80–85% of Company product revenue, and were core operations to Extreme. Due to their required duties to review earnings press releases, quarterly financial reports, and internal control reports, and to oversee the anti-fraud program, the Audit Committee members either (a) knew of the fraud; or (b) breached their fiduciary duties by failing discharge their required duties to detect and halt the channel-stuffing scheme.

267. Defendants Khanna, Holgren, and Kennedy attended at least 75% of aggregate board meetings during the Relevant Period, at which relevant information regarding the Company's distribution channel, revenue recognition, and backlog risks were discussed. *See* 2022 Proxy at 12; 2023 Proxy at 12.

268. Moreover, Proxy statements filed during the Relevant Period list all three as having "accounting and finance skills." 2022 Proxy at 10; 2023 Proxy at 10.

269. In his biography in both the 2022 and 2023 Proxy statements, Defendant Kennedy is described as having "financial expertise," and his role is described as bringing "***extensive financial*** and executive ***leadership experience in technology companies***, including networking companies, and provid[ing] management and ***financial expertise*** to our Board." 2022 Proxy at 6, 9; 2023 Proxy at 6, 9 (emphasis added).

270. In Defendant Khanna's biographies in the same Proxy statements, his disclosed skills include: "financial and internal audit leadership establishment of financial controls and processes; [and] financial advice." 2022 Proxy at 6; 2023 Proxy at 6.

271. In Defendant Holmgren's biographies in those Proxy statements, her skills include "risk assessment and planning." 2022 Proxy at 6; 2023 Proxy at 6.

272. The Proxy statements further state that both Kennedy and Khanna "have past employment experience in finance or accounting, requisite professional certification in accounting or other comparable experience or background that results in their financial sophistication, including

being or having been a chief executive officer, chief financial officer or other senior officer with financial oversight responsibilities." 2022 Proxy at 12; 2023 Proxy at 12.

273. Taken together, these descriptions and claims in both the 2022 and 2023 Proxy statements (on which Extreme Network shareholders relied when voting on numerous proposals, including, the re-election of Directors, including those on the Audit Committee, an amended Equity Incentive Plan, and amendments to Company's certificate of incorporation) led shareholders to believe that those Directors on the Audit Committee who were specifically tasked with reviewing the Company's financial statements, had done so with the experience and expertise as listed therein. It is therefore reasonable to believe that those same Audit Committee members also had the ability and fiduciary duty to understand and oversee the Company's backlog and distributor practices.

274. Khanna, while in possession of material non-public information, sold 40,000 shares of the Company's stock at various prices per share for a windfall of $803,996, and these sales demonstrate his motive in facilitating and participating in the misleading statements. Khanna materially personally benefitted from the artificial inflation to Extreme stock caused by the channel stuffing fraud and his decision to cause the Company to repurchase over $100 million of its own stock while he was selling. Khanna had not sold any Extreme shares from January 2020 until the disposal of the shares alleged herein. Khanna's sales were self-directed and not subject to a 10b5-1 plan. As a result of his insider selling, Khanna may be personally subject to disgorgement.

275. Likewise, Kennedy, while in possession of material non-public information, sold 20,000 shares of the Company's stock for a windfall of $378,100, and his sale demonstrates his motive in facilitating and participating in the misleading statements. Kennedy materially personally benefitted from the artificial inflation to Extreme stock caused by the channel stuffing fraud and his decision to cause the Company to repurchase over $100 million of its own stock while he was selling. Moreover, Kennedy had not sold any Extreme shares from January 2020 until the disposal of the shares alleged herein. Kennedy's sales were self-directed and not subject to a 10b5-1 plan. As a result of his insider selling, Kennedy may be personally subject to disgorgement.

276. For these reasons, Khanna, Holmgren, and Kennedy breached their fiduciary duties, face a substantial likelihood of liability, are not independent or disinterested, and thus demand upon them is futile and, therefore, excused.

**Compensation Committee Defendants Shoemaker, Holmgren, and Kennedy**

277. Defendants Carinalli, Shoemaker, Holmgren, and Kennedy comprised the Board's Compensation Committee throughout the Relevant Period. These four Defendants are not disinterested or independent and, therefore, are incapable of considering demand for the additional and independent reason that they designed, recommended, and approved the executive compensation program through which the senior officers responsible for the channel-stuffing scheme were enriched on the basis of the very financial metrics that the scheme inflated. Carinalli served as Chair of the Compensation Committee; Shoemaker, Holmgren, and Kennedy each served as members. 2023 Proxy atatters concerning management performance, officer compensation and benefits plans and programs." 2023 Proxy at 11, 13. The Compensation Committee was further charged with overseeing "management of risks relating to and arising from [the Company's] compensation plans and arrangements." *Id.* at 11. Carinalli, Shoemaker, Holmgren, and Kennedy discharged these responsibilities by designing and approving an executive compensation program in which the largest portion of named-executive-officer pay was tied directly to "the creation of stockholder value" and to "achieving the Company's strategic objectives and financial goals," including the Company's reported revenue, stock-price performance, and total shareholder return. 2023 Proxy at 45, 49. For Defendant Meyercord, 55% of fiscal 2023 compensation was tied directly to Company and stock-price performance, and bonuses were targeted at 130% of base salary. *Id.* at 45, 49.

278. The metrics on which the Compensation Committee conditioned executive pay are the very metrics this Court has held were inflated by the channel-stuffing and backlog-misrepresentation scheme. In the Securities Class Action MTD Order, the Court expressly relied on the executive compensation program in finding that the Securities Action complaint pleads a strong inference of scienter, holding that the Defendants "were motivated to inflate [the Company's] 'financial results and stock prices because their eligibility for stock options and executive bonuses were based principally on the company's financial performance.'" Securities Class Action MTD Order at 23–24.

The Court further credited the allegation that "Defendant Meyercord alone earned over $1.1 million in cash in FY 2023" through the executive compensation program, *id.*, and that the Defendants Thomas, Tate, and Rhodes likewise received "significant bonuses through the executive compensation program." *Id.* That executive compensation program was designed and approved by Carinalli, Shoemaker, Holmgren, and Kennedy. The financial results that triggered those payouts were the product of fraud.

279. Having tied executive compensation directly to revenue, stockholder value, and stock-price performance, Carinalli, Shoemaker, Holmgren, and Kennedy had a duty to scrutinize the integrity of the very metrics on which they conditioned awards. The Compensation Committee met repeatedly during each fiscal year of the Relevant Period; it reviewed quarterly financial results in connection with the certification of performance metrics and payout determinations under the executive compensation program; it signed the Compensation Committee Reports incorporated into the 2022 and 2023 Proxy Statements; and it represented to shareholders, through those Reports, that the Committee had reviewed and discussed with management the Compensation Discussion and Analysis, including the performance metrics on which executive compensation was based. 2022 Proxy at 76; 2023 Proxy at 76. Carinalli, Shoemaker, Holmgren, and Kennedy either (a) actually performed the review their charter required and the Compensation Committee Reports represented they had performed, and therefore knew or recklessly disregarded that the metrics on which they conditioned executive pay had been inflated by the channel-stuffing scheme; or (b) failed to perform that review and falsely represented to shareholders that they had, a breach of the duty of good faith. Either scenario establishes a substantial likelihood of liability.

280. The Compensation Committee's approval of executive compensation tied to inflated metrics caused direct and quantifiable injury to the Company. The Committee approved Meyercord's fiscal 2023 compensation of $16,132,678, nearly double his fiscal 2022 compensation, and nearly triple his fiscal 2021 compensation. 2023 Proxy at 55. The Committee approved bonuses targeted at 130% of base salary for Meyercord, *id.* at 50, and approved the bonuses for Defendants Thomas, Tate, and Rhodes that the Court identified in the Securities Class Action MTD Order. Securities Class Action MTD Order at 23–24. The fiscal 2023 escalation in named-executive-officer compensation

was not earned by genuine corporate performance: it was the product of revenue, backlog, and stock-price metrics that the channel-stuffing scheme inflated. Carinalli, Shoemaker, Holmgren, and Kennedy thereby caused the Company to transfer millions of dollars in cash and equity to officers who would not have qualified for those payouts under undistorted financial metrics, and to issue equity awards calibrated to a stock price that this Court has held was artificially inflated. Each such payout and award represents a transfer of Company assets premised on financial results that the Securities Class Action MTD Order has now held are adequately alleged to be the product of fraud.

281. Making matters worse, in June 2022, in setting compensation for fiscal 2023, the Compensation Committee approved a meaningful increase in the value of the performance-based equity grants offered to Defendant Meyercord. Meyercord's stock awards for fiscal 2023 totaled $14,190,565, up from $7,419,370 in fiscal 2022. 2023 Proxy at 55. The Committee expressly tied that increase to "Mr. Meyercord's performance in that role, impact to the Company, and the Company's relative TSR performance." 2023 Proxy at 50-51. The performance metrics the Committee invoked to justify nearly doubling Meyercord's grant are the very metrics this Court has held the Securities Action complaint adequately alleges were inflated by the channel-stuffing scheme. Securities Class Action MTD Order at 23–24.

282. The Compensation Committee certified the August 2020 PSU grants at maximum (150% of target) on August 16, 2023, based on a three-year Company TSR of 527% compared to a Russell 2000 Index TSR of 30%. 2023 Proxy at 50-51. The Committee also certified the first and second tranches of the August 2021 PSU grants and the first tranche of the August 2022 PSU grants at 100% of target. *Id.* Each such certification used the Company's stock price as the operative measure of relative TSR. The SAC alleges, and the Securities Class Action MTD Order has held the Securities Action complaint adequately alleges, that the Company's stock price during the Relevant Period was artificially inflated by the channel-stuffing scheme. Securities Class Action MTD Order at 23–24. The Compensation Committee's certifications therefore directly transferred, and authorized the future transfer of, Company equity to officers based on the very stock-price performance the SAC alleges to be the product of fraud.

283. Carinalli, Shoemaker, Holmgren, and Kennedy therefore face a substantial likelihood of liability for breach of the duty of loyalty, corporate waste, and unjust enrichment of fellow Defendants. The Compensation Committee Defendants knowingly or recklessly approved compensation premised on financial results they had a duty to scrutinize and that this Court has held are adequately alleged to be the product of fraud; their approval of those awards is not protected by the business-judgment rule and cannot be exculpated under the Company's certificate of incorporation. Because Carinalli, Shoemaker, Holmgren, and Kennedy cannot disinterestedly consider a demand that would require them to authorize litigation against themselves and the recovery of the very compensation awards they approved, demand upon each of them is futile and excused for this additional and independent reason.

**Defendant Burton**

284. Defendant Burton is not disinterested or independent and, therefore, is incapable of considering demand. During the Relevant Period, Burton served on the Board's Nominating and Governance Committee, the body charged with overseeing the Company's corporate governance practices, the Code of Business Conduct and Ethics, and the Board's risk-oversight framework. As a member of that Committee, Burton had heightened duties to oversee the integrity of the Company's public disclosures, the administration of the Company's insider trading policy, and the conduct of fellow directors and officers.

285. Burton, while in possession of material non-public information, sold 9,000 shares of the Company's stock on December 14, 2022 at $20.35 per share for total proceeds of $183,150. That sale was self-direct and not pursuant to a Rule 10b5-1 plan. Burton therefore cannot invoke the affirmative defense provided to insiders who execute trades pursuant to a contract, instruction, or written plan adopted in good faith at a time when they were not aware of material non-public information. The sale was a discretionary, off-plan trade.

286. The context of and details surrounding Burton's sale support an inference of improper motive.

287. The sale was Burton's only sale of Extreme stock during the Relevant Period. The date she selected to liquidate, between Meyercord's November 15, 2022 statements at the Needham

Conference alleged above, and the Company's January 25, 2023 corrective disclosure, supports the inference that the trade was the product of material non-public information.

288. Burton's $20.35 execution price was approximately 23.3% above the $16.50 closing price on January 25, 2023, the day on which the Company disclosed that backlog had collapsed to $532 million, that the Product Book-to-Bill Ratio had dropped from 1.3x to 0.9x, and that Defendant Thomas had resigned. Burton avoided approximately $34,650 in losses by selling six weeks before that disclosure.

289. The 9,000 shares Burton sold represented approximately 12.5% of Burton's 72,243 directly held shares immediately before the sale. The transaction was executed in direct form, meaning Burton personally received the proceeds. There is no trust, family, or pass-through structure to dilute the inference of personal benefit.

290. Less than four weeks before her sale, Burton voted with the Board to increase the Company's share repurchase authorization from $25 million per quarter to $50 million per quarter. The Company subsequently repurchased 5,375,391 shares of its own stock during fiscal 2023 at an average price of $18.58 per share, $1.77 per share less than the price at which Burton liquidated her own personal stake. Burton thus committed Company cash to buy stock at allegedly inflated prices while simultaneously selling her own holdings at a still-higher price.

291. Burton's December 14, 2022 sale fell within a cluster of insider sales from October 26, 2022 through January 24, 2023 (Defendants Meyercord, Thomas, and Vitalone). Defendant Vitalone's sale on January 24, 2023, the trading day immediately before the corrective disclosure, confirms that those with the most direct line of sight into the Company's deteriorating organic demand were liquidating into the inflated market. Burton's sale fits within that pattern and was timed to maximize her proceeds.

292. Burton is NACD-certified and held Chief Marketing Officer roles at multiple software and AI companies, including Quantcast, H2O.ai, Hortonworks, and SAP, and holds a B.A. in Mathematics with a focus in Computer Science. Burton cannot credibly claim a lack of sophistication regarding book-to-bill ratios, backlog metrics, or the gap between fulfillment-driven and demand-driven revenue, concepts central to the Company's misrepresentations.

293. Taken together, Burton's discretionary, off-plan, single-event sale at a local price peak, executed less than four weeks after she voted to expand the Company's repurchase authority and against the backdrop of a clustered wave of senior-insider selling, constitutes a non-exculpated breach of the duty of loyalty and supports a strong inference of liability for trading on material non-public information. As a result of her insider selling, Burton may be personally subject to disgorgement and faces a substantial likelihood of liability.

**<u>Defendant Shoemaker</u>**

294. Defendant Shoemaker is not disinterested or capable of impartially considering a demand, and therefore demand upon him is futile and excused, for several independent reasons.

295. Shoemaker has served as the Company's Independent Board Chair since February 2017. 2023 Proxy at 11. In that role, he assumed and publicly represented that he was discharging the specific duties enumerated in the Company's Corporate Governance Guidelines and at page 11 of the 2023 Proxy, including chairing executive sessions of independent directors, ensuring that independent directors had adequate information to meet without management present, setting the agenda for Board meetings, and being the designated channel for communications with stockholders. 2023 Proxy at 11. Shoemaker cannot plausibly claim ignorance of matters that came before the Board, including the channel-stuffing scheme and its effect on reported revenues, demand, and backlog, without repudiating his representations to stockholders about his role as Independent Chair.

296. Shoemaker chaired the Nominating, Governance, and Environmental & Social Responsibility Committee during the Relevant Period. 2023 Proxy at 6, 12. As Chair of that committee, Shoemaker led the annual review of Board performance, committee composition, and corporate governance matters, including reviewing the performance of the Audit Committee in its oversight of financial reporting, internal controls, and the Company's anti-fraud program. *Id.* at 11–14.

297. Shoemaker served as a member of the Compensation Committee during the Relevant Period. 2023 Proxy at 6. In that capacity, he approved Meyercord's fiscal 2023 compensation of $16,132,678, which was tied to financial metrics that were inflated by the channel stuffing scheme alleged herein.

298. Shoemaker signed the Company's Form 10-Ks for fiscal years 2022 and 2023, each of which contained the materially false and misleading statements identified in the Securities Class Action and herein.

299. The channel-stuffing and backlog scheme affected the Company's core business operations, 80% to 85% of product revenues during the Relevant Period ran through the very distributor channel that was being stuffed. Under the core operations doctrine, as applied by the Court in the Securities Class Action MTD Order, senior fiduciaries with direct responsibility for financial oversight, which applies by extension to Shoemaker, as Board Chair, "must have known about the backlog orders because of their devastating effect on the corporation's revenue." Securities Class Action MTD Order at 24–25. The Board's representation in the 2023 Proxy that it "reviews and discusses with management on a quarterly basis its financial results and forecasts," 2023 Proxy at 11, eliminates any plausible claim of ignorance.

300. Shoemaker issued the 2023 Proxy in his capacity as a director, soliciting approval of officer exculpation without disclosing the ongoing misconduct of the officers to be exculpated. He therefore faces a substantial likelihood of liability in connection therewith.

301. Shoemaker authorized, as a member of the Board, the Company's repurchase of 7,740,611 shares of its own stock at artificially inflated prices for more than $150 million, and the November 17, 2022 increase in the quarterly repurchase cap from $25 million to $50 million. He therefore faces a substantial likelihood of liability for breach of fiduciary duty and for violations of Section 10(b) of the Exchange Act with respect to the Company's purchase of its own securities.

302. For these reasons, Shoemaker cannot consider a demand with disinterestedness and independence, and demand upon him is excused as futile.

**Defendant Carinalli**

303. Defendant Carinalli is not disinterested or capable of impartially considering a demand, and therefore demand upon him is futile and excused, for several independent reasons.

304. Carinalli chaired the Compensation Committee during the Relevant Period. 2023 Proxy at 6, 13. The Compensation Committee is responsible for the oversight of the Board's "management of risks relating to and arising from [the Company's] compensation plans and

arrangements," as well as for "discharging [the] Board's responsibilities relating to compensation and benefits of [the Company's] executive officers and evaluat[ing] and report[ing] to [the] Board on matters concerning management performance, officer compensation and benefits plans and programs" *Id*. at 11, 13. In his capacity as Chair, Carinalli was principally responsible for approving executive compensation at levels tied to the financial metrics, including revenue, stock price, and "stockholder value" that the channel-stuffing scheme inflated. Carinalli approved Meyercord's fiscal 2023 compensation of $16,132,678 (nearly double fiscal year 2022 and nearly triple fiscal year 2021); Thomas's, Tate's, and Rhodes's significant bonuses (Securities Class Action MTD Order at 23–24); and Vitalone's compensation, each of which was increased by the artificially inflated financial performance the Securities Class Action MTD Order held was the product of the channel stuffing and backlog fraud.

305. Carinalli signed the Compensation Committee Report included in the 2023 Proxy, representing to shareholders that the Committee had reviewed and discussed with management the Compensation Discussion and Analysis (including the performance metrics on which executive compensation was based). 2023 Proxy at 76.

306. Carinalli served as a member of the Nominating, Governance, and Environmental & Social Responsibility Committee during the Relevant Period, with responsibility for reviewing corporate governance practices and board-level risk oversight. 2023 Proxy at 6, 13–14.

307. Carinalli signed the Company's Form 10-Ks for fiscal years 2022 and 2023, each of which contained the materially false and misleading statements identified in the Securities Class Action and herein..

308. Carinalli, who had served on the Board since 1996 and was represented to shareholders as possessing expertise in "risk assessment and planning" (2023 Proxy at 10), cannot plausibly claim ignorance of the channel-stuffing scheme's effect on the Company's core revenue.

309. Carinalli issued the 2023 Proxy soliciting officer exculpation. He therefore faces a substantial likelihood of liability on Count II.

310. Carinalli authorized the buyback program and the November 17, 2022 cap increase on the same terms as each other director.

311. For these reasons, Carinalli cannot consider a demand with disinterestedness and independence, and demand upon him is excused as futile.

**The Entire Board**

312. The entire Board, Meyercord, Shoemaker, Carinalli, Kennedy, Holmgren, Khanna, and Burton, authorized the Company's stock repurchase program, under which the Company repurchased 7,740,611 shares of its common stock between July 2022 and January 2024 at a total cost of over $150 million, at share prices that were artificially inflated by the channel-stuffing and backlog-misrepresentation scheme alleged herein. Those repurchases transferred Company assets to selling shareholders, including, disproportionately, to the Insider Trading Defendants who were themselves selling Extreme stock to the market while the Company was simultaneously buying.

313. On November 17, 2022, in the middle of the fraud, the Board affirmatively increased the quarterly repurchase cap from $25 million to $50 million per quarter. The Board did so: (a) more than four months after FE-1 informed then-CFO Thomas, during a July 2022 exit interview attended by Thomas and the Company's Executive Vice President of Global Human Resources, of specific instances of channel stuffing and distributor manipulation and provided Thomas with documents and emails evidencing the scheme (Securities Action MTD Order at 7–8); (b) after the Summer 2022 Executive Leadership Team meetings in which FE-7 warned Meyercord, Thomas, and Rice that the Company's public backlog representations conflicted with established industry practice and that an "acid test" of industry participants confirmed up to 66% of backlog would vanish once competitors delivered first (Securities Action MTD Order at 24); (c) three weeks after Defendant Meyercord had sold 100,000 shares of Company stock on October 27, 2022 for $1,710,374 in proceeds, while the Company was purchasing its own shares on the open market; and (d) while the Audit Committee was receiving regular reports from the Chief Financial Officer, Corporate Controller, Senior Vice President of Financial Planning & Analysis, and Senior Director of Internal Audit, pursuant to the Company's representations in its 2023 Proxy. 2023 Proxy at 11.

314. By doubling the quarterly cap on repurchases at the peak of the artificial stock-price inflation, the Board compounded the injury to the Company. Each repurchased share cost the

Company more than its true value, transferring the premium to selling shareholders, including insiders.

315. The Company's repurchases of its own stock at artificially inflated prices constitute purchases of a "security" within the meaning of Section 10(b) of the Exchange Act and Rule 10b-5. Because the Individual Defendants caused the Company to rely on their own material misrepresentations when the Company purchased its own shares, either directly or through the fraud-on-the-market doctrine, the Company is among the victims of the Individual Defendants' § 10(b) violations. Each director who authorized the repurchases and the cap increase therefore faces a substantial likelihood of liability under both Delaware fiduciary-duty law and the federal securities laws.

316. Under the core operations doctrine as applied in the Securities Class Action MTD Order, the Board's knowledge of the channel-stuffing scheme's effect on core revenue is inferable from: (i) the Board's own representation that it reviewed financial results quarterly (2023 Proxy at 11); (ii) the fact that 80–85% of product revenue ran through the very distributor channel that was being stuffed (Securities Class Action MTD Order at 3); (iii) the Audit Committee's charter-mandated responsibility to "review and discuss earnings press releases and other information provided to analysts and rating agencies;" (iv) the fact that each director signed Company 10-Ks containing the challenged statements; and (v) the fact that the Company's executives "had lots of eyes on this backlog process – it's updated all the way up to Ed [Meyercord]." Securities Class Action MTD Order at 23.

317. On September 26, 2023, after two corrective disclosures had already caused significant share-price declines on January 25, 2023 and August 24, 2023, the entire Board issued the 2023 Proxy soliciting shareholder approval of a Certificate of Incorporation amendment to provide officer exculpation under 8 *Del. C.* § 102(b)(7).

318. The Board "unanimously recommend[ed]" that shareholders vote in favor of the officer-exculpation amendment. Proxy at 38. The amendment was submitted to protect the very officers, including Meyercord, Thomas, Rhodes, Tate, Rice, and Vitalone, who were then actively

engaged in, or had already participated in, the channel-stuffing and backlog-misrepresentation scheme later challenged in the Securities Action.

319. The Board's solicitation of officer exculpation, while those very officers were engaged in the challenged misconduct, was not the product of disinterested business judgment. It reflected either (a) affirmative knowledge of the officers' wrongdoing, such that the Board sought to insulate them from liability on the basis of information not disclosed to the solicited shareholders; or (b) conscious disregard of evidence sufficient to put the Board on notice of the wrongdoing, which the directors allowed to continue while facilitating shareholder-approved insulation of the wrongdoers. Either scenario establishes the Board's demand-disabling interest.

320. By soliciting shareholder approval of officer exculpation without disclosing the misconduct that the officers were then engaged in, misconduct that a reasonable shareholder would have considered material to the vote, the entire Board breached its duty of candor to shareholders. Each director who signed the 2023 Proxy faces a substantial likelihood of liability under § 14(a) of the Exchange Act and Rule 14a-9. The directors' substantial likelihood of § 14(a) liability is itself a basis for demand futility.

321. Additionally, four of the seven members of the current Board, Shoemaker, Holmgren, Khanna, and Burton, worked in senior positions at Sun Microsystems, Inc. ("Sun") during substantially overlapping periods. 2023 Proxy at 7–9. Specifically: Shoemaker served in various executive roles at Sun from 1990 to June 2004, culminating as Executive Vice President, Worldwide Operations Organizations, and Executive Vice President and General Manager for Sun's Computer Systems Division. Holmgren held "increasingly senior roles" at Sun for over twenty years beginning in 1985, culminating as Senior Vice President, Storage Systems. Khanna held various finance roles at Sun from 1991 to 2004, including International Controller and Vice President Finance for Global Services Business. Burton held executive and senior management positions at Sun beginning in 2000, including senior marketing roles. Altogether, Shoemaker, Holmgren, and Khanna served in overlapping senior-management capacities at Sun from 1991 to 2004, a period of approximately thirteen years. Burton's senior-management tenure at Sun overlapped with Shoemaker's,

Holmgren's, and Khanna's for periods ranging from approximately four to six years between 2000 and 2006.

322. Reasonable doubt as to director independence is evaluated holistically on the basis of particularized facts showing personal and professional ties. The overlapping tenure of Shoemaker, Holmgren, Khanna, and Burton at Sun, spanning up to thirteen years for three of the four directors, in senior management roles during the same corporate era, is a particularized fact that, when combined with the other independence-impairing facts pled herein, supports a reasonable doubt that any of these four directors can impartially consider a demand to pursue litigation against any other of them. Because Plaintiffs have already pled that each of these defendants face a substantial likelihood of liability as set forth above, the Sun interlock provides an additional basis for reasonable doubt that Shoemaker, Holmgren, and Burton can impartially consider a demand to pursue litigation against Khanna, or any of each other. Conversely, each of Shoemaker's, Holmgren's, and Burton's substantial likelihood of liability (pled supra) in turn provides additional basis for reasonable doubt that the others can impartially consider demand as to them.

323. Demand is excused because the Directors, who are named as defendants in this action, control the Company and are indebted to each other. The Directors have longstanding business and personal relationships with each other and the Individual Defendants that preclude them from acting independently and in the best interests of the Company and the shareholders. These conflicts of interest precluded the Directors from adequately assessing and managing risks, overseeing the Company's internal control over financial reporting, overseeing disclosure controls and procedures and calling into question the Individual Defendants' conduct. Thus, any demand upon the Directors would be futile.

324. Extreme has been, and will continue to be, exposed to significant losses due to the wrongdoing complained of herein. Yet, the Directors have not filed any lawsuits against themselves or others who were responsible for that wrongful conduct to attempt to recover for Extreme any part of the damages Extreme suffered and will continue to suffer, thereby. Thus, any demand to the Directors would be futile.

325. The Individual Defendants' conduct described herein and summarized above could not have been the product of legitimate business judgment as it was based on bad faith and intentional, reckless, or disloyal misconduct. Thus, none of the Directors can claim exculpation from their violations of duty pursuant to the Company's charter (to the extent such a provision exists). As a majority of the Directors face a substantial likelihood of liability, they are self-interested in the transactions challenged herein. They cannot be presumed to be capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company. Accordingly, demand is excused as being futile.

326. The acts complained of herein constitute violations of fiduciary duties owed by Extreme's officers and directors, and these acts are incapable of ratification.

327. The Directors may also be protected against personal liability for their acts of mismanagement and breaches of fiduciary duty alleged herein by directors' and officers' liability insurance if they caused the Company to purchase it for their protection with corporate funds i.e., monies belonging to the stockholders of Extreme. If there is a directors' and officers' liability insurance policy covering the Directors, it may contain provisions that eliminate coverage for any action brought directly by the Company against the Directors, known as, inter alia, the ''insured-versus-insured exclusion.'' As a result, if the Directors were to sue themselves or certain of the officers of Extreme, there would be no directors' and officers' insurance protection. Accordingly, the Directors cannot be expected to bring such a suit. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage, if such an insurance policy exists, will provide a basis for the Company to effectuate a recovery. Thus, demand on the Directors is futile and, therefore, excused.

328. If there is no directors' and officers' liability insurance, then the Directors will not cause Extreme to sue the Individual Defendants named herein, since, if they did, they would face a large uninsured individual liability. Accordingly, demand is futile in that event, as well.

329. Thus, for all of the reasons set forth above, all of the Directors, and, if not all of them, certainly at least five of them, cannot consider a demand with disinterestedness and independence. Consequently, a demand upon the Board is excused as futile.

## CLAIMS FOR RELIEF

## COUNT I

### Breach of Fiduciary Duty Against the Individual Defendants

330. Plaintiffs incorporate by reference and re-allege each and every allegation set forth above, as though fully set forth herein.

331. Each Individual Defendant owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of Extreme's business and affairs.

332. Each of the Individual Defendants violated and breached his or her fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision. The Individual Defendants' conduct set forth herein was due to their intentional, reckless, or negligent breach of the fiduciary duties they owed to the Company, as alleged herein. The Individual Defendants intentionally, recklessly, or negligently breached or disregarded their fiduciary duties to protect the rights and interests of Extreme's shareholders.

333. In breach of their fiduciary duties owed to Extreme, the Individual Defendants willfully or recklessly caused the Company to violate federal regulations by falsely stating and/or failing to disclose the Company's true business performance, as alleged herein.

334. The Individual Defendants had actual or constructive knowledge that the Company issued materially false and misleading statements, and they failed to correct those public statements and representations. The Individual Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein or acted with reckless disregard for the truth, in that they failed to ascertain and disclose such facts, even though such facts were available to them. Such material misrepresentations and omissions were committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of Extreme's securities.

335. The Individual Defendants had actual or constructive knowledge that they had caused the Company to engage in the fraudulent schemes set forth herein improperly and to fail to maintain adequate internal controls. The Individual Defendants had actual knowledge that the Company was engaging in the fraudulent schemes set forth herein, and that internal controls were not adequately

maintained, or acted with reckless disregard for the truth, in that they caused the Company to engage in the fraudulent schemes improperly and to fail to maintain adequate internal controls, even though such facts were available to them. Such improper conduct was committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of Extreme's securities.

336. These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

337. As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, Extreme has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

338. Plaintiffs, on behalf of Extreme, have no adequate remedy at law.

## COUNT II

### Violations of Section 14(a) of the Exchange Act Against the Director Defendants

339. Plaintiffs incorporate by reference and realleges each and every allegation contained above, as though fully set forth herein.

340. Rule 14a-9, promulgated pursuant to § 14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a-9. Specifically, the 2022 Proxy and 2023 Proxy violated § 14(a) and Rule 14a-9 when they solicited shareholder approval for management proposals including, the reelection of directors who were breaching their fiduciary duties, additional shares for equity compensation of officers who were breaching their fiduciary duties, and, critically, the certificate of incorporation amendment to exculpate officers.

341. Defendants knew or recklessly failed to know that the statements and omissions regarding the qualifications and oversight capabilities of the Board's director nominees, as well as their activities as Board and committee members, contained in the 2022 Proxy and 2023 Proxy were materially false and misleading.

342. The misrepresentations and omissions in the 2022 Proxy and 2023 Proxy were material to Company shareholders in voting on the 2022 Proxy and 2023 Proxy. At the time of the proxy solicitations the Company's directors and officers were breaching their fiduciary duties to the Company, and benefitted, directly and indirectly, from the votes.

343. Had the 2022 Proxy and 2023 Proxy accurately disclosed the material facts, including the Audit Committee, full Board's, and officers' fiduciary breaches, reasonable shareholders would have withheld their votes, the management proposals would not have been adopted. Accordingly, the false and misleading proxy statement deprived shareholders of the opportunity to make an informed voting decision and resulted in harm to the Company, in violation of Section 14(a) of the Exchange Act and SEC Rule 14a-9.

344. The 2022 Proxy and 2023 Proxy were thus each an essential link in the accomplishment of the continuation of defendants' continued violation of their fiduciary duties.

345. The Company was damaged as a result of the defendants' material misrepresentations and omissions in the proxy statement.

346. Plaintiffs on behalf of the Company have no adequate remedy at law.

**<u>COUNT III</u>**

**Against Individual Defendants for Violations of Section 10(b) and Rule 10b-5 of the Securities Exchange Act of 1934**

347. Plaintiffs incorporate by reference and reallege each and every allegation contained above, as though fully set forth herein.

348. The Individual Defendants participated in a scheme to defraud with the purpose and effect of defrauding the Company. Not only is the Company now defending claims that it violated Section10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, but the Company itself, due to the Individual Defendants' acts, was one of the largest victims of the unlawful scheme perpetrated on investors by the Individual Defendants. With the price of its common stock trading at artificially-inflated prices due to the Individual Defendants' material misrepresentations, the Individual Defendants caused the Company to repurchase approximately 7,740,611 of its own shares on the open market at artificially-inflated prices, damaging the Company by millions of dollars.

349. The Individual Defendants individually and in concert, directly and indirectly, by the use and means of instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct designed to falsify the Company's press releases, public statements made in conference calls, and periodic and current reports filed with the SEC.

350. The Individual Defendants employed devices, schemes and artifices to defraud while in possession of adverse, material, non-public information and engaged in acts, practices and a course of conduct that included the making of, or participation in the making of, untrue and/or misleading statements of material facts and/or omitting to state material facts necessary in order to make the statements made about the Company not misleading

351. The Individual Defendants acted with scienter in that they either had actual knowledge of the schemes and the misrepresentations and/or omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose the true facts, even though such facts were available to them. The Individual Defendants were senior executives of the Company, or received direct briefings from them, and were therefore directly responsible for the schemes set forth herein and for the false and misleading statements and/or omissions disseminated to the public through press releases, conference calls, and filings with the SEC.

352. In addition to each of the Individual Defendants approving the issuance of the Company's false and misleading statements while they were serving as a senior executive or director of the Company, as members of the Board, each of the Individual Defendants then serving as a director made and/or signed the Company's Forms 10-K and Forms 10-Qfiled with the SEC as alleged herein.

353. By virtue of the foregoing, the Individual Defendants have violated § 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

354. Plaintiffs on behalf of the Company have no adequate remedy at law.

## COUNT IV

**Breach of Fiduciary Duty – Misappropriation of Material, Non-Public Information Against the Insider Trading Defendants**

355. Plaintiffs incorporate by reference and re-allege each and every allegation set forth above, as though fully set forth herein.

356. At the time that the Insider Trading Defendants sold their Extreme stock, they knew the material, non-public information described above and sold stock motivated, in whole or in part, by the substance of such information.

357. The information described above was proprietary, non-public information concerning the Company's financial condition and future business prospects. It was a proprietary asset belonging to the Company, which the Insider Trading Defendants misappropriated to their own benefit when they sold Extreme stock.

358. The Insider Trading Defendants' sales of stock while in possession and control of this material, adverse, non-public information was a breach of their fiduciary duties of loyalty and good faith.

359. Since the use of the Company's proprietary information for their own gain constitutes a breach of the Insider Trading Defendants' fiduciary duties, any profits made by the Insider Trading Defendants as a result of their stock sales should be disgorged and the Company is entitled to the imposition of a constructive trust on any profits the Insider Trading Defendants obtained thereby.

## COUNT V

### Unjust Enrichment
### Against the Individual Defendants

360. Plaintiffs incorporate by reference and re-allege each and every allegation set forth above, as though fully set forth herein.

361. By their wrongful acts, violations of law, and false and misleading statements and omissions of material information and facts that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of Extreme.

362. Each of the Defendants received payment from Extreme, in the form of either salary or director fees while actively breaching their fiduciary duties to Extreme.

363. All the payments and benefits provided to Defendants were at the expense of Extreme. The Company received no benefit from these payments.

364. Plaintiffs, as shareholders and representatives of Extreme, seek restitution from the Individual Defendants and seeks an order from this Court disgorging all profits—including from

benefits, and other compensation, including any performance-based or valuation-based compensation, obtained by the Individual Defendants due to their wrongful conduct and breach of their fiduciary and contractual duties.

365. Plaintiffs, on behalf of Extreme, have no adequate remedy at law.

## COUNT VI

### Waste of Corporate Assets
### Against the Individual Defendants

366. Plaintiffs incorporate by reference and re-allege each and every allegation set forth above, as though fully set forth herein.

367. As a result of the foregoing, and by failing to properly consider the interests of the Company and its public shareholders, the Individual Defendants have caused Extreme to waste valuable corporate assets, to incur many millions of dollars of legal liability and/or costs to defend unlawful actions, and to lose assets from investors and customers who no longer trust the Company.

368. As a result of the waste of corporate assets, the Individual Defendants are each liable to the Company.

369. Plaintiffs, on behalf of Extreme, have no adequate remedy at law.

## PRAYER FOR RELIEF

FOR THESE REASONS, Plaintiffs demand judgment in the Company's favor against all Individual Defendants as follows:

a) Declaring that the Plaintiffs may maintain this action on behalf of Extreme and that Plaintiffs are adequate representatives of the Company;

b) Declaring that the Individual Defendants have breached and/or aided and abetted the breach of their fiduciary duties to Extreme;

c) Determining and awarding to Extreme the damages sustained by it, or disgorgement or restitution owed to it, as a result of the violations set forth above from each of the Individual Defendants, jointly and severally, together with pre-judgment and post-judgment interest thereon;

d) Directing the Individual Defendants to take all necessary actions to reform and improve Extreme's corporate governance and internal procedures to comply with applicable laws and to protect Extreme and its shareholders from a repeat of the damaging events described herein;

e) Awarding Plaintiffs the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

f) Granting such other and further relief as the Court may deem just and proper.

**JURY TRIAL DEMANDED**

Plaintiffs hereby demand a trial by jury.

Dated: April 28, 2026

**WOLF HALDENSTEIN ADLER FREEMAN & HERZ LLP**

By: */s/ Betsy C. Manifold*
BETSY C. MANIFOLD

Betsy C. Manifold
Rachele R. Byrd
750 B Street, Suite 1820
San Diego, CA 92101
Telephone: (619) 239-4599
Facsimile: (619) 234-4599
manifold@whafh.com
byrd@whafh.com

**KUEHN LAW, PLLC**
Justin A. Kuehn
Molly J. Brown
53 Hill Street, Suite 605
Southampton, NY 11968
Telephone: (833) 672-0814
justin@kuehn.law
molly@kuehn.law

**GLANCY PRONGAY WOLKE & ROTTER LLP**
Benjamin I. Sachs-Michaels
745 Fifth Avenue, Fifth Floor
New York, NY 10151
Telephone: (212) 935-7400
bsachsmichaels@glancylaw.com

**GLANCY PRONGAY WOLKE & ROTTER LLP**
Robert V. Prongay
Pavithra Rajesh
1925 Century Park East, Suite 2100
Los Angeles, CA 90067
Telephone: (310) 201-9150
Facsimile: (310) 201-9160
rprongay@glancylaw.com
prajesh@glancylaw.com

*Co-Lead Counsel for Plaintiffs*

**VERIFICATION**

I, Nathan Turner, do hereby verify that I am a holder of common stock of Extreme Networks, Inc. and was a holder of such common stock at the time of the wrongs complained of in the foregoing Second Amended Verified Shareholder Derivative Complaint ("Complaint"). I have authorized the filing of the Complaint. I have reviewed the Complaint. All of the averments contained in the Complaint regarding me are true and correct upon my personal knowledge and, with respect to the remainder of the averments, are true and correct to the best of my knowledge, information, and belief.

I declare under penalty of perjury that the foregoing is true and correct.

Date: Apr 22, 2026

Nathan Turner
Nathan Turner (Apr 22, 2026 09:45:36 EDT)

Nathan Turner

**VERIFICATION**

I, Abbas Hemani, have reviewed the allegations made in this Second Amended Verified Stockholder Derivative Complaint, know the contents thereof, and authorize its filing. To those allegations of which I have personal knowledge, I believe those allegations to be true. As to those allegations of which I do not have personal knowledge, I rely upon my counsel and their investigation and believe them to be true. I further declare that I am a current holder, and have been a holder, of Extreme Networks, Inc. common stock at all relevant times.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct. Executed this 22 day of April 2026.

Abbas Hemani (Apr 22, 2026 14:52:02 CDT)

ABBAS HEMANI